UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

AUREL SMITH,

                                    Plaintiff,
                                                        9:11-CV-0241
v.                                                      (TJM/TWD)

M. WILDERMUTH, et al.,

                                    Defendants.
_____

APPEARANCES:                                OF COUNSEL:

AUREL SMITH, 02-A-6279
Plaintiff pro se
Attica Correctional Facility
Box 149
Attica, NY 14011

HON. ERIC T. SCHNEIDERMAN                   ADRIENNE J. KERWIN, ESQ.
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, NY 12224

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## REPORT-RECOMMENDATION and ORDER

This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy,

Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  In

his amended complaint, Plaintiff Aurel Smith alleged that Defendants violated his right to

practice his religion, subjected him to excessive force, and failed to protect him from his

cellmate.  (Dkt. No. 5.)  The matter is currently before the Court for screening of Plaintiff's

second amended complaint. (Dkt. No. 62.) For the reasons that follow, I recommend that the Court (1) direct Defendants to respond to the excessive force claim against Defendants Wildermuth, Ensel, Slater, Hale, Morris, and Noethe, the conspiracy claim against Defendants Wildermuth, Ensel, Slater, Hale, Morris, and Noethe, the First Amendment claim against Defendant Wildermuth, the Eighth Amendment failure-to-intervene claim against Defendants Bailey, Chewens, and Saez, the Eighth Amendment conditions of confinement claim against Defendant Martuscello, and the Eighth Amendment failure-to-protect claim against Defendants Rock and Evans; (2) dismiss the state law claims and the RLUIPA claim without leave to amend; and (3) dismiss the equal protection claim against Defendant Martuscello with leave to amend.

## I.      FACTUAL AND PROCEDURAL SUMMARY

### A.      Allegations of the Amended Complaint

At all times relevant to this action, Plaintiff was prisoner in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"). (Dkt. No. 5 at 2.) Plaintiff's claims arise from events that occurred at Coxsackie and Upstate Correctional Facilities. *Id*. at 1.

Plaintiff was incarcerated at Coxsackie Correctional Facility from January 2009 to July 2010. (Dkt. No. 5 at 6.) In the amended complaint, Plaintiff alleged that throughout that period there was a "maintained environment" that permitted "staff abuse and misconduct, especially guard brutality and falsification of incident reports so as to cover-up/justify such instances of misconduct." *Id*. Defendant Martuscello was Superintendent of Coxsackie from September 2009 to the time that Plaintiff filed the amended complaint. *Id*. Before that time he was the facility's Deputy Superintendent of Security. *Id*. Plaintiff alleged that, in that role, Defendant

Martuscello was directly responsible for the supervision of officers' use of force. *Id.* Plaintiff alleged that from the time that Defendant Martuscello became Superintendent until April 20, 2010, there was a beating of an inmate by a correctional officer every month. *Id.*

At 3:30 p.m. on April 20, 2010, Plaintiff was in his cell. (Dkt. No. 5. at 6-7.) Plaintiff was performing his salaah, a formal Muslim prayer, with his back to the cell gate. *Id.* at 7. As Plaintiff was engaged in this prayer, Defendant Correctional Officer Wildermuth approached Plaintiff's cell and ordered Plaintiff to move a coat that was hanging on Plaintiff's bed post. *Id.* Plaintiff reached over and moved the coat while still engaged in the salaah. *Id.* He then continued praying. *Id.* Defendant Wildermuth shouted "Hey, I'm talking to you!" at Plaintiff. *Id.* Plaintiff raised his right hand to shoulder level to indicate that Defendant Wildermuth should wait. *Id.* Defendant Wildermuth became irate, began yelling at Plaintiff, banged on Plaintiff's cell gate with his baton, and reached his baton into the cell and knocked some of Plaintiff's personal items from his locker onto the floor. *Id.* Plaintiff continued praying. *Id.* As a result, Defendant Wildermuth informed Plaintiff that he would be confined to his cell for the day. *Id.* at 8.

When Plaintiff finished praying, "he sought to speak to . . . Wildermuth in order to explain the matter so as to mitigate Wildermuth's anger and to avoid a future repetition of that event." (Dkt. No. 5 at 8.) Defendant Wildermuth, irate, told Plaintiff that he did not care whether Plaintiff was praying and that Plaintiff had better acknowledge him. *Id.*

A few hours later, Defendant Wildermuth returned to Plaintiff's cell. (Dkt. No. 5 at 8.) Defendant Wildermuth "began/rehashed a confrontation," which became heated and ended with Defendant Wildermuth storming away. *Id.*

A few hours later, Defendants Morris and Ensel came to Plaintiff's cell and asked if he was ready to move.  (Dkt. No. 5 at 8.)  Plaintiff told them that he was not because he was unaware that he was scheduled for a move.  *Id.* at 8-9.  He asked if he was being set up in retaliation for his dispute with Defendant Wildermuth.  *Id.* at 9.  Defendants Morris and Ensel told Plaintiff to do as he was told and pack his belongings.  *Id.*  Plaintiff was fearful for his safety, but packed his belongings.  *Id.*

When Plaintiff was done packing, Defendant Wildermuth used the lock-box control panel to open Plaintiff's door, as Defendants Morris and Ensel stood in front of the door.  (Dkt. No. 5 at 9.)  Before opening the door, Defendant Wildermuth told Plaintiff "We'll see how tough you are now."  *Id.*

Defendants Wildermuth, Morris, and Ensel escorted Plaintiff as he moved six bags of belongings to his new cell.  (Dkt. No. 5 at 9-10.)  There were several correctional officers positioned in the area between the cells, including Defendants Hale and Slater.  *Id.* at 10. Some of the officers made snide remarks about Plaintiff threatening an officer.  *Id.*

As Plaintiff carried his last bag of belongings down the staircase to his new cell, Defendant Wildermuth blocked his path.  (Dkt. No. 5 at 10.)  Defendants Wildermuth, Hale, Slater, Ensel, Morris, and Noethe and other officers then attacked Plaintiff, beating, kicking, choking him and hitting him with their batons for approximately fifteen minutes.  *Id.* at 10-15.  Defendants Saez, Chewens, and Bailey stood by throughout this attack.  *Id.* at 12.  Plaintiff was injured so badly that he was transported to an outside hospital, where he was diagnosed with a concussion, swelling in the back of his head, blood in both ear canals, and abrasions and bruises to his neck, back, and face.  *Id.* at 15.

Thereafter, Defendants filed false reports to cover up the use of excessive force. (Dkt. No. 5 at 16.) Plaintiff was found guilty of several institutional rules violations as a result of the false reports. *Id.* at 20. Plaintiff was sentenced to twenty-four months in the SHU, lost twenty-four months of privileges, and lost twenty-four months of good time credits. *Id.* at 20-21. Plaintiff appealed and the sentence was reduced to twelve months in the SHU, loss of privileges, and loss of good time credits. *Id.* at 21. Plaintiff filed an Article 78 proceeding in New York state court challenging the sentence. *Id.* That proceeding was still pending when Plaintiff filed the amended complaint. *Id.*

Plaintiff filed a grievance on April 27, 2010, regarding staff abuse and excessive force. (Dkt. No. 5 at 16.) Defendant Martuscello denied the grievance. *Id.* The denial stated that "[s]taff denies all allegations of assaulting the grievant . . . . The grievant was interviewed by a Lieutenant and offered no additional evidence to support his complaints." (Dkt. No. 5-1 at 15.)

On May 12, 2010, Plaintiff sent Defendant Martuscello a letter requesting that Defendant Martuscello file a criminal complaint on Plaintiff's behalf against the officers who used excessive force. (Dkt. No. 5 at 17; Dkt. No. 5-1 at 20.) No criminal charges were filed. (Dkt. No. 5 at 18.) Defendant Martuscello did not contact the Inspector General's office. *Id.* However, the Inspector General investigated the matter at Plaintiff's request. *Id.* The Inspector General did not, however, interview other inmates who witnessed the attack. *Id.*

Plaintiff filed another grievance "against the administrative deliberate indifference and negligence by . . . officials, including Def. Martuscello, regarding the widespread and pervasive conditions of abuse" at Coxsackie. (Dkt. No. 5 at 19.) Defendant Martuscello did not file a timely response to the grievance. *Id.* Plaintiff then appealed Defendant Martuscello's failure to

respond. *Id*. That grievance was denied. *Id*.

Plaintiff filed a grievance against Defendant Martuscello regarding the failure to file criminal charges. (Dkt. No. 5 at 19.) That grievance was denied at all levels of review. *Id*. at 20.

Plaintiff was transferred to Upstate on July 16, 2010, to serve his SHU sentence. (Dkt. No. 5 at 21.) In September 2010, Plaintiff was moved into a cell with inmate Lester Scarbrough. *Id*. Inmate Scarbrough suffered from psychiatric disorders, had a history of assaults on staff and fights with other inmates, outweighed Plaintiff by twenty or twenty-five pounds, and was at least two inches taller than Plaintiff. *Id*. at 21-22. After about two weeks, during which time Inmate Scarbrough behaved extremely erratically and told Plaintiff at length about his mental problems and desire to be single-celled, Plaintiff asked to be moved to any available cell. *Id*. at 22-23. Plaintiff was not moved and Inmate Scarbrough began to accuse him of being a spy. *Id*. at 23. When, despite the availability of cells, Plaintiff had not been moved by October 4, 2010, he began writing complaints stating that he was afraid for his safety. *Id*.

Plaintiff's first written complaint was to Defendant Rock. (Dkt. No. 5 at 23; Dkt. No. 5-1 at 72.) Plaintiff did not receive a reply, so he submitted another complaint to Defendant Rock on October 7, 2010. (Dkt. No. 5 at 23; Dkt. No. 5-1 at 73.) On that same day he submitted a complaint to Defendant Evans of the Office of Mental Health. (Dkt. No. 5 at 23-24; Dkt. No. 5-1 at 74.) Plaintiff did not receive a reply from either Defendant Rock or Defendant Evans, so he submitted another complaint to Defendant Rock on October 11, 2010. (Dkt. No. 5 at 24; Dkt. No. 5-1 at 75.) Plaintiff believes that Defendant Rock failed to respond to his letters in retaliation for a lawsuit that Plaintiff filed against him regarding incidents at Great Meadow Correctional Facility. (Dkt. No. 5 at 24.)

6

On October 12, 2010, Inmate Scarbrough attacked Plaintiff. (Dkt. No. 5 at 24.) Plaintiff fought back. *Id.* at 25. Plaintiff did not receive medical attention for the injuries he sustained. *Id.* at 25-26.

Plaintiff and Inmate Scarbrough received misbehavior reports and were moved to separate cells. (Dkt. No. 5 at 25.) Inmate Scarbrough stole some of Plaintiff's belongings in the process of changing cells. *Id.* at 26. Plaintiff challenged his misbehavior report at the disciplinary hearing, on appeal, and through an Article 78 proceeding. *Id.* at 25. That proceeding was still pending when Plaintiff filed the amended complaint. *Id.*

On October 12, 2010, Plaintiff wrote to Defendant Rock requesting medical attention and the filing of criminal charges against Inmate Scarbrough. (Dkt. No. 5 at 26.) Plaintiff did not receive medical attention and criminal charges were not filed. *Id.*

On October 12, 2010, Plaintiff wrote to Defendant Rock regarding Inmate Scarbrough's theft of Plaintiff's property. (Dkt. No. 5 at 26.)

On October 14, 2010, Plaintiff filed a grievance against Defendants Rock and Evans regarding their failure to respond to his requests to be protected from Inmate Scarbrough. (Dkt. No. 5 at 26.) He did not receive a response. *Id.* at 27. Plaintiff resubmitted this grievance on November 23, 2010. *Id.* at 28. Thereafter, Plaintiff filed a series of grievances and complaints with various individuals and agencies without receiving any results. *Id.* at 28-32.

**B.     Filing and Initial Review of the Original and Amended Complaints**

Plaintiff filed this action on March 4, 2011. (Dkt. No. 1.) The amended complaint was filed on the same day as the original complaint. (Dkt. No. 5) On August 3, 2011, the Court issued its initial review of the amended complaint. (Dkt. No. 9.) Upon initial review, the Court

dismissed Plaintiff's First Amendment claim that he was denied access to the inmate grievance program and Plaintiff's conspiracy claims against Defendants Rock and White (who was not discussed in the preceding statement of facts because he is no longer a defendant) with prejudice. *Id*. at 11.  The Court dismissed Plaintiff's equal protection claims against Defendants Martuscello and Rock without prejudice.[1]  *Id*. at 12.  The Court allowed Plaintiff's other claims to proceed.  *Id*. at 8.

### C.     Defendants' Motion to Dismiss

Defendants moved to dismiss (1) Plaintiff's state law claims; (2) the First Amendment religion claim against Defendant Wildermuth; and (3) all claims against Defendants Martuscello, Rock, and Evans.  (Dkt. No. 32.)  Defendants did not move to dismiss the Eighth Amendment excessive force claims against Defendants Wildermuth, Ensel, Hale, Slater, Morris, and Noethe or the Eighth Amendment failure-to-intervene claims against Defendants Bailey, Saez, and Chewens.  Plaintiff opposed the motion.  (Dkt. Nos. 35 and 37.)

### D.     Ruling on the Motion to Dismiss

On January 24, 2013, I recommended that the Court dismiss the following claims without leave to amend: (1) all of Plaintiff's state law claims; (2) the claim that Defendant Martuscello denied Plaintiff's grievance regarding the alleged use of excessive force; (3) the claims that Defendants Martuscello, Rock, and Evans failed to file criminal charges on Plaintiff's behalf; (4) the claim that Defendant Martuscello failed to contact the Inspector General's office; (5) the claim that Defendants Martuscello, Rock, and Evans failed to respond to Plaintiff's letters and

---

[1]      Plaintiff did not amend the equal protection claim in response to the Court's initial review.  In his opposition to the motion to dismiss, Plaintiff stated that he was withdrawing the claim.  (Dkt. No. 35 at 5-6.)

grievances; and (6) the retaliation claim against Defendant Rock.  (Dkt. No. 43 at 26.)  I

recommended that Plaintiff be allowed leave to amend (1) the claim that Defendant Martuscello

permitted abusive conditions to exist at Coxsackie; and (2) the claim that Defendants Rock and

Evans failed to protect Plaintiff from the attack by Inmate Scarbrough.  *Id.*  Finally, I

recommended that the Court direct Defendants to answer (1) Plaintiff's First Amendment and

RLUIPA claims against Defendant Wildermuth; (2) the excessive force claims against

Defendants Wildermuth, Hale, Slater, Ensel, Morris, and Noethe; and (3) the failure-to-intervene

claims against Defendants Saez, Chewers, and Bailey.  *Id.*

The Court adopted the Report-Recommendation in its entirety on March 11, 2013.  (Dkt.

No. 45)  Plaintiff moved for reconsideration of the Court's order.  (Dkt. No. 46.)  The Court

denied that motion on February 4, 2014.   (Dkt. No. 55.)  Plaintiff filed an interlocutory appeal.

(Dkt. No. 56.)  The Second Circuit issued a mandate dismissing the appeal for lack of

jurisdiction on July 21, 2014, which was received by this Court on August 13, 2014.  (Dkt. No.

63.)

The matter is now before the Court for initial screening of Plaintiff's second amended

complaint.  (Dkt. No. 62.)

## II.    LEGAL STANDARD

Under 28 U.S.C. § 1915A (2006), "[t]he court shall review . . . a complaint in a civil

action in which a prisoner seeks redress from a[n] . . . employee of a governmental entity."  28

U.S.C. § 1915A(a) (2006).  In conducting this review, "the court shall identify cognizable claims

or dismiss the complaint, or any portion of the complaint, if the complaint (1) is frivolous,

malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief

9

from a defendant who is immune from such relief." 28 U.S.C. §1915A(b)(1-2). In addition, 28 U.S.C. § 1915(e) directs that when a party proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . is frivolous or malicious[,] fails to state a claim on which relief may be granted[,] or . . . seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).[2] Although the court has the duty to show liberality towards pro se litigants, *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and extreme caution should be exercised in ordering sua sponte dismissal of a pro se action, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), there is a responsibility on the court to determine that an action states a claim and that the claim is not frivolous before permitting a party to continue proceeding *in forma pauperis*. *See, e.g.*, *Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a complaint sua sponte if the complaint is frivolous).

## III. ANALYSIS

The second amended complaint asserts the following claims: (1) an Eighth Amendment excessive force claim against Defendants Wildermuth, Ensel, Slater, Hale, Morris, and Noethe; (2) a claim for assault and battery under New York state law against Defendants Wildermuth, Ensel, Slater, Hale, Morris, and Noethe; (3) a conspiracy claim against Defendants Wildermuth, Ensel, Slater, Hale, Morris, and Noethe; (4) a claim for libel and defamation under New York state law against Defendants Wildermuth, Ensel, Slater, Hale, and Morris for "authoring false reports" regarding the events of April 20, 2010; (5) First Amendment and RLUIPA claims

---

[2] In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989) (superceded by statute on other grounds).

against Defendant Wildermuth; (6) an Eighth Amendment failure-to-intervene claim against Defendants Bailey, Chewens, and Saez; (7) a claim for negligence under New York state law against Defendants Bailey, Chewens, and Saez; (8) an Eighth Amendment claim against Defendant Martuscello regarding the conditions of confinement at Coxsackie; (9) an Eighth Amendment claim against Defendants Rock and Evans for failing to protect Plaintiff from Inmate Scarbrough;[3] and (10) an equal protection claim against Defendant Martuscello. (Dkt. No. 62 at 39-44.)

A. **Excessive Force Claim**

As he did in the first amended complaint, Plaintiff asserts an Eighth Amendment excessive force claim against Defendants Wildermuth, Ensel, Slater, Hale, Morris, and Noethe regarding the events of April 20, 2010. (Dkt. No. 62 at 17-22, 39-40.) Defendants did not previously move to dismiss that claim. (Dkt. No. 32.) The Court directed Defendants to answer the claim. (Dkt. No. 43 at 26, Dkt. No. 45 at 3.) The claim is again sufficiently well-pleaded to survive initial review. Therefore, I recommend that the Court direct Defendants to respond to the excessive force claim.

B. **State Law Claims**

Plaintiff asserts three state law claims in the second amended complaint. (Dkt. No. 62 at 40-41, 42.) The Court previously dismissed Plaintiff's state law claims without leave to amend pursuant to New York Corrections Law § 24. (Dkt. No. 43 at 9-10, 26; Dkt. No. 45 at 2.) For

---

[3]    Plaintiff asserts this claim as both his ninth and tenth causes of action. (Dkt. No. 62 at 43-44.) In the ninth cause of action, he alleges that Defendants Rock and Evans failed to protect him by ignoring his letters of complaint. *Id.* at 43. In the tenth cause of action, he alleges that Defendants Rock and Evans failed to protect him by allowing "a mentally unstable and provenly violent inmate" to be double-celled. *Id.* at 43-44.

the reasons discussed in the earlier Report-Recommendation, I recommend once again that the Court dismiss Plaintiff's state law claims without leave to amend.

### C. Conspiracy

Plaintiff asserts a conspiracy claim against Defendants Wildermuth, Ensel, Slater, Hale, Morris, and Noethe. (Dkt. No. 62 at 40.) The earlier Report-Recommendation did not discuss such a claim.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (citations omitted). Here, the second amended complaint sufficiently alleges facts supporting all three elements for this cause of action to survive initial review.

In addition, the facts alleged on the face of the second amended complaint sufficiently establish, for the purposes of initial review, that Plaintiff's conspiracy claim is not barred by the intracorporate conspiracy doctrine. The intracorporate conspiracy doctrine states that employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of New York*, No. 97-CV-1337, 1999 U.S. Dist. LEXIS 3164, at *5-6, 1999 WL 151702, at *2 (W.D.N.Y. Mar. 17, 1999).[4] "This doctrine applies to public entities and their employees." *Lee v. City of Syracuse*, 603 F. Supp. 2d 417, 442 (N.D.N.Y. 2009) (citations omitted). The Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985. *Herrmann v. Moore*, 576

---

[4] The Court will provide Plaintiff with a copy of all of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

F.2d 453, 459 (2d Cir. 1978); *Girard v. 94th and Fifth Ave. Corp.*, 530 F.2d 66, 72 (2d Cir.

1976)).  However, it has not explicitly extended its application of the doctrine to conspiracy

claims under § 1983.  Several district courts in the Second Circuit have applied the doctrine,

without discussion, to § 1983 cases.  *See Samms v. Fischer*, No. 9:10-CV-0349 (GTS/GHL),

2011 U.S. Dist. LEXIS 97810, at *45 n.8, 2011 WL 3876528, at *15 n.8 (N.D.N.Y. Mar. 25,

2011) (collecting cases).  In *Anemone v. Metropolitan Transportation Authority*, 419 F. Supp. 2d

602, 604 (S.D.N.Y. 2006), the Southern District squarely held that the intracorporate conspiracy

doctrine should be applied to § 1983 cases.[5]  Other district courts have followed that case's logic

and reasoning.  *See Reich v. Lopez*, ___ F. Supp. ___, No. 13-CV-5307 (JPO), 2014 U.S. Dist.

LEXIS 115079, at *51-53, 2014 WL 4067179, at *20 (S.D.N.Y. Aug. 18, 2014) (collecting

cases).

　　　　Even assuming that the intracorporate conspiracy doctrine applies to § 1983 cases, there

is an exception to the doctrine where "individuals pursue personal interests wholly separate and

apart from the entity."  *Orafan v. Goord*, 411 F. Supp. 2d 153, 165 (N.D.N.Y. 2006) (citation and

quotation marks omitted), *vacated and remanded on other grounds*, *Orafan v. Rashid*, 249 Fed.

App'x 217 (2d Cir. 2007).   Courts have found that the personal interest exception applies, and

thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover

up their use of excessive force.  *See, e.g.*, *Hill v. City of New York*, No. 03-CV-1283, 2005 U.S.

Dist. LEXIS 38926, at *12-13, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005).  Here,

Plaintiff alleges that Defendants conspired to cover up their use of excessive force.  (Dkt. No. 62

---

[5]　　　　On appeal, the Second Circuit affirmed the trial court's judgment but declined to
address the intracorporate conspiracy issue.  *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 121
(2d Cir. 2011).

at 40.)  Therefore, I recommend that this cause of action survive initial review and that the Court direct Defendants to respond.

### D.    Religion Claims

As he did in the first amended complaint, Plaintiff asserts First Amendment and RLUIPA claims against Defendant Wildermuth.  (Dkt. No. 62 at 15-16, 41.)  For the reasons discussed in the previous Report-Recommendation (Dkt. No. 43 at 11-14), I once again recommend that the Court direct Defendants to respond to Plaintiff's First Amendment claim.  However, I recommend that the Court dismiss the RLUIPA claim without leave to amend.

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution[6] . . . unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a) (2006).  RLUIPA does not authorize monetary damages against state officers in their official capacities. *Sossamon v. Texas*, 131 S. Ct. 1651, 1654 (2011).  In addition to that restriction, the Second Circuit held after the previous Report-Recommendation was issued in this case that RLUIPA does not create a private right of action against state officers in their individual capacities. *Washington v. Gonyea*, 731 F.3d 143, 145 (2d Cir. 2013) (per curiam).  Here, Plaintiff seeks only money damages for the alleged violation of his rights under RLUIPA.  (Dkt. No. 62 at 45-46.)  That relief is not available under RLUIPA.

---

[6]        An "institution" is any facility or institution that is "owned, operated, or managed by, or provides services on behalf of any State" and is, *inter alia*, "for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped" or "a jail, prison, or other correctional facility."  42 U.S.C. § 1997(1) (2010).

Plaintiff could not amend the complaint to cure this defect by seeking declaratory or injunctive relief because he is no longer housed at Coxsackie, where Defendant Wildermuth is employed. *Shepherd v. Goord*, 662 F.3d 603, 610 (2d Cir. 2011) ("'In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.'") (quoting *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006)). Therefore, I recommend that the Court dismiss the RLUIPA claim without leave to amend.

### E.     Failure-to-Intervene

As he did in the first amended complaint, Plaintiff asserts an Eighth Amendment failure-to-intervene claim against Defendants Bailey, Chewens, and Saez. (Dkt. No. 62 at 20, 41-42.) Defendants did not previously move to dismiss that claim. (Dkt. No. 32.) The Court directed Defendants to answer the claim. (Dkt. No. 43 at 26, Dkt. No. 45 at 3.) The claim is again sufficiently well-pleaded to survive initial review. Therefore, I recommend that the Court direct Defendants to respond to the failure-to-intervene claim.

### F.     Eighth Amendment Claim Against Defendant Martuscello

As he did in the first amended complaint, Plaintiff asserts an Eighth Amendment conditions of confinement claim against Defendant Martuscello. (Dkt. No. 62 at 5-15, 42-43.) In response to Defendants' motion to dismiss, the Court dismissed that claim with leave to amend to allege facts plausibly suggesting Defendant Martuscello's personal involvement. (Dkt. No. 43 at 14-17; Dkt. No. 45 at 2.)

Under Second Circuit precedent, "'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885

15

(2d Cir. 1991)).  In order to prevail on a § 1983 cause of action against an individual, a plaintiff

must show some "tangible connection" between the unlawful conduct and the defendant.  *Bass v.*

*Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).  If the defendant is a supervisory official, a mere

linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of

respondeat superior) is insufficient to show his or her personal involvement in that unlawful

conduct.  *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431,

435 (2d Cir. 2003) (per curiam); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210

(2d Cir. 1985) (per curiam).  In other words, supervisory officials may not be held liable merely

because they held positions of authority.  *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996)

(citations omitted).  Rather, supervisory personnel may be considered personally involved if they:

(1) directly participated in the violation; (2) failed to remedy that violation after learning of it

through a report or appeal; (3) created, or allowed to continue, a policy or custom under which

the violation occurred; (4) had been grossly negligent in managing subordinates who caused the

violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on

information indicating that the violation was occurring.  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d

Cir. 1995) (citations omitted).[7]

---

[7]     In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court ruled that where the
underlying constitutional claim is a claim of intentional discrimination, a supervisory official's
liability must be judged by the official's purpose rather than the official's knowledge of
subordinates' actions or policies.  The Second Circuit has not yet issued a decision discussing
*Iqbal*'s effect on the *Colon* categories.  Several district courts in the Second Circuit have
determined that *Iqbal* nullified some of the *Colon* categories.  *See Sash v. United States*, 674 F.
Supp. 2d 531, 543-44 (S.D.N.Y. 2009) (collecting cases).  The Second Circuit itself has noted
that "*Iqbal* has . . . engendered conflict within our Circuit about the continuing vitality of the
supervisory liability test set forth in *Colon*."  *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir.
2012).  The Second Circuit declined to address the issue in *Reynolds*, however, and has not
addressed it since that time.  I will assume for the purposes of this initial review that *Colon*

District courts in this circuit have routinely held that a prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official "failed to remedy the violation after learning of it through a report or appeal." *Rivera v. Goord*, 119 F. Supp. 2d 327, 344-45 (S.D.N.Y. 2000). *See also Watson v. McGinnis,* 964 F. Supp. 127, 130 (S.D.N.Y. 1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Similarly, district courts have held that "an allegation that an official ignored a prisoner's letter of protest and request for investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." *Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002). However, the Second Circuit has recently cautioned courts against dismissing claims at the 12(b)(6) stage for failure to allege personal involvement where the plaintiff alleges that an official failed to respond to a letter of complaint. *Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013) ("At the pleading stage, even if Grullon had no knowledge or information as to what became of his Letter after he sent it, he would be entitled to have the court draw the reasonable inference . . . that the Warden in fact received the Letter, read it, and thereby became aware of the alleged conditions of which Grullon complained.").

Here, the second amended complaint includes ten pages of ways in which Plaintiff alleges that Defendant Martuscello became aware of an environment existing at Coxsackie in which correction officers had free rein to abuse prisoners. Expressing no opinion as to whether such allegations are sufficient to withstand a dispositive motion, I find that they are sufficient for the purposes of initial review and recommend that the Court direct Defendants to respond to this

remains good law.

claim.

### G.     Failure-to-Protect Claim

As he did in the first amended complaint, Plaintiff alleges that Defendants Rock and Evans violated his Eighth Amendment rights by failing to protect him from Inmate Scarbrough. (Dkt. No. 62 at 29-39, 43-44.)  In response to Defendants' motion to dismiss, the Court dismissed this claim with leave to amend to allege facts plausibly suggesting deliberate indifference.  (Dkt. No. 43 at 24-25, 25; Dkt. No. 45 at 2.)  Specifically, the Court noted that the amended complaint did "not allege that Defendant Rock ever saw Plaintiff's letters and grievances, much less that he consciously disregarded them."  (Dkt. No. 43 at 25.)

As noted above, the Second Circuit has recently cautioned courts against dismissing claims at the 12(b)(6) stage for failure to allege personal involvement where the plaintiff alleges that an official failed to respond to a letter of complaint. *Grullon*, 720 F.3d at 141.  In light of *Grullon*, the second amended complaint sufficiently alleges deliberate indifference to survive initial review.  Plaintiff alleges that he repeatedly wrote letters and grievances to Defendants Rock and Evans regarding Inmate Scarbrough's erratic behavior and Plaintiff's fears for his own safety.  (Dkt. No. 62 at 30, 31-32.)  Plaintiff further alleges, and the Court has confirmed, that Defendant Evans was named as a defendant in a lawsuit by Inmate Scarbrough preceding his attack on Plaintiff. *Scarbrough v. Evans*, No. 9:09-CV-0850 (NAM/DEP).  In that lawsuit, Scarbrough alleged that he was mentally unstable and was not being protected from himself and others. *Id.*  Assuming, as the Second Circuit has directed that the Court must, that Defendants Rock and Evans in fact received those letters and read them, Plaintiff has alleged facts sufficient to survive initial review. *See Simmons v. Lantz*, No. 3:04–CV–2180, 2007 U.S. Dist. LEXIS

18

19050, at *7-8, 2007 WL 842008, at *3 (D. Conn. Mar.12, 2007) (holding that plaintiff's

allegations that he informed a defendant captain that he felt threatened by his cell mate, but the

defendant refused to move him to another cell, were sufficient to withstand a motion to dismiss);

*Colman v. Vasquez*, 142 F. Supp. 2d 226, 237 (D. Conn. 2001) (holding that because plaintiff

prisoner advanced factual allegations that a prison official knew the inmate faced a substantial

risk of serious harm, and failed to take reasonable measures to abate that harm, his complaint

should survive a motion to dismiss); *Sims v. Bowen*, No. 96–CV–655, 1998 U.S. Dist. LEXIS

3856, at *11, 1998 WL 146409, *3 (N.D.N.Y. Mar. 23, 1998) (Pooler, J.) (noting that "an inmate

must inform a correctional officer of the basis for his belief that another inmate represents a

substantial threat to his safety before the correctional official can be charged with deliberate

indifference"). Therefore, I recommend that the Court direct Defendants to respond to this claim.

H.    **Equal Protection**

Plaintiff alleges that Defendant Martuscello violated his right to equal protection by

failing to afford him "the same protection as a non-prisoner would be given." (Dkt. No. 62 at

44.) For the reasons discussed below, I recommend that the Court dismiss this claim without

leave to amend.

The Equal Protection Clause provides that "no State shall . . . deny to any person within

its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This is

"essentially a direction that all persons similarly situated should be treated alike." *City of

Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Equal Protection Clause "bars

the government from selective adverse treatment of individuals compared with other similarly

situated individuals if 'such selective treatment was based on impermissible considerations such

as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)) (emphasis omitted). Governmental action may also violate the Equal Protection Clause where the defendants intentionally treat the plaintiff "differently from others with no rational basis for the difference in treatment." *Bizarro*, 394 F.3d at 86 (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Thus, a plaintiff asserting an equal protection claim must allege facts plausibly suggesting that (1) he was treated differently from similarly situated individuals; and (2) the defendants treated him differently due to his membership in a suspect class, inhibited his exercise of a fundamental right, acted out of malice, or acted irrationally and arbitrarily.

Here, Plaintiff has not pleaded facts plausibly suggesting either element. First, he has not alleged that he was treated differently from any similarly situated individual. Second, he has not alleged facts plausibly suggesting the second element. Plaintiff specifically alleges that he was treated differently because he is a prisoner than he would have been if he were not a prisoner. He does not allege a "class of one" theory. Rather, his contention is that, as a prisoner, he is a member of a suspect class. Prisoners do not comprise a suspect or quasi-suspect class for Equal Protection purposes. *See Coleman v. Martin*, 363 F. Supp. 2d 894, 902 (E.D. Mich. 2005) ("Prisoners are not members of a protected class . . . ."); *Hampton v. Hobbs*, 106 F.3d 1281, 1286 (6th Cir. 1997) ("[N]either prisoners nor indigents are [members of a] suspect class . . . ."); *Vargas v. Pataki*, 899 F. Supp. 96, 98-99 (N.D.N.Y. 1995) (quoting *Moss v. Clark*, 886 F.2d 686, 690 (4th Cir. 1989)) ("Prisoners . . . 'are not a suspect class.'"). Therefore, I recommend that the Court dismiss Plaintiff's equal protection claim.

Where a pro se complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (internal quotation and citation omitted). Of course, an opportunity to amend is not required where the plaintiff has already amended the complaint. *See Advanced Marine Tech. v. Burnham Sec., Inc.*, 16 F. Supp. 2d 375, 384 (S.D.N.Y. 1998) (denying leave to amend where plaintiff had already amended complaint once). In addition, an opportunity to amend is not required where "[t]he problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco*, 222 F.3d at 112. Here, although I am extremely reluctant to do so, I recommend that the Court grant Plaintiff an opportunity to amend the equal protection cause of action. Although Plaintiff has previously amended his complaint, he has not previously received any guidance from the Court regarding this particular claim. Moreover, there is a possibility, however slim, that he could plead facts sufficient to overcome the substantive problems.

**ACCORDINGLY**, it is

**RECOMMENDED** that the Court direct Defendants to respond to (1) the excessive force claim against Defendants Wildermuth, Ensel, Slater, Hale, Morris, and Noethe; (2) the conspiracy claim against Defendants Wildermuth, Ensel, Slater, Hale, Morris, and Noethe; (3) the First Amendment claim against Defendant Wildermuth; (4) the Eighth Amendment failure-to-intervene claim against Defendants Bailey, Chewens, and Saez; (5) the Eighth Amendment conditions of confinement claim against Defendant Martuscello; and (6) the Eighth Amendment failure-to-protect claim against Defendants Rock and Evans. And it is further

**RECOMMENDED** that the Court dismiss the state law claims and the RLUIPA claim without leave to amend; and it is further

**RECOMMENDED** that the Court dismiss the equal protection claim against Defendant Martuscello with leave to amend; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Bond v. Board of Educ. of New York*, No. 97-CV-1337, 1999 U.S. Dist. LEXIS 3164, 1999 WL 151702 (W.D.N.Y. Mar. 17, 1999); *Samms v. Fischer*, No. 9:10-CV-0349 (GTS/GHL), 2011 U.S. Dist. LEXIS 97810, 2011 WL 3876528 (N.D.N.Y. Mar. 25, 2011); *Reich v. Lopez*, ___ F. Supp. ___, No. 13-CV-5307 (JPO), 2014 U.S. Dist. LEXIS 115079, 2014 WL 4067179 (S.D.N.Y. Aug. 18, 2014); *Hill v. City of New York*, No. 03-CV-1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005); *Simmons v. Lantz*, No. 3:04–CV–2180, 2007 U.S. Dist. LEXIS 19050, 2007 WL 842008 (D. Conn. Mar. 12, 2007); and *Sims v. Bowen*, No. 96–cv–655, 1998 U.S. Dist. LEXIS 3856, 1998 WL 146409 (N.D.N.Y. Mar. 23, 1998).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. <u>**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**</u>. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: October 31, 2014
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

1999 WL 151702
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Ethel BOND, Plaintiff,

v.

BOARD OF EDUCATION OF THE CITY OF NEW
YORK, Martha Rodriguez–Torres, as Principal
of Public School 156, and Oswaldo Malave, as
Assistant Principal of Public School 156, Defendants.

No. 97 CV 1337.  |  March 17, 1999.

**ORDER**

GERSHON, District J.

**\*1** Plaintiff Ethel Bond ("Bond") is a fifty-two year old, African–American woman who has been a teacher for the New York City Board of Education ("BOE") since 1981 and a delegate to the United Federation of Teachers ("UFT") since 1992. Defendants are the BOE, Martha Rodriguez–Torres ("Rodriguez–Torres"), the principal of Public School 156 and Oswaldo Malave ("Malave"), the assistant principal of Public School 156. Plaintiff filed this action in March 1997, seeking injunctive and monetary relief. She alleges retaliation pursuant to the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158, and age discrimination pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 623 and 626. Specifically, plaintiff alleges that defendants retaliated against her for her involvement in the UFT by threatening to "get rid of" her and by giving her unsatisfactory performance ratings in December 1994 and June 1995, and that they discriminated against her because of her age by requiring her to submit weekly lesson plans, reassigning her paraprofessional to other teachers, and denying her a promotion to the position of team leader.

Plaintiff moves to amend her complaint to include claims under 42 U.S.C. §§ 1983, 1985(3), 1986 and for defamation under state law. In addition to the allegations contained in the original complaint, the proposed amended complaint includes allegations that plaintiff was suspended and that defendants placed derogatory materials in her personnel file. The proposed pleading states that the materials accused plaintiff of neglecting to follow prescribed lesson plans, but it does not specify the exact language contained in such materials.

Defendants oppose plaintiff's motion to amend on the ground that leave to amend would be futile.

**DISCUSSION**

Rule 15(a) of the Federal Rules of Civil Procedure provides, in pertinent part, that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."Amendments are generally favored as they tend " 'to facilitate a proper decision on the merits." ' *Sokolski v. Trans Union Corp.,* 178 F.R.D. 393, 396 (E.D.N.Y.1998) (citation omitted). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis,* 371 U.S. 178, 182 (1962).

The party opposing an amendment must establish that leave to amend would be prejudicial or futile or that there exists undue delay, bad faith or dilatory motive on the part of the moving party. *See Foman,* 371 U.S. at 182; *Scharff v. Claridge Gardens, Inc.,* 1990 WL 186879 \*2 (S.D.N.Y.). A proposed amendment is futile only if it fails to state a claim and could not survive a motion to dismiss. *See Scharff,* 1990 WL 186879 at \*2. [1] "If the [movant] has at least colorable grounds for relief, justice ... require[s]" that leave to amend be granted. *Golden Trade, S.r.L. v. Jordache,* 143 F.R.D. 504, 506 (S.D.N.Y.1992) (quoting *S.S. Silberblatt, Inc. v. East Harlem Pilot BlockBldg. 1 Housing Dev. Fund Co., Inc.,* 608 F.2d 28, 42 (2d Cir.1979)).

**Plaintiff's Section 1985(3) Claim**

**\*2** 42 U.S.C. § 1985(3) states, in relevant part:

If two or more persons in any state ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

Plaintiff alleges that, by giving her unsatisfactory performance ratings, requiring her to submit lesson plans, placing derogatory materials in her personnel file, suspending her and threatening to get rid of her, Rodriguez–Torres and Malave acted in concert and with unnamed conspirators to retaliate against her for her union activities and to discriminate against her based on her age. Defendants argue that leave to amend to include a claim of conspiracy under Section 1985(3) would be futile because such a claim is barred by the intracorporate conspiracy doctrine.

Under that doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together. *See Solla v. AETNA Health Plans of New York Inc.,* 14 F.Supp.2d 252, 257 (E.D.N.Y.1998). The Second Circuit has imported the doctrine into Section 1985 jurisprudence and has dismissed a claim of conspiracy against officers and employees of a non-profit institution. *See Herrmann v. Moore,* 576 F.2d 453 (2d Cir.), *cert. denied,*439 U.S. 1003 (1978). An exception to the intracorporate conspiracy doctrine applies to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity. *See Roniger v. McCall,* 22 F.Supp.2d 156, 168 (S.D.N.Y.1998); *Solla,* 14 F.Supp.2d at 257–59. Thus, whether the doctrine is applicable here depends on whether Malave and Rodriguez–Torres were acting in furtherance of the BOE's interests or whether their conduct was motivated by personal interest. Plaintiff's proposed amended complaint specifically states that Malave and Rodriguez–Torres were acting "in the ordinary course of employment," and there are no allegations that either defendant had a personal interest in discriminating against plaintiff apart from any interests held by the BOE. Although the complaint includes an allegation that Rodriguez–Torres wanted to "get rid of" plaintiff, personal bias does not constitute personal interest and is not sufficient to defeat the intracorporate conspiracy doctrine. *See Johnson v. Nyack Hospital,* 954 F.Supp. 717, 723 (S.D.N.Y.1997). Rather, as in *Natale v. Town of Darien, Conn.,* 1998 WL 91073 * 5 (D.Conn.), plaintiff alleges only the classic circumstance for application of the intracorporate conspiracy doctrine, namely, that defendants acted within the scope of their employment. Therefore, plaintiff has failed to state a claim of conspiracy upon which relief can be granted, and she is not entitled to amend her complaint to include such a claim under Section 1985(3).

## Plaintiff's Section 1986 Claim

**\*3** 42 U.S.C. § 1986 states, in relevant part, that:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented....

Plaintiff alleges that the BOE "adopted, with little or no investigation, all wrongful acts" taken by Rodriguez–Torres and Malave, and that such "willful neglect" by the BOE deprived her of equal protection of the laws in violation of 42 U.S.C. § 1986. "Courts within this circuit have interpreted § 1986 as merely giving a remedy for misprision of a violation of 42 U.S.C. § 1985."*Dangler v. New York City Off Track Betting Corp.,* 1998 WL 599711 *6 (S.D.N.Y.) (citation and quotations omitted). Since plaintiff has failed to state a cognizable conspiracy claim under Section 1985(3), it necessarily follows that her Section 1986 claim must also be dismissed.

## Plaintiff's Section 1983 Claim

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) she was deprived of a right secured by the Constitution or laws of the United States and (2) the deprivation was committed by a person acting under the color of state law. *See Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994)."[A] complaint must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983."*See Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987). Defendants do not dispute that they were acting under the color of state law in their positions as administrators in a public high school. Rather, they argue that the complaint is conclusory and that plaintiff has not properly alleged that

she was deprived of a right secured by the Constitution and laws of the United States.

In *Alfaro,* the Second Circuit held that plaintiffs' "general and conclusory allegation" that they were deprived of "a prompt administrative hearing" to review the denial of their application for taxi medallions did not meet the requisite standard for pleadings in a Section 1983 action. *See id.*Here, however, plaintiff specifies how and when defendants discriminated against her (*i.e.,* by giving her unsatisfactory performance ratings and requiring her to submit weekly lesson plans, etc.), the reasons for such discrimination (*i.e.,* her age and membership in a labor union), and the injury suffered (*i.e.,* suspension and denial of a promotion). Thus, the factual allegations in plaintiff's proposed amended complaint are not so conclusory as to require dismissal.

**\*4** The more difficult issue is whether plaintiff has properly alleged that she was deprived of a right secured by the Constitution or laws of the United States. Although plaintiff does not articulate a specific legal basis for her Section 1983 claim in the body of the proposed amended complaint, in her reply brief she states: "Plaintiff has made sufficient allegations of a deliberate policy and practice by the Board of Education that allow principals of Schools under it to harass, defame, unfairly target, discipline and punish teachers under such principals. This conduct of the defendants promoted a hostile working environment and that is a deprivation of equal protection."Thus, it is assumed that plaintiff is alleging a violation of the Equal Protection Clause of the Fourteenth Amendment. [2] Defendants argue that leave to amend to include a Section 1983 equal protection claim would be futile because the ADEA provides the exclusive remedy for age discrimination claims and that plaintiff is barred from making a claim based on her status as a union activist because government employers at the state level are exempt from the NLRA.

Defendants' contention that plaintiff is barred from making a claim of anti-union bias under Section 1983 because state and municipal employers are not subject to the NLRA is without merit. Plaintiff's equal protection claim is not based on any rights afforded her under the NLRA, but on her right to equal protection under the Equal Protection Clause itself. *Cf. Greene v. Hawes,* 913 F.Supp. 136, 142 (N.D.N.Y.1996) (denying fair representation claim for lack of jurisdiction under Section 1983). The Equal Protection Clause clearly protects individuals from discriminatory acts by state and municipal officials based on union membership. Although

union members are not a suspect class, the Supreme Court has held that discrimination based on union membership must satisfy the rational basis test to survive scrutiny under the Equal Protection Clause. *See City of Charlotte v. Local 660, International Association of Firefighters,* 426 U.S. 283, 286 (1976) (city's refusal to withhold dues from union members' paychecks must meet standard of reasonableness to survive scrutiny under the Equal Protection Clause).*See also Local 749, AFSCME, Council 4, AFL–CIO v. Ment,* 945 F.Supp. 30, 36 (D.Conn.1996) (dismissing plaintiffs' claim under the Equal Protection Clause because plaintiffs failed to allege facts sufficient to show that they were discharged based on union membership). The existence of a federal statute, which applies to federal government employers *only,* does not change this. In other words, it is precisely because the NLRA provides no protection to plaintiffs discriminated against by municipal employers that plaintiff's equal protection claim is not preempted by the NLRA.

The Second Circuit has not ruled on whether the ADEA preempts claims of age discrimination under Section 1983. The circuits that have considered the issue have held that the ADEA provides the exclusive remedy for such discrimination. *See Zombro v. Baltimore City Police Dep't,* 868 F.2d 1364, 1369 (4th Cir.), *cert. denied,*493 U.S. 850 (1989); *Ray v. Nimmo,* 704 F.2d 1480, 1485 (11th Cir.1983); *Paterson v. Weinberger,* 644 F.2d 521, 525 (5th Cir.1981). And the district courts in this circuit are split. *Compare Jungels v. State University College of New York,* 922 F.Supp. 779, 785 (W.D.N.Y.1996) (ADEA does not preempt age discrimination claims under Section 1983); *Reed v. Town of Branford,* 949 F.Supp. 87, 90 (D.Conn.1996) (same), *with Gregor v. Derwinski,* 911 F.Supp. 643, 651 (W.D.N.Y.1996) (ADEA provides the exclusive remedy for age discrimination); *Reale v. Jenkins,* 1993 WL 37091 \*4 (S.D.N.Y.1993) (same). However, the Second Circuit has held that employment discrimination claims under Section 1983 are not preempted by concurrent Title VII claims, stating that "Title VII is not the exclusive remedy for discrimination claims against state or municipal employers, where those claims derive from violations of Constitutional rights."*Annis v. County of Westchester, N.Y.,* 36 F.3d 251, 254 (2d Cir.1994).*See also Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 143 (2d Cir.), *cert. denied,*510 U.S. 1164 (1994) ("a § 1983 claim is not precluded by a concurrent Title VII claim, when the former is based on substantive rights distinct from Title VII.") (citation and quotations omitted). Given the current uncertain state of the law and the Second Circuit's holdings in the employment discrimination context,

plaintiff will be permitted to amend her complaint to include an age discrimination claim under Section 1983. The issue of preemption can be revisited at a later date if necessary.

### Defamation

**\*5** Section 3813(1) of the New York Education Law requires a plaintiff to serve a notice of claim before filing a tort action against the BOE. Since plaintiff acknowledged at oral argument that she never filed a notice of claim, plaintiff has failed to state a claim of defamation against the BOE upon which relief can be granted.

In addition, plaintiffs alleging defamation in New York must set forth "the particular words complained of" in the complaint. N.Y.C .P.L.R. 3016(a). Failure to specify the allegedly defamatory language warrants dismissal. *See Gill v. Pathmark Stores, Inc.,* 237 A.D.2d 563, 564 (2d Dep't 1997); *Vardi v. Mutual Life Ins. Co. of N.Y.,* 136 A.D.2d 453, 456 (1st Dep't 1988). Failure to state the particular person or persons to whom the comments were made also requires dismissal. *See Gill,* 237 A.D.2d at 564. Since plaintiff's proposed amended complaint does not state the exact language contained in the materials defendants placed in her personnel file, nor does the complaint specify who read the file, plaintiff has failed to state a claim upon which relief may be granted, and leave to amend would be futile.

### CONCLUSION

Plaintiff's motion for leave to amend the complaint to include a state law defamation claim and claims under 42 U.S.C. §§ 1985(3) and 1986 is denied. Plaintiff's motion to amend the complaint to include a claim under 42 U.S.C. § 1983 is granted. Plaintiff is directed to serve and file an amended complaint in conformity with this order within ten days.

SO ORDERED.

### Footnotes

1    On a motion to dismiss, "a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957). The court "must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (*quoting Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836 (1994)). A motion to dismiss "is addressed solely to the face of the pleadings, and '[t]he court's function...is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient.' " *Tinlee Enterprises, Inc. v. Aetna Casualty & Surety Co.,* 834 F.Supp. 605, 607 (E.D.N.Y.1993) (quoting *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985)).

2    In the jurisdiction section of the complaint, plaintiff states that the action arises under Title VII of the Civil Rights Act and under the Fourth, Fifth, Sixth, Thirteenth and Fourteenth Amendments to the United States Constitution. As defendants point out, the complaint does not contain any allegations from which it could be inferred that defendants violated plaintiff's Fourth, Fifth, Sixth or Thirteenth Amendment rights. The Fourth Amendment prohibits unreasonable searches and seizures, which are not at issue here; the Fifth Amendment prohibits deprivations of due process by the federal government, which is not a party to this action; the Sixth Amendment applies to criminal prosecutions only; and the Thirteenth Amendment prohibits involuntary servitude, which is not alleged.

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 3591719
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Sean HILL, Plaintiff,

v.

THE CITY OF NEW YORK, Detective Gregory
Barrett, individually and in his official
capacity as a New York City Policy Officer,
and Police Officer John Does, individually
and their official capacities as New York City
Police Officers, the identity and number of
whom are presently unknown, Defendants.

No. 03 CV 1283(ARR).  |  Dec. 30, 2005.

**Attorneys and Law Firms**

Rene Myatt, The Law Office of Rene Myatt, Hollis, NY, for
Plaintiff's Counsel.

Hillary A. Frommer, Corporation Counsel for the City of New
York Law Department, New York, NY, James M. Moschella,
Karasyk & Moschella, LLP, New York, NY, for Defendants'
Counsel.

*NOT FOR PRINT OR ELECTRONIC PUBLICATION*

ROSS, J.

*OPINION AND ORDER*

**\*1**  In this action, plaintiff Sean Hill ("plaintiff" or "Hill")
brings suit against defendants Detective Gregory Barrett
("Barrett"), Police Officer John Does ("Does"), and the City
of New York ("New York City") (collectively, "defendants")
pursuant to 42 U.S.C. § 1983 and various state tort laws.
Specifically, plaintiff seeks relief for violations of his Fourth
and Fourteenth Amendment rights and for state-law claims,
such as assault, battery, intentional infliction of emotional
distress, and negligence. At this time, the court considers
defendants' motions for summary judgment pursuant to Rule
56 of the Federal Rules of Civil Procedure. For the reasons
set forth below, defendants' motions are granted in part and
denied in part.

**BACKGROUND**

Unless otherwise noted, the parties do not contest the
following facts. On the afternoon July 2, 2002, plaintiff
witnessed a shooting, which resulted in the death of the
victim, on Rutland Road and 94th Street in Kings County,
New York. Ptf. 56.1 Stmt. ¶¶ 1-2. Plaintiff was riding a yellow
and black motorcycle at the time of the shooting. *Id.* ¶ 3.
After observing the shooting, plaintiff took a closer look at
the victim to figure out if he knew him. *Id.* ¶ 4. After realizing
that he did not know the victim, plaintiff drove his motorcycle
to the corner of 94th Street and parked it. *Id.* ¶¶ 5, 8. Plaintiff
remained on the scene, talking to his friend John about the
incident. *Id.* ¶ 10.

Police arrived on the scene and began securing the area
by taping around its perimeter, where plaintiff was located.
*Id.* ¶¶ 11-14.Plaintiff attempted to leave the scene, but an
unidentified police officer told him he could not leave the
taped-off area. *Id.* ¶ 13.Plaintiff explained that he had to
leave to make his 3:00pm shift as a New York City Transit
Authority employee. *Id.* ¶ 15.Plaintiff provided his name to
the police officer and was permitted to leave the scene. *Id.*
¶¶ 19-21.He then drove away from the scene down Rutland
Road. *Id.* ¶ 24.According to defendants, at some point, a
description of the perpetrator was transmitted over the radio
to police officers. Def. Barrett 56.1 Stmt. ¶¶ 44-45. The
perpetrator was described as an African-American male who
was driving a yellow and black motorcycle. *Id.* ¶ 46.

Defendant Barrett and his partner, Detective Patrick Rafferty,
were driving in the vicinity of the crime scene at this time and
received the radio transmission describing the perpetrator.
*Id.* ¶ 44.They observed plaintiff, who apparently matched
the description of the perpetrator, driving on his motorcycle
from the crime scene and started following him. *Id.* ¶¶ 49,
52.Plaintiff took a left on Remsen Avenue, and the detectives
continued to follow him. Ptf. 56.1 Stmt. ¶ 26. He then stopped
at a red traffic light at the intersection of Remsen Avenue and
Winthrop Street. *Id.*

According to plaintiff, he was stopped at the light for about
a minute when a car hit his motorcycle from behind and
threw him from the vehicle to the ground. *Id.* ¶¶ 30-32.It is
undisputed that the New York City Police Department has
a written policy prohibiting officers from using the tactic of
"ramming" other vehicles in an attempt to stop those vehicles.
*See* Ptf. Ex. I; Def. New York City 56.1 Stmt. ¶ 113. Plaintiff

claims that two white male officers and two black male officers surrounded him with guns in his face and then threw him on the car, handcuffed him, and searched his person. Ptf. 56.1 Stmt. ¶¶ 33-34. Plaintiff further claims that he broke his right hand as a result of defendants' conduct. *Id.* ¶¶ 71, 75, 80.An independent witness, Dave Campbell, corroborated plaintiff's story in interviews with the Civilian Complaint Review Board during its investigation of this incident. *See* Ptf. Ex. C at 6.

 **\*2** Defendants, on the other hand, claim that Defendant Barrett stopped his car behind the motorcycle and observed Detective Rafferty exit the passenger side of their vehicle and approach the right side of plaintiff's motorcycle. Def. Barrett 56.1 Stmt. ¶¶ 62-63. Defendant Barrett further observed Detective Rafferty grab plaintiff's right hand and remove it from the motorcycle throttle. *Id.* ¶ 64.At this time, Defendant Barrett parked his vehicle and then approached plaintiff's motorcycle from the left side, where he helped Detective Rafferty remove plaintiff from the motorcycle. *Id.* ¶¶ 65-68.Meanwhile, two deputy sheriffs arrived on the scene and parked their car in front of the motorcycle. *Id.* ¶¶ 72-73.Defendants claim that, though the motorcycle fell to the ground, plaintiff never fell on the ground. *Id.* ¶ 85.Defendants also maintain that plaintiff never complained about any injuries and there was no damage to the rear of plaintiff's motorcycle. *Id.* ¶¶ 86, 105.

Thereafter, plaintiff was detained at the Remsen Avenue location until a witness identified plaintiff as being at the scene of the earlier murder.*Id.* ¶ 106.According to plaintiff, he and his friends who joined him at the Remsen Avenue location explained to the police that he was not involved in the murder. Ptf. 56.1 Stmt. ¶ 43. Detectives Barrett and Rafferty directed Officers Lynah and Mason to transport plaintiff to the 67th Precinct. Def. Barrett 56.1 Stmt. ¶ 107-08. There, he was placed in an interview room, where he was questioned by Detectives Hardman and O'Brien. *Id.* ¶ 120.According to plaintiff, he was in the room for approximately seven hours. Ptf. 56.1 Stmt. ¶¶ 60-61. He subsequently was released, and he was given a letter for his employer explaining that he missed his shift because he was aiding the police in an investigation. Def. Barrett 56.1 Stmt. ¶ 130.

Plaintiff, who is represented by counsel, filed his initial complaint on March 17, 2003. On April 29, 2004, plaintiff filed an amended complaint. Discovery was completed on April 15, 2005. *See* Order dated February 28, 2005. Defendant New York City moved for summary judgment on August 10,

2005. Defendant Barrett moved for summary judgment on August 11, 2005.

## DISCUSSION

### A. *Standard for Summary Judgment*

Under Rule 56, summary judgment is proper if the pleadings, depositions, answers, interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Proc.56(c). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome of the litigation if application of the relevant substantive law requires their determination. *See*Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate [s] the absence of a genuine issue of material fact."*Celotex Corp. v. Cartrett,* 477 U.S. 317, 323 (1986). The substantive law determines the facts that are material to the outcome of a particular litigation. *See*Anderson, 477 U.S. at 250; *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975). In determining whether summary judgment is appropriate, a court must resolve all ambiguities, and draw all reasonable inferences against the moving party. *See*Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (*citing*United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

 **\*3** If the moving party meets its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial."Fed. R. Civ. Proc. 56(e). The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts."*Matsushita,* 475 U .S. at 586. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."*Anderson,* 477 U.S. at 247-48. Only when it is apparent that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight" should summary judgment be granted. *Gallo v. Prudential Residential Servs. Ltd. Partnership,* 22 F.2d 1219, 1223 (2d Cir.1994).

**B. Claims Against Defendant Barrett**

**1. Section 1983 Claims**

**i) Excessive Force**

Barrett argues that plaintiff's excessive force claims under § 1983 should be dismissed because plaintiff's initial stop and detention was based on reasonable suspicion and any force used in detaining plaintiff was *de minimus* and, therefore, objectively reasonable. The Fourth Amendment protects against unreasonable seizures. *See Graham v. Connor,* 490 U.S. 386, 395 (1989)."[T]he 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out."*Id.* (emphasis in original) (quoting *Tennessee v. Garner,* 471 U.S. 1, 7-8 (1985)). Thus, a plaintiff can "prevail on his excessive force claim if he is able to show that [the defendant officer] used more force than was necessary to subdue him."*Curry v. City of Syracuse,* 316 F.3d 324, 332 (2d Cir.2003). The officer's actions, however, "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."*Graham,* 490 U.S. at 396. Determining whether a particular seizure is reasonable is a fact-intensive process, which "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."*Id.* (internal quotation marks and citations omitted). More importantly, such an inquiry requires the factfinder to apply "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."*Id.* Given the need for such a fact-intensive inquiry, "granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable."*Amnesty America,* 361 F.3d at 123.

**\*4** The court concludes that summary judgment is not appropriate with regard to plaintiff's excessive force claim because there is clearly a genuine issue of material fact as to whether Barrett used his vehicle to strike plaintiff's motorcycle. It is undisputed that on the afternoon of July 2, 2002, Barrett and Detective Rafferty stopped plaintiff at a red traffic light on Remsen Avenue, handcuffed him, placed him in the back of a patrol car, and sent him to the 67th Precinct to be questioned about a murder that he witnessed. Plaintiff contends that Barrett "rammed" his vehicle into plaintiff's

stopped motorcycle, throwing plaintiff off the motorcycle on to the ground. Ptf. 56.1 Stmt. ¶¶ 30-34. Plaintiff supports his allegation with his own deposition testimony, *see* Hill Dep. at 48-49, and the CCRB report, [1] which substantiated plaintiff's claim of that Barrett improperly used his vehicle "to hit [plaintiff] off his motorcycle thereby injuring him."*See* Ptf. Ex. C at 21. In addition to concluding that plaintiff was a credible witness, CCRB relied on photographs of plaintiff's motorcycle after the incident, documentation of plaintiff's injuries, and the testimony of various witnesses, including an independent eyewitness who corroborated plaintiff's story. *Id.* Barrett contests plaintiff's version of events, claiming that he did not use his vehicle to hit plaintiff's motorcycle. *See* Barrett Dep. at 46. Barrett contends that he stopped his vehicle behind plaintiff's motorcycle and then aided Detective Rafferty in removing plaintiff from his motorcycle. *Id.* at 46-50.The testimony of other officers on the scene supports Barrett's claim that he did not hit his vehicle into plaintiff's motorcycle. *See* Alves Dep. at 47; Williams Dep. at 36-37. [2]

Viewing the evidence in the light most favorable to plaintiff and drawing all reasonable inferences in his favor, the court is not able to conclude that no rational factfinder could find that Barrett used excessive force. The deposition testimony of plaintiff and the CCRB report give rise to a genuine issue of material fact as to Barrett's conduct, and the court must therefore deny Barrett's motion for summary judgment on the excessive force claim.

**ii) Qualified Immunity**

Barrett also argues that he should be entitled to qualified immunity because he reasonably believed that he had the requisite legal justification to stop and detain plaintiff and that he could use reasonable force to detain plaintiff. Where a defendant claims qualified immunity and moves for summary judgment on this ground, the court engages in a two-step analysis. *Saucier v. Katz,* 533 U .S. 194, 201 (2001). The initial inquiry is whether, viewed in the light most favorable to the injured party, the facts alleged demonstrate that the officer's conduct violated a constitutional right. *Id.* If the alleged facts fail to establish a constitutional violation, the inquiry ends. If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."*Id.* If a right has not been clearly established, then an official, acting unconstitutionally, is not on notice that his conduct is unlawful. *Id.* at 202.In the absence of such

notice, summary judgment based on qualified immunity is appropriate. *Id.*

**\*5** Viewed in the light most favorable to the plaintiff, the facts alleged indicate that defendant Barrett used excessive force and thus violated the Fourth Amendment. The court, therefore, proceeds to the second step of the *Saucier* analysis and asks whether this violated right was clearly established. There can be no doubt that the right to be free from excessive use of force was clearly established at the time of the incident. *See, e.g.,Graham,* 490 U.S. at 395. It "would have been clear to a reasonable officer" that it was unlawful to use his vehicle to hit a stopped motorcycle, thereby throwing its driver to the ground. *SeeSaucier,* 533 U.S. at 202. Consequently, defendant Barrett does not have qualified immunity with regard to his alleged use of excessive force against plaintiff.

### iii) *Failure to Intercede*

Barrett also argues that plaintiff's failure to intercede claim should fail as a matter of law because it is relates to the alleged violation of plaintiff's rights by Barrett himself. The court agrees. The Second Circuit has held that "[a] law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers."*O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988). The duty to intercede has been invoked in cases where, as here, law enforcement officers are accused of using excessive force. *Seeid.*(collecting cases). This duty, however, is premised on the theory that the defendant officer did nothing to prevent the unlawful use of excessive force by other officers. *Seeid.* at 12 (upholding jury verdict finding defendant liable for excessive force because he did nothing to prevent a fellow officer from dragging the perpetrator across the floor after watching him be beaten by another officer). Here, plaintiff's failure to intercede claim against Barrett is meritless because the only underlying constitutional violations alleged are claims against Barrett himself-namely, the excessive force, fabrication, and false statement claims. The court therefore dismisses plaintiff's § 1983 claim alleging that Barrett failed to intercede.

### iv) *Conspiracy*

Barrett also contends that there is no evidence supporting plaintiff's conspiracy claim under § 1983. To establish a § 1983 conspiracy, a plaintiff must demonstrate that there is (1) an agreement between state actors or between a state actor and a private entity; (2) to act in concert to cause an unconstitutional injury; and (3) an overt act done

in furtherance of that goal causing damages. *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). The Second Circuit has also recognized that " 'conspiracies are by their very nature secretive operations,' and may have to be proven by circumstantial, rather than direct, evidence.'" *Id.* at 72 (quoting *Rounseville v. Zahl,* 13 F.3d 625, 632 (2d Cir.1994)).

Here, plaintiff's complaint alleges that defendants Barrett and Does "conspired together and maliciously and willfully entered into a scheme to deprive plaintiff to his rights, well-being[,] and to commit the above-alleged unlawful acts."Amended Compl. ¶ 70. Plaintiff supports his allegation with his own deposition testimony and the CCRB report, which show that Barrett used his vehicle to hit plaintiff's stopped motorcycle, causing plaintiff to fall off the motorcycle and sustain injuries. *See* Hill Dep. at 48-49; Ptf. Ex. C at 21. This evidence directly contradicts the testimony of Barrett and the deputy sheriffs, Alves and Williams. While plaintiff has not established with direct evidence that Barrett and the deputy sheriffs had an agreement to conspire to falsify their testimony, the circumstantial evidence-in the light most favorable to plaintiff-does suggest that there was an agreement between state actors to falsify testimony and cover-up an unconstitutional use of excessive force. Given that a jury may rationally infer that the defendant officers participated in a conspiracy to cover-up unconstitutional acts, summary judgment is not appropriate on plaintiff's conspiracy claim. *SeeRicciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 131 (2d Cir.1997) (denying summary judgment based on circumstantial evidence supporting claim that defendant officers engaged in conspiracy to maliciously prosecute plaintiffs).

**\*6** Barrett also argues that plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. Under this doctrine, "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation, acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment."*Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978)."This is particularly so where the officers and employees are alleged to be acting within the scope of their employment."*Rini v. Zwirn,* 886 F.Supp. 270, 291 (E.D.N.Y.1995). Although the Second Circuit has recognized the intracorporate conspiracy doctrine in the context of 42 U.S.C. § 1985, *see*Herrmann, 576 F.2d at 459; *Girard v. 94th and Fifth Avenue Corp.,* 530 F.2d 66, 72 (2d Cir.1976), a review of relevant case law suggests that it has not extended its application of the doctrine to conspiracy claims under §

1983. At least one district court in this circuit has applied the doctrine to bar a § 1983 conspiracy claim. *SeeNassau County Employee "L" v. County of Nassau,* F.Supp.2d 293, 304 (E.D.N.Y.2004). Courts in other circuits have also barred conspiracy claims under § 1983 in reliance on the intracorporate conspiracy doctrine. *See, e.g.,Buschi v. Kirven,* 775 F.2d 1240, 1252-53 (4th Cir.1985); *Veney v. Ojeda,* 321 F.Supp.2d (E.D.Va.2004). The court, however, need not determine whether the doctrine applies to § 1983 conspiracy claims in the instant case because plaintiff's claim fits within an exception to the rule.

Under the "personal stake" exception, the intracorporate conspiracy doctrine does not apply "to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity." *Bond v. Bd. of Educ. of the City of New York,* No. 97-1337, 1999 WL 151702, at *2 (E.D.N.Y. Mar. 17, 1999). For the exception to apply, "[s]imply joining corporate officers as defendants in their individual capacities is not enough to make them persons separate from the corporation in legal contemplation." *Girard,* 530 F.2d at 72 (internal quotation marks and citation omitted). Rather, "[t]he plaintiff must also allege that they acted other than in the normal course of their corporate duties." *Id.* (internal quotation marks and citation omitted). Here, plaintiff clearly alleges that defendant Barrett acted in his own personal interest, not in the interest of the police department or the city, by conspiring with others to cover-up his alleged use of excessive force. Given that plaintiff has alleged that Barrett conspired based on a personal stake, the intracorporate conspiracy doctrine is inapplicable to the instant case. Consequently, the court denies summary judgment on plaintiff's conspiracy claim.[3]

### 2. *State Law Claims*

Given that the court has not dismissed plaintiff's § 1983 claims against defendant Barrett, the court maintains original jurisdiction over this action and must exercise supplemental jurisdiction over the related state law claims. *See*28 U.S.C. § 1367(a) (2005). Barrett, however, argues that two state law claims-intentional infliction of emotional distress and prima facie tort-fail as a matter of law and must be dismissed.

### i) *Intentional Infliction of Emotional Distress (IIED)*

**\*7** Barrett argues that plaintiff has failed to satisfy the elements of an IIED claim. Under New York law, a plaintiff must satisfy four elements to establish a claim of IIED: (1) extreme and outrageous conduct, (2) intent to cause

severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress. *SeeHowell v. New York Post Co.,* 81 N.Y.2d 115, 121 (1993). The New York Court of Appeals has emphasized, however, that "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 122 (internal quotation marks and citations omitted). The Court of Appeals has also strongly cautioned against claiming IIED where other tort remedies are available. *SeeFischer v. Maloney,* 43 N.Y.2d 553, 558 (1978). Accordingly, "[n]o intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability." *Hansel v. Sheridan,* 991 F.Supp. 69, 75 (N.D.N.Y.1998).

Barrett argues that his conduct does not constitute the "extreme and outrageous conduct" New York requires for this tort. In response, plaintiff maintains that Barrett's alleged "ramming" of plaintiff's motorcycle with his own vehicle is sufficiently outrageous to establish an IIED claim. In the instant case, the alleged conduct is entirely encompassed in plaintiff's traditional tort claims for assault and battery. Thus, plaintiff's claim for intentional infliction of emotional distress must be dismissed. *SeeMoore v. City of New York,* 219 F.Supp.2d 335, 339 (E.D.N.Y.2002).

### ii) *Prima Facie Tort*

Barrett also argues that plaintiff has failed to satisfy the requisite elements of a cause of action for prima facie tort. Under New York law, "[p]rima facie tort affords a remedy for the infliction of intentional harm, resulting in damage, without excuse or justification, by an act or series of acts which would otherwise be lawful." *Freihofer v. Hearst Corp.,* 65 N.Y.2d 135, 142 (1985) (internal quotation marks and citations omitted). To establish a claim for prima facie tort, a plaintiff must show (1) the intentional infliction of harm; (2) which results in special damages; (3) without any excuse or justification; (4) by an act or series of acts which would otherwise be lawful. *Id.* at 142-43.The New York Court of Appeals has noted that prima facie tort is not a "catch-all alternative for every cause of action which cannot stand on its own legs." *Id.* at 143 (internal quotation marks and citations omitted). While a party is not foreclosed from pleading prima facie tort as an alternative where a traditional tort remedy exists, "once a traditional tort has been established the allegation with respect to prima facie tort will be rendered academic." *Bd. of Educ. v. Farmingdale Classroom Teachers*

*Ass'n,* 38 N.Y.2d 397, 406 (1975); *see also* *Freihofer,* 65 N .Y.2d at 143. Moreover, the Court of Appeals has stressed that "[a] critical element of the cause of action is that plaintiff suffered a specific and measurable loss, which requires an allegation of special damages." *Id.*

**\*8** Barrett argues that the prima facie tort claim must be dismissed because plaintiff failed to allege special damages. The court need not reach the issue of special damages because plaintiff has failed to establish that the act or series of acts alleged would otherwise be lawful. *See* *Chen v. United States,* 854 F.2d 622, 629 (2d Cir.1988) (dismissing prima facie tort claim because acts of racial harassment and violations of federal procurement regulations fail to "constitute[ ] conduct that is otherwise lawful"). The court cannot conclude that Barrett's alleged use of excessive force and participation in a conspiracy to cover-up his unconstitutional conduct constitute lawful conduct. Moreover, assuming plaintiff is pleading prima facie tort in the alternative, it would also fail if a jury were to accept Barrett's version of events. Barrett claims that he did not use his vehicle to hit plaintiff's motorcycle nor did he in any way injure plaintiff or conspire to cover-up his acts. He also claims that he stopped and detained plaintiff based on reasonable suspicion, and plaintiff was subsequently questioned as a witness not as a suspect. Thus, were a jury to believe Barrett, plaintiff would not have a viable claim for prima facie tort because he failed to establish either intentional infliction of harm or lack of justification for Barrett's actions. The court therefore concludes that plaintiff's prima facie tort claim fails as a matter of law and must be dismissed.

## C. *Claims Against Defendant New York City*

### 1. *Section 1983 Claims*

New York City argues that plaintiff's § 1983 claims should be dismissed because plaintiff has failed to demonstrate that a municipal policy caused the alleged constitutional violations. Section 1983 provides a cause of action against any person who, under color of state law, violates rights or privileges established under the Constitution or law of the United States. A local government is considered a "person" for § 1983 purposes and, therefore, can be sued under the statute. *See* *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978). In *Monell,* however, the Supreme Court established that municipal liability under § 1983 only applies when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's

officers." *Id.* at 690; *see also* *Coon v. Town of Springfield,* 404 F.3d 683, 686 (2d Cir.2005). Thus, the plaintiff must establish (1) the existence of some municipal policy or custom and (2) "a causal connection-an 'affirmative link'-between the policy and the deprivation of his constitutional rights." *Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) (citation omitted).

#### i) *Failure to Train*

In his amended complaint, plaintiff alleges that New York City should be held liable under § 1983 due to its failure to train police officers who have engaged in excessive and unjustified use of force. The Supreme Court has held that a municipality may be held liable for failure to train its employees where it acts with " 'deliberate indifference' to the rights of persons with whom the police come into contact." *City of Canton v. Harris,* 489 U.S. 378, 388 (1989). To establish deliberate indifference, "plaintiffs [must] identify a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 129 (2d Cir.2004) (quoting *Canton,* 489 U.S. at 390-91). Such proof is necessary to ensure that " 'the officer's shortcomings ... resulted from ... a faulty training program' rather than from the negligent administration of a sound program or other unrelated circumstances." *Id.* (quoting *Canton,* 489 U.S. at 390-91).

**\*9** Here, plaintiff provides no evidence of a specific deficiency in New York City's training program, nor has he offered any evidence establishing the close relationship between the deficient program and the injury at issue. The court therefore dismisses plaintiff's § 1983 claim concerning New York City's alleged failure to properly train its employees.

#### ii) *Failure to Supervise*

In his amended complaint, plaintiff also argues that New York City failed to properly supervise its police officers. A failure to supervise claim need not rely on an explicitly stated municipal policy or regulation. *See* *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995). Rather, to survive summary judgment, a plaintiff must establish that "a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious,' and the policymaker's failure to investigate or rectify the

situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." *Amnesty America,* 361 F.3d at 128 (quoting *Vann,* 72 F.3d at 1049)."[D]eliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann,* 72 F.3d at 1049. Alternatively, deliberate indifference may be proven by "expert testimony that a practice condoned by the defendant municipality was 'contrary to the practice of most police departments' and was 'particularly dangerous' because it presented an unusually high risk that constitutional rights would be violated." *Id.*

Here, plaintiff merely offers generalized statistics related to police misconduct complaints made to the CCRB several years prior to the incident at issue. *See* Amended Compl. ¶¶ 49-51.These statistics suggest that excessive force allegations comprise a substantial portion of total civilian complaints of police misconduct. *See id.* ¶ 49.Plaintiff also cites statistics indicating that CCRB conducts "full investigations" on less than half of the complaints received and that the police department disciplines a small percentage of officers. *See id.* ¶¶ 50-51.Plaintiff argues that these numbers demonstrate that New York City has been on notice that police officers, including defendants Barrett and Does, "were disproportionately involved in police misconduct and abuse, particularly involving excessive force and brutality," and that New York City has failed to remedy the situation. *See id.* ¶ 53.

Even assuming *arguendo* that these statistics are accurate, plaintiff has failed to demonstrate that New York City has acted with deliberate indifference. At most, plaintiff's evidence demonstrates that New York City was on notice that there were a substantial number of complaints about police officers' use of excessive force against civilians. Plaintiff, however, does not offer any evidence establishing that New York City failed to follow up on the credible claims of excessive force or failed to discipline police officers who actually used excessive force against civilians. Plaintiff can not establish that New York City was deliberately indifferent to claims of excessive force by simply noting that the percentage of "fully investigated" CCRB complaints or disciplinary actions is small. Without an understanding of the types of complaints the CCRB "fully investigated," the disposition of the remaining complaints, or the categories of police misconduct that warranted discipline, plaintiff's statistics are meaningless to the issue of the whether New York City acted with deliberate indifference. Consequently,

the court must dismiss plaintiff's § 1983 claim alleging that New York City failed to adequately supervise its employees.

### iii) *Failure to Discipline*

**\*10** Plaintiff's claim that New York City failed to discipline officers for using excessive force should also be dismissed as a matter of law. As the CCRB report dated August 18, 2003 indicates, New York City did indeed pursue an investigation of defendant Barrett and the other officers involved in the incident at issue. *See* Ptf. Ex. I. Moreover, the CCRB investigator concluded that the allegation that Barrett employed excessive force was substantiated and that another allegation against an unknown officer should be further investigated. *Id.* at 22.At his deposition on April 5, 2005, Barrett testified that his case was still pending before the police disciplinary committee. Barrett Dep. at 94-95. Even assuming that the almost two-year delay between the issuance of the CCRB report and any disciplinary action demonstrates a failure to discipline, such a claim suggests, at most, negligent administration or one isolated incident of bureaucratic inaction. "[M]ere negligence or bureaucratic inaction" does not rise to the level of an actionable violation. *See Amnesty America,* 361 F .3d at 128. Plaintiffs must raise an inference that the municipality or its policymakers actually condoned such conduct and that the system is "so deficient as to reflect a policy of deliberate indifference to the civil rights of the citizenry." *See Sarus v. Rotundo,* 831 F.2d 397, 401-02 (2d Cir.1987). Plaintiff has failed to raise such an inference and, therefore, the court dismisses the § 1983 claim alleging that New York City failed to discipline defendants Barrett and Does.[4]

### 2. *State Law Claims*

### i) *Defective Notice of Claim*

New York City argues that plaintiff's state law claims against the city fail as a matter of law because plaintiff failed to comply with the state's notice of claim requirements. As a general rule, "in a federal court, state notice-of-claim statutes apply to state-law claims." *Hardy v. New York City Health & Hosp. Corp.,* 164 F.3d 789 (2d Cir.1999). Under New York law, a notice of claim is a "condition precedent" to bringing a tort claim against a municipality or any of its officers, agents, or employees. *See* N .Y. Gen. Mun. §§ 50-i(1)(a); 50-e(1)(a). The purpose of the notice of claim requirement is to afford the municipality "an adequate opportunity to investigate the circumstances surrounding the accident and to explore the merits of the claim while information is still

readily available."*Teresta v. City of New York,* 304 N.Y. 440, 443 (1952). A plaintiff must serve the notice of claim within ninety days after the claim arises. *See id.* § 50-e(1)(a). In addition, the notice must specify (1) the name and address of each claimant and his or her attorney; (2) the nature of the claim; (3) the time and the place of the incident; and (4) the injuries or damages claimed. *See id.* § 50-e(2). Notice of claim requirements are generally strictly construed, and failure to comply with the requirements typically results in dismissal due to failure to state a cause of action. *Hardy,* 164 F.3d at 793-94. To determine whether a notice of claim is sufficient, the proper inquiry is "whether it includes information sufficient to enable the city to investigate."*Brown v. City of New York,* 95 N.Y.2d 389, 393 (2000) (citations and internal quotation marks omitted). More specifically, the inquiry focuses on "whether based on the claimant's description municipal authorities can locate the place, fix the time[,] and understand the nature of the accident."*Id.*

 **11** Here, plaintiff timely served a notice of claim upon New York City. *See* Def. New York City Ex. K. However, New York City argues that the notice of claim fails to fully specify the nature of plaintiff's claim or identify the place of the incident. In his notice of claim, plaintiff states he "was struck from the rear by a vehicle owned and operated by the City" and "was thrown from his motorcycle and received injuries."*Id.* at 1. Plaintiff fails to specify the location of the accident or the fact that he is bringing a negligent hiring and supervision claim. *Id.* New York City correctly notes that such deficiencies are typically fatal to claims against the city. *See Fincher v. County of Westchester,* 979 F.Supp. 989, 1003 (S.D.N.Y.1997) (collecting state cases). However, New York's notice of claim statute also permits the court to disregard such defects if they were made in good faith and did not prejudice the city. *See* N.Y. Gen. Mun. § 50-e(6). Here, New York City alleges that plaintiff's notice of claim was defective, but fails to put forth any facts establishing that it was prejudiced by the defect. Moreover, there is no showing that the defect was made in bad faith. Consequently, the court exercises its discretion pursuant to N.Y. Gen. Mun. § 50-e(6) to disregard the defect. *See Malcom v. City of New York,* 770 N.Y.S.2d 79, 80 (2d Dep't 2003) (disregarding defect in notice of claim, which failed to allege location of arrest, because no actual prejudice was demonstrated nor was there a showing of bad faith). Plaintiff's state law claims against New York City are, therefore, properly before the court.

**ii)** *Negligent Hiring and Supervision*

New York City argues that summary judgment is appropriate with regard to plaintiff's negligent hiring and supervision claim because such a claim cannot be sustained when an employee is acting within the scope of his employment. "A claim for negligent hiring or supervision can only proceed against an employer for an employee acting outside the scope of her employment."*Colodney v. Continuum Health Partners, Inc.,* No. 03 Civ. 7276, 2004 WL 829158, at *8 (S.D.N.Y. Apr. 15, 2004). Where an employee acts within the scope of his or her employment, the employer generally is held liable for all the employees' torts under the doctrine of respondeat superior. *See Niles v. Palmer,* No. 97 Civ. 7573, 1999 WL 1419042, at *14 n. 6 (S.D.N.Y. Oct. 26, 1999). Accordingly, under the theory of respondeat superior, an employer is liable for any damages caused by an employee's negligence, and "no claim may proceed against the employer for negligent hiring or retention."*Karoon v. New York City Transit Auth.,* 659 N.Y.S.2d 27, 29 (1st Dep't 1997).

Here, New York City concedes that defendant Barrett was acting within the scope of his employment as an officer with the New York City Police Department. *See* Def. New York City Memorandum of Law at 19-20.[5] Accordingly, plaintiff's negligent hiring and supervision claim must be dismissed as a matter of law.

**iii)** *Respondeat Superior*

 **12** Finally, New York City argues that the court should decline to exercise supplemental jurisdiction over the respondeat superior claim because all the federal claims against the city have been dismissed. Under the Federal Rules of Civil Procedure, the court "may decline to exercise supplemental jurisdiction ... if the [ ] court has dismissed all claims over which it has original jurisdiction."28 U.S.C. § 1367(c). Although the court has dismissed all federal claims against New York City, the respondeat superior claim against the city is directly related to the state law claims against defendant Barrett. In the interests of judicial economy, the court exercises its discretion to retain jurisdiction over plaintiff's remaining state law claim against New York City.

**CONCLUSION**

For the foregoing reasons, defendants' motions for summary judgment are granted in part and denied in part. The court denies defendant Barrett's motion for summary judgment for plaintiff's excessive force and conspiracy claims under

§ 1983 and grants summary judgment on the failure to intercede, intentional infliction of emotional distress, and prima facie tort claims. The court denies defendant New York City's motion for summary judgment for plaintiff's respondeat superior claim, but grants summary judgment on plaintiff's §

1983 and negligent supervision and training claims against the city.

SO ORDERED.

### Footnotes

1    In his reply memorandum of law, Barrett argues that the CCRB report is inadmissible hearsay. The court disagrees. The CCRB report fits within Rule 803(8)(C) of the Federal Rules of Evidence, which provides that "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth factual findings resulting from an investigation made pursuant to authority granted by law" are admissible in civil proceedings, "unless the sources of information or other circumstances indicate lack of trustworthiness." The CCRB report clearly represents the factual findings of the investigation of plaintiff's complaint. Barrett simply asserts that the CCRB report is hearsay, but he fails to provide any evidence indicating that the sources of the report lack trustworthiness. Thus, the court concludes that the CCRB report is admissible as a public record pursuant to Rule 803(8)(C) of the Federal Rules of Evidence.

2    In an effort to attack plaintiff's credibility, defendant Barrett also cites evidence that plaintiff did not complain about his injuries and did not seek medical attention immediately. Def. Barrett 56.1 Stmt. ¶¶ 105, 113, 140, 144. In addition, he notes that plaintiff was involved in another physical altercation around the same time of this incident and, thus, could have sustained injuries as a result of that incident. *Id.* 141-43. If anything, these facts only reinforce the court's conclusion that there is a genuine issue of material fact for a jury to decide.

3    In his motion for summary judgment, defendant Barrett does not seek to dismiss plaintiff's remaining § 1983 claims for fabrication and falsifying statements (claims two and three). Thus, the court concludes that those claims stand.

4    Plaintiff also alleges that New York City has a policy or practice in place "wherein police officers regularly cover-up police use of excessive and unjustified force by telling false and incomplete stories." Amended Compl. ¶ 47. Plaintiff has failed to support his "code of silence" theory of § 1983 with any evidence, aside from the allegation that Barrett made false statements regarding the incident at issue. Even if the allegation is substantiated, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985). Therefore, the court also dismisses plaintiff's § 1983 claim under the "code of silence" theory.

5    New York City states that "plaintiff himself is asserting that Detective Barrett was acting as a police officer and in the scope of his duties as a police officer to investigate crimes. Thus, plaintiff cannot claim that Detective Barrett was not acting in the scope of his employment on July 2, 2002." Def. New York City Memorandum of Law at 20. Given that defendant New York City is arguing that there is no triable issue of fact regarding whether defendant Barrett was acting within the scope of his employment on the date at issue, the court infers that defendant New York City claims that defendant Barrett was acting within the scope of his employment.

**End of Document**                                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4067179
United States District Court,
S.D. New York.

The Honorable Otto J. REICH and
Otto Reich Associates, LLC, Plaintiffs,

v.

Leopoldo Alejandro Betancourt LOPEZ,
Pedro Jose Trebbau Lopez, and Francisco
D'Agostino Casado, Defendants.

No. 13–CV–5307 (JPO).    |    Signed Aug. 18, 2014.

**Synopsis**
**Background:** Former ambassador to Venezuela and his
consulting company filed suit against two corporations and
their officers who had secured high-valued energy-sector
contracts from Venezuelan government, alleging violations
of Racketeer Influenced and Corrupt Organizations Act
(RICO) and asserting claims for civil conspiracy, tortious
interference with prospective economic advantage, trade
libel, injurious falsehood, and defamation under New York
state common law. Defendants moved to dismiss.

**Holdings:** The District Court, J. Paul Oetken, J., held that:

[1] conduct that violated both Travel Act and Foreign Corrupt
Practices Act (FCPA) constituted one, rather than two,
predicate acts for purposes of RICO;

[2] complaint sufficiently alleged domestic conduct for
purposes of RICO claim;

[3] complaint sufficiently alleged injury from predicate act of
wire fraud; but

[4] predicate acts were not sufficiently related;

[5] although defendants transacted business in New York,
plaintiff's claims did not "arise out of" such business, as
required for the exercise of jurisdiction over defendants;

[6] claims sounding in defamation fell under exemption to
specific jurisdiction under New York's long-arm statute;

[7] jurisdictional discovery was appropriate; and

[8] conspiracy claim was not barred by intracorporate
conspiracy doctrine.

Motion granted in part and denied in part.

West Headnotes (48)

[1]    **Federal Civil Procedure**
       👉 Fraud, Mistake and Condition of Mind

       All claims for fraud, including those under
       Racketeer Influenced and Corrupt Organizations
       Act (RICO), must comply with heightened
       pleading standard set forth in federal rule for
       pleading fraud. 18 U.S.C.A. § 1962(c, d);
       Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

       Cases that cite this headnote

[2]    **Federal Civil Procedure**
       👉 Fraud, Mistake and Condition of Mind

       To meet the strictures of federal rule for pleading
       fraud, complaint must: (1) specify the statements
       that plaintiff contends were fraudulent; (2)
       identify the speaker; (3) state where and when
       the statements were made; and (4) explain
       why the statements were fraudulent. Fed.Rules
       Civ.Proc.Rule 9(b), 28 U.S.C.A.

       Cases that cite this headnote

[3]    **Federal Civil Procedure**
       👉 Fraud, Mistake and Condition of Mind

       While the circumstances of fraud must be
       pleaded with particularity under federal rule for
       pleading fraud, intent, knowledge, and other
       conditions of a person's mind may be alleged
       generally. Fed.Rules Civ.Proc.Rule 9(b), 28
       U.S.C.A.

       Cases that cite this headnote

[4]    **Racketeer Influenced and Corrupt
       Organizations**
       👉 Foreign Activity

Unlike a violation of the Travel Act, a violation of the Foreign Corrupt Practices Act (FCPA) is not an independent "predicate act" of racketeering activity under Racketeer Influenced and Corrupt Organizations Act (RICO); a FCPA violation can, however, serve as a basis for a Travel Act violation, which, in turn, is alleged as a predicate for a RICO offense charged. 18 U.S.C.A. §§ 1952(a), 1961(1).

Cases that cite this headnote

**[5]** **Racketeer Influenced and Corrupt Organizations**

  👈 Number of Predicate Acts

It is not proper under Racketeer Influenced and Corrupt Organizations Act (RICO) to charge two predicate acts where one action violates two statutes; a "pattern of racketeering" activity requires at least two acts of racketeering, not at least two statutory offenses. 18 U.S.C.A. § 1961(1).

Cases that cite this headnote

**[6]** **Racketeer Influenced and Corrupt Organizations**

  👈 Number of Predicate Acts

Conduct which violated both the Travel Act and the Foreign Corrupt Practices Act (FCPA) constituted one, rather than two predicate acts, for purposes of Racketeer Influenced and Corrupt Organizations Act (RICO) claim, since the same alleged conduct of defendants' improperly securing construction contracts for the Venezuelan government had resulted in both violations. 18 U.S.C.A. §§ 1343, 1952(a), 1961(1).

Cases that cite this headnote

**[7]** **Statutes**

  👈 Extraterritorial Operation

As a general matter, unless there is the affirmative intention of Congress clearly expressed to give a statute extraterritorial effect, court must presume statute is primarily concerned with domestic conditions.

Cases that cite this headnote

**[8]** **Statutes**

  👈 Extraterritorial Operation

Absent an express intention by Congress of extraterritorial effect, a statute applies only domestically.

Cases that cite this headnote

**[9]** **Racketeer Influenced and Corrupt Organizations**

  👈 Foreign Activity

Since neither the Travel Act nor the federal wire fraud statute applies extraterritorially, a plaintiff claiming international violations of these statutes as predicate acts for purposes of Racketeer Influenced and Corrupt Organizations Act (RICO) claim must allege sufficient domestic conduct in order to sustain an application under RICO. 18 U.S.C.A. §§ 1343, 1952(a), 1962(c, d).

Cases that cite this headnote

**[10]** **Racketeer Influenced and Corrupt Organizations**

  👈 Foreign Activity

Complaint against two corporations and their officers who had allegedly conspired to secure high-valued energy-sector contracts from Venezuelan government sufficiently alleged domestic conduct, as required for defendants' alleged international violation of Travel Act and federal wire fraud statute to constitute predicate acts under Racketeer Influenced and Corrupt Organizations Act (RICO); plaintiff alleged that defendants engaged in bribery of Venezuelan public officials by using wire communications originating from the United States, traveled to and from the United States to Venezuela, accepted and transmitted their ill-gotten gains to and from bank accounts in the United States, directed day-to-day activities of their Barbados corporation from the United States, and used wire communications in interstate commerce to relay false information to Venezuelan company.

18 U.S.C.A. §§ 1343, 1952(a), 1961(1), 1962(c, d).

Cases that cite this headnote

**[11]** **Racketeer Influenced and Corrupt Organizations**

🔑 **Foreign Activity**

As long as enough domestic conduct exists to fulfill the requirements of violation of the Travel Act or wire fraud statute, it is irrelevant, for purposes of establishing such violations as predicate acts under Racketeer Influenced and Corrupt Organizations Act (RICO), that those statutes are further violated by conduct that is extraterritorial in nature. 18 U.S.C.A. §§ 1343, 1952(a), 1962(c).

Cases that cite this headnote

**[12]** **Racketeer Influenced and Corrupt Organizations**

🔑 **Elements of Violation in General**

**Racketeer Influenced and Corrupt Organizations**

🔑 **Business, Property, or Proprietary Injury; Personal Injuries**

**Racketeer Influenced and Corrupt Organizations**

🔑 **Causal Relationship; Direct or Indirect Injury**

In order to adequately plead a claim under Racketeer Influenced and Corrupt Organizations Act (RICO) provision prohibiting a person associated with an enterprise from conducting or participating in the conduct of enterprise's affairs through a pattern of racketeering activity, plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) that has caused injury to plaintiff's business or property. 18 U.S.C.A. § 1962(c).

Cases that cite this headnote

**[13]** **Racketeer Influenced and Corrupt Organizations**

🔑 **Injury in General**

**Racketeer Influenced and Corrupt Organizations**

🔑 **Causal Relationship; Direct or Indirect Injury**

A plaintiff does not need to suffer injury from each of the predicate acts underlying a Racketeer Influenced and Corrupt Organizations Act (RICO) RICO claim, so long as he suffers direct injury from at least one. 18 U.S.C.A. § 1962(c).

Cases that cite this headnote

**[14]** **Racketeer Influenced and Corrupt Organizations**

🔑 **Business, Property, or Proprietary Injury; Personal Injuries**

**Racketeer Influenced and Corrupt Organizations**

🔑 **Causal Relationship; Direct or Indirect Injury**

Plaintiff sufficiently alleged injury from predicate act of wire fraud, as required to support claim for pattern of racketeering activity, in violation of Racketeer Influenced and Corrupt Organizations Act (RICO), against two corporations and their officers who had allegedly conspired to secure high-valued energy-sector contracts from Venezuelan government; complaint alleged defendants had made two specific phone calls, both containing intentionally false information, to two specific clients of plaintiff, in order to induce those clients to cease all business with plaintiff, thereby ending the combined $40,000 per month paid to him. 18 U.S.C.A. §§ 1343, 1962(c).

Cases that cite this headnote

**[15]** **Telecommunications**

🔑 **Knowledge and Intent in General**

While claim for wire fraud does not require proof of actual profit from the scheme to defraud, intent to profit is still a necessary element. 18 U.S.C.A. § 1343.

Cases that cite this headnote

**[16]** **Telecommunications**
- ☞ **Knowledge and Intent in General**

There was no evidence that two corporations and their officers who, by use of the wires, had allegedly tried to convince former Venezuelan ambassador's consulting clients to cease all business with him had actually intended to obtain money or property as a result of the scheme, as required to support former ambassador's claim for violation of wire fraud statute, as predicate act for Racketeer Influenced and Corrupt Organizations Act (RICO) claim; although there might have been an intent to harm former ambassador's business, the corporations were not market competitors such that they would expect to gain from plaintiff's loss of clients. 18 U.S.C.A. §§ 1343, 1962(c).

Cases that cite this headnote

**[17]** **Racketeer Influenced and Corrupt Organizations**
- ☞ **Continuity or Relatedness; Ongoing Activity**

To prove a pattern of racketeering activity for purposes of Racketeer Influenced and Corrupt Organizations Act (RICO) claim, a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity. 18 U.S.C.A. §§ 1961(5), 1962(c).

Cases that cite this headnote

**[18]** **Racketeer Influenced and Corrupt Organizations**
- ☞ **Continuity or Relatedness; Ongoing Activity**

To prove a pattern of racketeering activity for purposes of Racketeer Influenced and Corrupt Organizations Act (RICO) claim, the predicate acts must possess both relatedness and continuity. 18 U.S.C.A. §§ 1961(5), 1962(c).

Cases that cite this headnote

**[19]** **Racketeer Influenced and Corrupt Organizations**
- ☞ **Continuity or Relatedness; Ongoing Activity**

Predicate acts are "related," for purposes of Racketeer Influenced and Corrupt Organizations Act (RICO) claim, when they have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events. 18 U.S.C.A. §§ 1961(5), 1962(c).

Cases that cite this headnote

**[20]** **Racketeer Influenced and Corrupt Organizations**
- ☞ **Continuity or Relatedness; Ongoing Activity**

**Racketeer Influenced and Corrupt Organizations**
- ☞ **Nexus Between Enterprise and Acts**

For predicate acts to be "related," for purposes of Racketeer Influenced and Corrupt Organizations Act (RICO) claim, they must relate to each other, i.e., "horizontal relatedness," and they must relate to the enterprise, i.e., "vertical relatedness." 18 U.S.C.A. §§ 1961(5), 1962(c).

Cases that cite this headnote

**[21]** **Racketeer Influenced and Corrupt Organizations**
- ☞ **Continuity or Relatedness; Ongoing Activity**

There is a distinction in the application of relatedness of predicate acts as between criminal and civil Racketeer Influenced and Corrupt Organizations Act (RICO) cases; as a general rule, the question of whether acts form a pattern rarely is a problem with a criminal enterprise, as distinct from a lawful enterprise that commits occasional criminal acts. 18 U.S.C.A. §§ 1961(5), 1962(c).

Cases that cite this headnote

**[22]    Racketeer Influenced and Corrupt Organizations**

   &#9758; Continuity or Relatedness; Ongoing Activity

Predicate acts in support of civil Racketeer Influenced and Corrupt Organizations Act (RICO) claim were not sufficiently related, as required to show a pattern of racketeering activity; although the same two corporations and their officers were the alleged perpetrators of both predicate acts of bribery, in violation of Travel Act, and wire fraud, the victims of the predicates were dissimilar, and the alleged underlying goal of both predicate acts, to secure profitable energy contracts for Venezuela government without getting caught for their impropriety, was untenable, in that it was too remote. 18 U.S.C.A. §§ 1343, 1952(a), 1961(5), 1962(c).

Cases that cite this headnote

**[23]    Federal Courts**

   &#9758; Presumptions and Burden of Proof

Plaintiff bears burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit.

Cases that cite this headnote

**[24]    Federal Courts**

   &#9758; Weight and Sufficiency

In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists. Fed.Rules Civ.Proc.Rule 12(b)(2), 28 U.S.C.A.

Cases that cite this headnote

**[25]    Federal Courts**

   &#9758; Weight and Sufficiency

A prima facie case for personal jurisdiction must satisfy three elements: (1) proper service of process upon defendant; (2) a statutory basis for personal jurisdiction; and (3) accordance with constitutional due process principles. U.S.C.A. Const.Amends. 5, 14.

Cases that cite this headnote

**[26]    Federal Courts**

   &#9758; Personal Jurisdiction

The breadth of a federal court's personal jurisdiction is determined by the law of the state in which the district court is located.

Cases that cite this headnote

**[27]    Courts**

   &#9758; Related Contacts and Activities; Specific Jurisdiction

**Courts**

   &#9758; Business Contacts and Activities; Transacting or Doing Business

For plaintiff to demonstrate personal jurisdiction over a non-resident defendant under New York state law, plaintiff must show either that defendant was present and doing business in New York, so as to establish general jurisdiction, or that defendant committed acts within the scope of New York's long-arm statute, so as to establish specific jurisdiction. N.Y.McKinney's CPLR 301, 302.

Cases that cite this headnote

**[28]    Courts**

   &#9758; Business Contacts and Activities; Transacting or Doing Business

Under New York law, even though the doing business test is most often used to find jurisdiction over a corporate defendant, this test can be applied to a nonresident individual, as well. N.Y.McKinney's CPLR 301.

Cases that cite this headnote

**[29]    Courts**

   &#9758; Business Contacts and Activities; Transacting or Doing Business

Under New York law, a defendant is "doing business" and is therefore present in New York and subject to personal jurisdiction with respect to any cause of action, related or unrelated to

the New York contacts, if it does business in New York not occasionally or casually, but with a fair measure of permanence and continuity. N.Y.McKinney's CPLR 301.

Cases that cite this headnote

[30]  **Courts**
☞ Business Contacts and Activities; Transacting or Doing Business

Under New York law, in order to establish that defendant is "doing business," and therefore, present in New York and subject to personal jurisdiction, plaintiff must show that defendant engaged in continuous, permanent, and substantial activity in New York. N.Y.McKinney's CPLR 301.

Cases that cite this headnote

[31]  **Constitutional Law**
☞ Non-Residents in General

Under New York law, for general jurisdiction over an individual to comport with due process, defendant must be domiciled in New York, served in New York, or have otherwise consented to the court's jurisdiction; only on truly exceptional occasions may general jurisdiction be exercised over individuals who are at home in a state that is not otherwise their domicile. U.S.C.A. Const.Amends. 5, 14; N.Y.McKinney's CPLR 301.

Cases that cite this headnote

[32]  **Courts**
☞ Allegations, Pleadings, and Affidavits

Under New York law, to establish that defendant's domicile is New York, for purposes of exercising general jurisdiction over him, plaintiff should allege key indicia, such as that defendant holds a New York State driver's license, maintains personal and business checking and credit card accounts at New York banks, files New York State tax returns, and lists on tax returns New York as his home address. N.Y.McKinney's CPLR 301.

Cases that cite this headnote

[33]  **Courts**
☞ Business Contacts and Activities; Transacting or Doing Business

In determining whether personal jurisdiction may be exercised under New York's long-arm statute, court must decide: (1) whether defendant transacts any business in New York and, if so, (2) whether cause of action arises from such a business transaction. N.Y.McKinney's CPLR 302(a)(1).

Cases that cite this headnote

[34]  **Courts**
☞ Business Contacts and Activities; Transacting or Doing Business

A defendant "transacts business" in New York, for purposes of New York long-arm statute, if he has purposely availed himself of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws. N.Y.McKinney's CPLR 302(a)(1).

Cases that cite this headnote

[35]  **Courts**
☞ Related Contacts and Activities; Specific Jurisdiction

A suit will be deemed to have arisen out of a party's activities in New York, for purposes of establishing jurisdiction under New York's long-arm statute, if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York. N.Y.McKinney's CPLR 302(a)(1).

Cases that cite this headnote

[36]  **Federal Courts**
☞ Particular Entities, Contexts, and Causes of Action

While alien defendants' retention of New York lawyers tasked with the advancement of their business interests qualified as "transacting business," for purposes of New York's long-

arm statute, plaintiff's cause of action for civil
Racketeer Influenced and Corrupt Organizations
Act (RICO), defamation, tortious interference
with prospective economic advantage, trade
libel, and injurious falsehood did not "arise out
of" such business, as required for the exercise
of jurisdiction over defendants; counsel was
retained in association with another defamation
lawsuit to which plaintiff was not a party, and
there was no indication that defendants' New
York attorneys ever actually discussed plaintiff's
suit, let alone participated in or provided advice
regarding the two alleged phone calls giving
rise to his claims. 18 U.S.C.A. § 1962(c);
N.Y.McKinney's CPLR 302(a)(1).

Cases that cite this headnote

**[37]** **Courts**
👉 Business Contacts and Activities;
Transacting or Doing Business

The "arising out of" requirement for personal
jurisdiction under New York's long-arm statute
is not the same as merely being indirectly related
to the transacted business; instead, an articulable
nexus or a substantial relationship between the
asserted claim and the transacted business is
required. N.Y.McKinney's CPLR 302(a)(1).

Cases that cite this headnote

**[38]** **Federal Courts**
👉 Particular Entities, Contexts, and Causes of
Action

Even if alien defendants committed tortious acts
within New York, they were not subject to
specific jurisdiction under New York's long-arm
statute, in suit brought by former ambassador
to Venezuela alleging interference with his
consulting business, since the alleged torts all
involved defamation, for which an exception
existed under the statute; plaintiff asserted
claims for defamation, tortious interference with
prospective economic advantage, trade libel, and
injurious falsehood, but all of these causes of
action sounded in defamation. N.Y.McKinney's
CPLR 302(a)(2).

Cases that cite this headnote

**[39]** **Federal Civil Procedure**
👉 Jurisdictional Discovery

At the jurisdictional stage, district courts enjoy
broad discretion in deciding whether to order
discovery.

Cases that cite this headnote

**[40]** **Federal Civil Procedure**
👉 Jurisdictional Discovery

In deciding when to grant jurisdictional
discovery, reliance on conclusory allegations
is generally not enough, as it may lead
to an unwarranted fishing expedition for
jurisdiction; similarly, plaintiff's preliminary
showings should reveal more than mere
speculations or hopes that jurisdiction exists.

Cases that cite this headnote

**[41]** **Federal Civil Procedure**
👉 Jurisdictional Discovery

Jurisdictional discovery was appropriate in
former Venezuelan ambassador's suit against
non-resident defendants alleging defamation,
tortious interference with prospective economic
advantage, trade libel, and injurious falsehood
under New York law, based on defendants'
alleged interference with plaintiff's consulting
business, since it was likely to reveal
whether defendants were domiciled in New
York; plaintiff plausibly contended that limited
discovery would reveal whether one defendant
owned New York residential property, and
would help determine the portion of the year in
which both defendants resided in New York.

Cases that cite this headnote

**[42]** **Libel and Slander**
👉 Nature and Elements of Defamation in
General

To state a claim for defamation under New York
Law, plaintiff must allege: (1) a false statement
about plaintiff; (2) published to a third party

without authorization or privilege; (3) through fault amounting to at least negligence on the part of the publisher; (4) that either constitutes defamation per se or caused special damages.

Cases that cite this headnote

**[43]    Libel and Slander**
👈 Executive Officers and Employees

Complaint of former ambassador to Venezuela stated claim for defamation, under New York law, against officer of Venezuelan contracting company by alleging that defendant had intentionally and without authorization made false statements to plaintiff's competitors regarding his business dealings, resulting in both actual monetary damage through lost clients from his consulting business and injury that impugned the basic integrity or creditworthiness of his company.

Cases that cite this headnote

**[44]    Conspiracy**
👈 Nature and Elements in General

New York law does not recognize civil conspiracy as an independent cause of action; rather, the charge of conspiracy in a civil action is merely the string whereby plaintiff seeks to tie together those who, acting in concert, may be held responsible in damages for any overt act or acts.

1 Cases that cite this headnote

**[45]    Conspiracy**
👈 Nature and Elements in General

To establish a civil conspiracy under New York law, so as to tie together those who, acting in concert, may be held responsible in damages for any overt act or acts, plaintiff must demonstrate the underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury.

1 Cases that cite this headnote

**[46]    Conspiracy**
👈 Pleading

Complaint of former ambassador to Venezuela stated claim for civil conspiracy, under New York law, with sufficient specificity to tie together those who, acting in concert, could be held responsible in damages for overt acts of defamation, by alleging the date the agreement constituting the conspiracy was initiated, the identities of the co-conspirators, the content of the alleged agreement to convey false information about plaintiff, the motivation underlying the conspiracy, and when the conspiracy was executed, including dates, some locations, and the specific acts taken by each conspirator.

1 Cases that cite this headnote

**[47]    Conspiracy**
👈 Combination

In general, the "intracorporate conspiracy doctrine," provides that the officers, agents, and employees of a single corporate entity, each acting within the scope of his employment, are legally incapable of conspiring together; an exception to this doctrine applies when a plaintiff adequately alleges that each defendant possessed an independent, personal conspiratorial purpose, wholly separate and apart from the entity.

Cases that cite this headnote

**[48]    Conspiracy**
👈 Combination

Conspiracy claim, made under New York law by former Venezuelan ambassador against officers of two contracting companies who had secured energy-sector contracts from Venezuela, was not barred, at the dismissal stage of litigation, by the intracorporate conspiracy doctrine, which provided that officers, agents, and employees of a single corporate entity, each acting within the scope of his employment, were legally incapable of conspiring together, given allegations in

complaint that one co-conspirator's involvement in the alleged conspiracy was based on his personal interests, rather than his supposed role in his company, in that he had "profited wildly" from an ongoing illegal bribery scheme.

Cases that cite this headnote

**Attorneys and Law Firms**

John Daniel Castiglione, Mark Warren Smith, Noelle Marie Kowalczyk, Smith Valliere PLLC, New York, NY, for Plaintiffs.

Frank H. Wohl, Julia Claire Green, Lankler Siffert & Wohl LLP, William Christopher Carmody, Shawn J. Rabin, Susman Godfrey LLP, New York, NY, Joseph A. DeMaria, Fox Rothschild LLP, Miami, FL, for Defendants.

### *OPINION AND ORDER*

J. PAUL OETKEN, District Judge:

**\*1** Plaintiffs Otto J. Reich, a former ambassador to Venezuela, and his consulting company, Otto Reich Associates, LLC ("ORA"), allege that the activities of the defendants caused injury to their property and reputation. Plaintiffs bring claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c-d) ("RICO"), as well as claims of civil conspiracy, tortious interference with prospective economic advantage, trade libel, injurious falsehood, and defamation under New York state common law. Defendants move for dismissal pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(2). For the reasons that follow, Defendants' motion is granted in part and denied in part.

## I. Background

### A. Factual Background [1]

### 1. Parties

Defendants Leopoldo Alejandro Betancourt Lopez ("Betancourt"), Pedro Jose Trebbau Lopez ("Trebbau"), and Francisco D'Agostino Casado ("D'Agostino") are principals of Derwick Associates USA LLC ("Derwick USA")

and Derwick Associates Corporation (together "Derwick Associates"). Betancourt is the official co-founder and president of Derwick Associates, Trebbau is the official co-founder and vice-president, and D'Agostino is a key player in the organization—potentially the unofficial founder, owner, and operator. Betancourt and Trebbau are Venezuelan citizens and D'Agostino is a dual citizen of Venezuela and Spain. Betancourt and D'Agostino own residential property in New York and reside there for part of the year, including during the time period of the alleged illegal activities. Derwick USA is incorporated in Florida and Derwick Associates Corporation is a Barbados corporation. However, Defendants conduct and manage the day-to-day affairs of both entities from their office in New York.

Plaintiff Reich is the former U.S. Ambassador to Venezuela. His professional career has focused on corruption in Latin America. Since leaving government service in 2004, Reich has managed Plaintiff ORA, a consulting company for anti-corruption organizations and individuals that assists its clients in their public relations and business endeavors.

### 2. Derwick Associates' Business Model

Defendants, through Derwick Associates, are in the business of securing high-valued energy-sector contracts from agencies of the Venezuelan government. These contracts are won, the complaint alleges, through the use of bribery and monetary kickbacks and are not obtained through any open bidding process. The average Derwick Associates contract is overbilled by over 200%. Upon securing the inflated contracts, Derwick Associates then subcontracts the work to multiple United States companies, including Missouri-based ProEnergy Services. These subcontractors execute essentially all required construction, but are paid substantially less than the cost of the original contract. Derwick Associates then keeps a significant portion of the proceeds from the originally inflated contract. Plaintiffs specifically identify the following improperly secured contracts: four contracts with the state-owned Petroleos de Venezuela, S.A. ("PDVSA"), five contracts with the state-owned Corporacion Electrica de Venezuela ("CORPOELEC"), and two contracts with the state-owned Corporacion Venezolana de Guayan ("CVG").

**\*2** Both Derwick Associates and various individuals associated with the corporation have drawn attention from many journalistic publications as well as from the Federal Bureau of Investigation for their questionable business

practices. Defendants have attempted to conceal their ongoing illicit scheme, in part, by filing high-stakes lawsuits against critics of the company. In one instance, they filed two defamation lawsuits against Banco Venezolano and its President, Oscar Garcia Mendoza ("Mendoza"), one in Florida and the other in New York state court. Banco Venezolano has the reputation of being highly critical of the current Venezuelan government regime. Derwick Associates has since withdrawn both actions.

### 3. Injury to Plaintiffs

In October and November 2012, following the commencement of the Florida lawsuit, Banco Venezolano entered into negotiations with Reich and ORA to secure assistance in defending against the claims made in the Florida lawsuit and consulting for unrelated business activities. The agreed-upon rate for such services was $20,000 per month. In late November 2012, an agent of the Defendants unsuccessfully attempted to bribe Reich to stop providing assistance to Banco Venezolano. On December 6, 2012, an agent of Defendants attempted to persuade Reich to work on their behalf rather than to continue consulting for Banco Venezolano. Reich rejected both offers.

On December 7, 2012, Reich was scheduled to meet with Cesar Briceño ("Briceño"), a representative of Banco Venezolano, to discuss the ongoing Florida lawsuit. That same day, Derwick Associates amended its complaint in the Florida lawsuit to add an allegation that Briceño met with a former U.S. government official in December 2012, referring to the scheduled December 7 meeting with Reich. Shortly afterwards, Betancourt and Trebbau called their partner, Convict–Guruceaga, and instructed him to call Joaquin Urbano Berrizbeitia ("Urbano"), a member of Banco Venezolano's Board of Directors, to assert that "Otto Reich is working for us."(Dkt. No. 29 at ¶ 147.) Around the last week of December 2012, Banco Venezolano ceased all communications and business with ORA and Reich.

During this effort to harm the relationship between ORA/ Reich and Banco Venezolano, Betancourt placed a November 2012 call to Eligio Cedeño ("Cedeño"), another client of ORA since 2010. During this call, Betancourt falsely informed Cedeño that ORA's consulting services were retained by Derwick Associates. Within days of the conversation, Cedeño terminated his business with ORA.

### B. Procedural Background

Plaintiffs filed their initial complaint on July 30, 2013. On August 1, D'Agostino was personally served while in the state of New York. On January 14, 2014, Plaintiffs filed the first amended complaint. Defendants moved to dismiss on February 28, 2014.

### II. Legal Standard

When considering a Rule 12(b)(6) motion to dismiss, a court is obliged to "accept as true all of the factual allegations contained in the complaint,"*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 572, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), drawing "all inferences in the light most favorable to the non-moving party's favor,"*In re NYSE Specialists Sec. Litig.,* 503 F.3d 89, 95 (2d Cir.2007). While Rule 8(a) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief,"Fed.R.Civ.P. 8(a), "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."*Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (noting that a court is "not bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986))). In other words, a properly stated claim includes a showing of "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"*ATSI Comm., Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 546, 127 S.Ct. 1955).

**\*3** **[1]** **[2]** **[3]** Additionally, all claims of fraud— including those under RICO—must comply with Rule 9(b)'s heightened pleading standard. *See*Fed.R.Civ.P. 9(b). To meet the strictures of Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."*Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290 (2d Cir.2006) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)).Rule 9(b) also dictates that while the circumstances of the fraud must be pleaded with particularity, "intent, knowledge, and other conditions of a person's mind may be alleged generally."

## III. Discussion

The operative complaint—the First Amended Complaint—asserts claims under the federal RICO statute (Counts I and II) as well as state law claims for tortious interference with prospective economic advantage (Counts III and IV), trade libel/injurious falsehood/defamation (Count V), defamation (Count VI), and civil conspiracy (Count VII). Defendants move to dismiss these claims on various grounds.

### A. Qualifying RICO Predicate Acts

Before the Court can determine whether Plaintiffs have sufficiently pleaded the requisite elements of a RICO claim, it must determine what violations count as predicate acts of racketeering activity. Plaintiffs allege three types of predicate acts: violations of the Travel Act, 18 U.S.C. § 1952(a)*et seq.;* violations of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd–1 *et seq.,* and wire fraud under 18 U.S.C. § 1343. The violations of the Travel Act and FCPA are based upon the allegedly improperly signed contracts between Defendants and PDVSA, CORPOELEC, and CVG. The violations of the wire fraud statute are based upon the November and December 2012 phone calls to Banco Venezuelo and Cedefio.

[4] With respect to the Travel Act and FCPA violations, RICO provides an exhaustive list of qualifying predicate acts and the latter is notably absent. *See* 18 U.S.C. § 1961(1)."The FCPA, unlike the Travel Act, is not a[n] [independent] RICO predicate."*United States v. Young & Rubicam, Inc., 741 F.Supp. 334, 338 (D.Conn.1990).* While Plaintiffs cite many instances in which an FCPA violation is considered in a court's analysis of whether a RICO claim has been properly pleaded, *see Environmental Tectonics v. W.S. Kirkpatrick, Inc., 847 F.2d 1052, 1063 (3d Cir.1988); Rotec Indus. v. Mitsubishi Corp., 163 F.Supp.2d 1268, 1278 (D.Or.2001); Dooley v. United Technologies Corp., 803 F.Supp. 428, 438–40 (D.D.C.1992),* an FCPA violation is never counted separately and in addition to a violation of the Travel Act. However, "FCPA violations [can serve] as a basis for Travel Act violations, which, in turn, are alleged as predicates for the RICO offense charged."*Young & Rubicam, Inc., 741 F.Supp. at 338.*

[5] [6] In this case, the same alleged conduct underlies the violations of both the Travel Act and the FCPA. By presenting these as separate and independent predicate acts, Plaintiffs are impermissibly attempting to double-count this conduct, notwithstanding RICO's requirement that each predicate act

have its own source of conduct. "[I]t is not proper under RICO to charge two predicate acts where on[e] action violates two statutes. A pattern of racketeering activity requires 'at least two *acts* of racketeering,' not 'at least two statutory offenses.' "*Watkins v. Smith,* 12 Civ. 4635(DLC), 2012 WL 5868395, *4–5 (S.D.N.Y. Nov. 19, 2012), aff'd,561 Fed.Appx. 46 (2d Cir.2014)* (quoting *United States v. Kragness, 830 F.2d 842, 860–61 (8th Cir.1987)).* Therefore, this Court will review the plausibility of the RICO claim based upon the Travel Act violations (with the FCPA violations subsumed) and the alleged wire fraud. [2]

### B. Extraterritoriality of RICO

*\*4* [7] [8] As a general matter, "unless there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect, [courts] must presume it is primarily concerned with domestic conditions."*Norex Petroleum Ltd. v. Access Indus., Inc., 631 F.3d 29, 32 (2d Cir.2010)* (quoting *Morrison v. National Australia Bank Ltd., 561 U.S. 247, 130 S.Ct. 2869, 2877–78, 177 L.Ed.2d 535 (2010)).* Consequently, "absent an express intention by Congress of extraterritorial effect, a statute applies only domestically."*Id.*

"RICO is silent as to any extraterritorial application."*Id.; see also N.S. Fin. Corp. v. Al–Turki, 100 F.3d 1046, 1051 (2d Cir.1996); Petroleos Mexicanos v. SK Eng'g & Const. Co. Ltd., 2013 WL 3936191, at \*2 (S.D.N.Y. July 30, 2013), aff'd,572 Fed.Appx. 60 (2d Cir.2014).* The Second Circuit has accordingly held that "[t]he RICO statutes do not apply extraterritorially."*Petroleos Mexicanos, 2013 WL 3936191, at \*2; see also Republic of Iraq v. ABB AG, 920 F.Supp.2d 517, 543 (S.D.N.Y.2013).* Similarly, the Second Circuit has rejected the argument that "Congress's adoption of some RICO predicate statutes with extraterritorial reach indicated a congressional intent that RICO have extraterritorial reach for all its predicates."*European Cmty. v. RJR Nabisco, Inc., 764 F.3d 129, 136 (2d Cir.2014)* (citing *Norex, 631 F.3d at 33).* Thus, courts may not infer from "the extraterritoriality of certain RICO predicates ... the extraterritoriality of RICO as a whole."*Id.*

Following *Norex,* some district courts misinterpreted the Circuit's rejection of the argument that "RICO applies extraterritorially *in all of its applications* as a ruling that RICO can never have extraterritorial reach in *any* of its applications."*Id. Cf. European Cmty. v. RJR Nabisco, Inc., 2011 WL 843957, at \*5 (E.D.N.Y. Mar. 8, 2011); Cedeno v.*

*Intech Grp., Inc.,* 733 F.Supp.2d 471, 473 (S.D.N.Y.2010). The Second Circuit has recently clarified that it has *not* held that the alleged enterprise *itself* must be domestic in nature. *European Cmty. v. RJR Nabisco, Inc.,* 764 F.3d at 135–36. A requirement that defendants must be "associated with a domestic enterprise in order to sustain RICO liability seems [illogical]. Under that standard, if an enterprise formed in another nation sent emissaries to the United States to engage in domestic ... violations of the various RICO predicate statutes, its participants would be immune from RICO liability merely because the crimes committed in the United States were done in conjunction with a foreign enterprise." *European Cmty.,* 764 F.3d at 138–39; *see also Chevron Corp. v. Donziger,* 871 F.Supp.2d 229, 243 (S.D.N.Y.2012) ("If the citizenship or legal auspices under which an enterprise exists were controlling or entitled to substantial weight, the applicability of the statute in a given case would depend upon a factor unrelated to the statutory purpose."). Rather, "the focus properly is on the pattern of racketeering activity and its consequences," not on the enterprise. *Chevron Corp.,* 871 F.Supp.2d at 245.

**\*5** Defendants commit the same interpretive mistake by limiting their discussion of extraterritoriality to asserting factual claims such as "Derwick Associates is a Barbados corporation" or that the defendants "are citizens and nationals of Venezuela."(Dkt. No. 33 at p. 14.) Defendants make little effort to refute the more relevant inquiry: whether the predicate acts are themselves either sufficiently domestic or apply extraterritorially.

**[9]** The question, then, is whether "liability or guilt could attach to extraterritorial conduct under the relevant RICO predicate." *European Cmty.,* 764 F.3d at 136. Plaintiffs allege two eligible acts: violation of the Travel Act (which subsumes the violation of the FCPA) and wire fraud. However, the Second Circuit has already held that both the Travel Act and the federal wire fraud statute "do not apply extraterritorially." *Id.* at 141. Therefore, Plaintiffs must "[allege] sufficient domestic conduct" for each of these predicate acts to apply in order to sustain their application under RICO.*Id.*

**[10]** In this respect, Plaintiffs allege: that Defendants engaged "in unlawful activities, namely, the bribery of Venezuelan public officials ... [by using] wire communications (including communications via telephone) originating from the United States and traveled to and from the United States"; that Defendants "accepted and transmitted their ill-gotten gains to and from bank accounts

in the United States"; that they directed "the day-to-day activities of Derwick Associates from the United States"; that they used "wire communications (including communications via telephone) in interstate commerce to ... [relay] false information to Cedeño and Banco Venezolano who relied upon said information to Plaintiffs' harm"; and that they are believed to have placed these telephone calls from within the United States. (Dkt. No. 29 at ¶¶ 149, 159, 178, 252, 258.) These allegations are sufficient to render the underlying conduct "domestic" enough to be actionable under RICO.

**[11]** While Defendants focus upon the many international aspects of the alleged scheme and challenge the truth of Plaintiffs' factual allegations, such arguments are unavailing. As for the first, while the scheme in question has many international aspects, "if domestic conduct satisfies every essential element to prove a violation of a United States statute that does not apply extraterritorially, that statute is violated even if some further conduct contributing to the violation occurred outside the United States." *European Cmty.,* 764 F.3d at 142. As long as enough domestic conduct exists to fulfill the requirements of both the Travel Act and wire fraud, it is irrelevant that those statutes are further violated by conduct that is extraterritorial in nature. As for the second, it is not appropriate to determine the truth of Plaintiffs' allegations at the motion to dismiss stage. "Should the pattern of conduct of certain Defendants or certain schemes prove to be extraterritorial" following discovery, the court may "narrow the scope of this action accordingly, through either motions for (partial) summary judgment or through carefully tailored jury instructions." *Id.* Accordingly, extraterritoriality concerns do not bar the alleged RICO claim at this stage.

## C. Pleading the RICO Claim

**\*6** **[12]** In order to adequately plead a RICO claim under § 1962(c), Plaintiffs must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) that has caused injury to plaintiff's business or property." *Drexel Burnham Lambert Inc. v. Saxony Heights Realty Associates,* 777 F.Supp. 228, 238 (S.D.N.Y.1991); *see Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Defendants argue that Plaintiffs' claim must fail as it lacks both sufficient injury and a pattern connecting the alleged predicate acts.

### 1. Breadth of Injury Required

**[13]** Although Plaintiffs allege predicate acts for violations of both the Travel Act and the wire fraud statute, they allege injury only as a result of the wire fraud. (Dkt. No. 29 at ¶¶ 150, 162, 273.) The Travel Act violations arise out of the alleged bribery of Venezuelan officials, from which Reich and ORA are unable to plausibly show any resulting proximate injury. Nevertheless, Plaintiffs do not need to suffer injury from each of the predicate acts underlying their RICO claim; direct injury from one is enough. *See Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23 (2d Cir.1990)* ("[T]he injury must be caused by a pattern of racketeering activity violating section 1962*or by individual RICO predicate acts.") (emphasis added); *see also Marshall & Ilsley Trust Co. v. Pate,* 819 F.2d 806, 810 (7th Cir.1987); *Town of Kearny v. Hudson Meadows Urban Renewal Corp.,* 829 F.2d 1263, 1268 (3d Cir.1987) (citing *Sedima,* 473 U.S. at 497, 105 S.Ct. 3275) ("[T]he injury which confers standing on a RICO plaintiff is injury flowing from the commission of the predicate act, not injury flowing from the pattern of such acts."); *Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1347 (2d Cir.1994) (the holdings of the Third and Seventh Circuits "appear[ ] to be a correct reading of § 1964(c)"); *Chevron Corp.,* 871 F.Supp.2d at 253 ("[A] RICO damages plaintiff need allege only that it has suffered an injury directly resulting from some or all of the activities comprising the violation [.]") (internal quotation marks omitted). Therefore, as long as Plaintiffs can sufficiently plead proximate injury resulting from the wire fraud conduct, they will have met the injury requirement of RICO standing.

### 2. Standing and Injury

RICO grants standing to "[a]ny person injured in his business or property by reason of a violation of § 1962."18 U.S.C. § 1964(c). The wire fraud statute defines the crime as the use of the wires "for the purpose of executing" a "scheme or artifice to defraud." 18 U.S.C. § 1343. In applying this statute, courts have required plaintiffs to allege: "(1) the existence of a scheme to defraud, (2) defendants' knowing participation in such a scheme, and (3) the use of wire or mail communications in interstate commerce in furtherance of that scheme." *Am. Fed'n of State, Cnty. & Mun. Employees Dist. Council 37 Health & Sec. Plan v. Bristol–Myers Squibb Co.,* 948 F.Supp.2d 338, 345 (S.D.N.Y.2013); *see also MLSMK Inv. Co. v. JP Morgan Chase & Co.,* 737

F.Supp.2d 137, 142 (S.D.N.Y.2010); *Boritzer v. Calloway,* 10 Civ. 6264(JPO), 2013 WL 311013, at *6 (S.D.N.Y. Jan. 24, 2013). The relevant portion of the Complaint states that Defendants knowingly agreed among themselves to provide false information to both Banco Venezolano and Cedefio. (Dkt. No. 29 at ¶¶ 147, 149, 157.) This false information included the assertion that Reich was working in conjunction with Derwick Associates. (*Id.* at ¶¶ 148, 159–161.) The alleged purpose of the scheme underlying the proliferation of this false information was to harm the business of ORA and injure Reich's ongoing professional relationship with the recipients. (*Id.* at ¶ ¶ 145, 147, 157–158.) Finally, the false information was communicated in November and December of 2012 via interstate telephone wires. (*Id.* at ¶¶ 148, 159.) Defendants contend that Plaintiffs lack standing because: (1) any alleged injury is merely reputational, and (2) Defendants did not intend to obtain Plaintiffs' property, a necessary component of a scheme to defraud.

***7** As an initial matter, the alleged injury suffered by the Plaintiffs is more than reputational. Defendants contend that the requisite harm for wire fraud must amount to more than injury to one's reputation, or else "any ordinary defamation action could be brought under the mail fraud statute."*United States v. Ferrara,* 701 F.Supp. 39, 43 (E.D.N.Y.1988), *aff'd,*868 F.2d 1268 (2d Cir.1988); *see also Kimm,* 2005 WL 89386, at *4; *Tsipouras v. W & M Properties, Inc.,* 9 F.Supp.2d 365, 368 (S.D.N.Y.1998). The distinction between wire fraud and defamation recognizes that "while one can be compensated under the law for injury to one's reputation, that compensation is not based on an injury to what has commonly been known as 'property.' "*Kimm,* 2005 WL 89386, at *5 (quoting *Ferrara,* 701 F.Supp. at 43). In both *Kimm* and *Ferrara,* however, the injury to each plaintiff's reputation was general, forward looking, and speculative, pertaining to theoretical loss of potential future business or profits by unspecified potential clients or associates. Emphasizing this point, the Second Circuit held on appeal in *Kimm* that "the *generalized reputational* harms alleged, including *the risk of future lost business* commissions, are too speculative to constitute an injury to business or property."*Kimm v. Chang Hoon Lee & Champ, Inc.,* 196 Fed.Appx. 14, 16 (2d Cir.2006) (emphasis added).

**[14]** In contrast, Plaintiffs' allegations of wire fraud regard two specific phone calls, both containing intentionally false information, made to two specific clients of ORA, in order to induce those clients to cease all business with Plaintiffs, thereby ending the combined $40,000 per month paid to

Plaintiffs. (Dkt. No. 29 at ¶¶ 147–149, 157, 159–161.) That $40,000 per month loss is the relevant and sufficient injury suffered by Plaintiffs due to the alleged wire fraud. (*Id.* at ¶ 273.) Courts commonly differentiate in this fashion between insufficient claims of general reputational injury and sufficient claims of actual economic losses stemming from a harmed reputation. *See Cement–Lock v. Gas Tech. Inst.,* 2007 WL 4246888, at \*26 (N.D.Ill. Nov. 29, 2007) ("[I]njury to business reputation is compensable under RICO, if it results in concrete economic, contractual, or business losses.... Plaintiffs point to a specific lost business opportunity.... This is sufficiently concrete to confer RICO standing.") (internal quotation marks omitted); *Hy Cite Corp. v. badbusinessbureau.com, L.L.C.,* 418 F.Supp.2d 1142, 1151 (D.Ariz.2005) (recognizing that the injury requirement is met when "[p]laintiff alleges that it has lost [specific] customers, that customers have rescinded [specific] sales contracts, and that Plaintiff's reputation has been injured as a result of the contents of Defendants' website"); *Philatelic Found. v. Kaplan,* 85 Civ. 8571(RWS), 1986 WL 5629, at \*11 (S.D.N.Y. May 9, 1986) (although "[p]ecuniary damage to business reputation [appears] to raise difficult problems of proof, [this] type of damage has been included within the 'injury to his business' requirement of § 1964(c)"), *abrogated on other grounds by Aramony v. United Way of Am.,* 969 F.Supp. 226 (S.D.N.Y.1997); *see generally Nat'l Beverage Sys., Inc. v. Leonard Fountain Specialties, Inc.,* 2012 WL 2389870 (E.D.Mich. June 25, 2012); *Texas Air Corp. v. Air Line Pilots Ass'n Int'l,* 1989 WL 146414 (S.D.Fla. July 14, 1989); *Galerie Furstenberg v. Coffaro,* 697 F.Supp. 1282, 1287 (S.D.N.Y.1988). Accordingly, Plaintiffs have sufficiently alleged injury to themselves resulting from the acts of wire fraud.

**\*8** **[15]** **[16]** While Plaintiffs have sufficiently alleged actual injury, a wire fraud scheme to defraud also requires that Defendants intend to obtain property, a claim which is lacking in Plaintiffs' allegations. Although it is well established in this Circuit that wire fraud does not require proof of actual profit from the scheme to defraud, intent to profit is still necessary. *See Porcelli v. United States,* 404 F.3d 157, 162 (2d Cir.2005) (quoting *McNally v. United States,* 483 U.S. 350, 358–359, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987)) ("The second clause, 'or for obtaining money or property,' was intended to be read in connection with 'any scheme or artifice to defraud.' The statute has thus been interpreted to criminalize any scheme or artifice for obtaining money or property" but "the defendant does not need to literally 'obtain' money or property to violate the statute"); *Boritzer,* 2013 WL 311013, at \*6 (quoting

*Drexel Burnham Lambert Inc.,* 777 F.Supp. at 238) ("[I]n order for the deceit implicit in fraud to rise to the level of wire fraud in particular, 'defendants must have used the ... wires as a means to obtain money or property.' "). In this case, while Plaintiffs allege that Defendants intended to deprive them of money or property, they have not alleged that Defendants intended to *obtain* money or property as a result of their scheme. Nor could they plausibly do so: Defendants are not a market competitor of Plaintiffs such that they would expect to gain from Plaintiffs' loss of clients. Consequently, while there may be intent to harm, there is no intent to obtain property from Plaintiffs, and there is no scheme to defraud within the wire fraud statute.

### 3. Pattern of Racketeering Activity

**[17]** **[18]** Alternatively, even if wire fraud were properly pleaded, there is a final pleading requirement that the alleged predicate acts together form "a pattern of racketeering activity." 18 U.S.C. § 1962(c). A "pattern" requires at least two acts of "racketeering activity" occurring within ten years of each other. *See* 18 U.S.C. § 1961(5). The Supreme Court has held that "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). In other words, the predicate acts must possess both relatedness and continuity for a pattern to exist. In the present case, the requirement of relatedness is challenged.

**[19]** **[20]** The determination of relatedness is heavily dependent on the specific circumstances of each case. The Supreme Court has provided some guidance as to what factors contribute to relatedness among predicates:

> Predicate acts are "related" for RICO purposes when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."

**\*9** *Schlaifer Nance & Co. v. Estate of Warhol,* 119 F.3d 91, 97 (2d Cir.1997) (quoting *H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. 2893). The Second Circuit has gone further in developing the "requirement of relatedness, holding that predicate acts must be related to each other ('horizontal' relatedness), and they must be related to the enterprise ('vertical' relatedness)." *United States v. Daidone,* 471 F.3d

371, 375 (2d Cir.2006); *see also United States v. Minicone, 960 F.2d 1099, 1106 (2d Cir.1992); Rosenson v. Mordowitz,* 11 Civ. 6145(JPO), *2012 WL 3631308 (S.D.N.Y. Aug. 23, 2012).* However, while there are technically two distinct relatedness requirements in this Circuit, "[i]n practice, these tests may be satisfied with a single showing of relatedness: vertical relatedness may be demonstrated by establishing that the predicate acts are 'related to the activities of [the RICO] enterprise,' and horizontal relatedness may be established by showing that each individual predicate act is related to the RICO enterprise."*Li Jun An v. Hui Zhang,* 13 Civ. 5064(PKC), *2013 WL 6503513, at *7 (S.D.N.Y. Dec. 6, 2013)* (quoting *Daidone, 471 F.3d at 375).* Therefore, the alleged predicate acts are judged in respect to their joint relationship to the enterprise.

**[21]** There is a distinction in the application of relatedness as between criminal and civil RICO cases. As a general rule, "the question of whether acts form a pattern rarely is a problem with a criminal enterprise, as distinct from a lawful enterprise that commits occasional criminal acts."*Minicone, 960 F.2d at 1108* (internal quotation marks omitted). Due to this distinction, it is not enough for Plaintiffs to plead that the alleged predicate acts were in furtherance of one of the potential enterprises, as each "possess[es] multiple legitimate purposes[,] and the predicate acts are not [all] related to the enterprise[s] in the same way."*Vild v. Visconsi, 956 F.2d 560, 568–69 (6th Cir.1992); see also Li Jun An, 2013 WL 6503513, at *8* ("[W]hen the enterprise primarily conducts a legitimate business, no such presumption arises."); *Envtl. Servs., Inc. v. Recycle Green Servs., Inc., 7 F.Supp.3d 260, ——, 2014 WL 1259959, at *9 (E.D.N.Y.2014).* As this is a civil case, Plaintiffs must plead more.

**[22]** Beyond the fact that Defendants are the alleged perpetrators of both the bribery and the wire fraud, very little links the two predicates together. For example, the victims of the predicates are dissimilar. Whereas the bribery would theoretically harm the Defendants' business competitors, the Plaintiffs are only the victims of the wire fraud. While a RICO plaintiff does not need to suffer injury from every alleged predicate act to have standing, a claim based upon predicate acts with dissimilar victims still undermines a finding of relatedness. *See H.J. Inc., 492 U.S. at 240, 109 S.Ct. 2893.*

Additionally, the establishment of a uniform purpose underlying both the bribery and the wire fraud is highly tenuous. Plaintiffs proffer that the alleged predicates "share common goals (increasing and protecting the financial position of the enterprise) ...."*Daidone, 471 F.3d at 376;* (*see* Dkt. No. 44 at p. 13.) The argument follows that both the bribery and the fraud facilitate Defendants' underlying goal of securing profitable energy contracts without getting caught for their impropriety. Such a broad characterization of purpose is untenable. *See Ray Larsen Associates, Inc. v. Nikko Am., Inc.,* 89 Civ. 2809(BSJ), *1996 WL 442799, at *7 (S.D.N.Y. Aug. 6, 1996)* ("Although these two types of conduct may be interrelated in the sense that both have the effect of generally increasing defendants' funds, the relationship between the two types of conduct is simply too remote to support a claim under RICO."); *see also Heller Fin., Inc. v. Grammco Computer Sales, Inc., 71 F.3d 518, 525 (5th Cir.1996).* If such an all-encompassing purpose were sufficient, the relationship requirement would do little to limit the scope of potential RICO claims.

**\*10** Without relatedness between the bribery and the wire fraud, each must be judged independently. Neither is sufficient to plead a RICO claim on its own. As previously noted, the bribery charges have not caused Plaintiffs proximate injury and therefore Plaintiffs lack standing. The wire fraud claims alone are insufficient because they lack continuity. Without the larger, multi-year bribery scheme, the wire fraud allegations consist of only two alleged instances occurring within a two-month period. Since *H.J. Inc.,* the Second Circuit has "never held a period of less than two years to constitute a 'substantial period of time,' " as is necessary under RICO. *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc., 187 F.3d 229, 242 (2d Cir.1999).*"While this two-year guidepost is not necessarily a bright-line rule, it is rare" that less time will rise to the level of continuous activity. *Boritzer, 2013 WL 311013, at *11* (internal quotation marks omitted). That is because "Congress [is] concerned in RICO with long-term criminal conduct."*GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 466 (2d Cir.1995)* (quoting *H.J. Inc., 492 U.S. at 241–42, 109 S.Ct. 2893); see also Ray Larsen Associates, Inc., 1996 WL 442799, at *8* ("A scheme that spans seventeen months does not generally reflect the kind of long-term criminal conduct over a "substantial period of time" contemplated by the RICO statute."); *Cont'l Realty Corp. v. J.C. Penney Co., Inc., 729 F.Supp. 1452, 1455 (S.D.N.Y.1990).* Ultimately, Plaintiffs have attempted to combine the distinct violations under the Travel Act and the wire fraud statute into one claim so that each may compensate for the deficits of the other. *See, e.g., Ray Larsen Associates, Inc., 1996 WL 442799, at *7* ("A review of the record suggests that plaintiff has alleged these predicate acts as an afterthought, in order to buttress its weak argument with

respect to 'continuity,' that is, to extend the duration of the scheme."). Because the predicates cannot be considered together, the RICO claim must fail.

**D. RICO Conspiracy Claim**

18 U.S.C. § 1962(d) states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."As Plaintiffs have not adequately pleaded a substantive RICO violation, their conspiracy claim under 18 U.S.C. § 1962(d) is also dismissed. *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 182 (2d Cir.2004) ("[B]ecause Plaintiffs did not adequately allege a substantive violation ... the District Court properly dismissed Count Six, which alleged a RICO conspiracy."); *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1064 (2d Cir.1996) ("Since we have held that the prior claims do not state a cause of action for substantive violations of RICO, the present claim does not set forth a conspiracy to commit such violations."), *vacated on other grounds,* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998).

**E. Subject Matter Jurisdiction**

**\*11** Because the only federal claim in this case—the RICO claim—has been dismissed, the question arises whether this Court has subject matter jurisdiction over the remaining claims, all of which arise under state law. Plaintiffs alternatively assert subject matter jurisdiction on the basis of diversity of citizenship. *See* 28 U.S.C. § 1332. Plaintiffs' Complaint alleges that ORA is a Virginia limited liability company, with Reich as its sole member, and that Reich is a citizen of Virginia. (Dkt. No. 29 at ¶¶ 21–22.) The Complaint also alleges that all three defendants are citizens of Venezuela or Spain, and that the amount in controversy is over $2,000,000. (*Id.* at ¶¶ 24, 26, 28, 324.) Accordingly, this Court has subject matter jurisdiction over the remaining claims.

**F. Personal Jurisdiction**

Since the Court has dismissed Plaintiffs' RICO claims, Plaintiffs cannot rely upon 18 U.S.C. § 1965(b) to establish personal jurisdiction over each of the defendants. Absent this statutory grant of authority, Betancourt and Trebbau challenge the exercise of personal jurisdiction over them. [3]

**1. Legal Standard for Personal Jurisdiction**

**[23]** **[24]** **[25]** "A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit."*Penguin Gr. (USA) Inc. v. Am. Buddha,* 609 F.3d 30, 34 (2d Cir.2010) (citation omitted)."In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists."*Thomas v. Ashcroft,* 470 F.3d 491, 495 (2d Cir.2006)."A prima facie case for personal jurisdiction must satisfy three elements: (1) proper service of process upon the defendant; (2) a statutory basis for personal jurisdiction; and (3) accordance with constitutional due process principles."*Eternal Asia Supply Chain Mgmt. (USA) Corp. v. Chen,* 12 Civ. 6390(JPO), 2013 WL 1775440 (S.D.N.Y. Apr. 25, 2013) (citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 673 F.3d 50, 59–60 (2d Cir.2012)). Defendants contend that the second and third requirements are not met.

**[26]** **[27]** In reference to the requisite statutory basis, "[t]he breadth of a federal court's personal jurisdiction is determined by the law of the state in which the district court is located."*Thomas,* 470 F.3d at 495; *see also Bensusan Restaurant Corp. v. King,* 126 F.3d 25, 27 (2d Cir.1997). Here, the relevant state is New York. For a plaintiff to demonstrate personal jurisdiction over a defendant under New York state law, the plaintiff must show "either that the defendant was 'present' and 'doing business' in New York within the meaning of [CPLR] § 301, [general jurisdiction], or that the defendant committed acts within the scope of New York's long-arm statute, [CPLR] § 302, [specific jurisdiction]."*Schultz v. Safra Nat. Bank of New York,* 377 Fed.Appx. 101, 102 (2d Cir.2010).

**2. General Jurisdiction**

**[28]** **[29]** **[30]** Under § 301, a defendant "is subject to general personal jurisdiction in New York if it is 'doing business' in the state."*Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 95 (2d Cir.2000)."Although the 'doing business' test is most often used to find jurisdiction over a corporate defendant, this test can be applied to a nonresident individual."*Patel v. Patel,* 497 F.Supp.2d 419, 425 (E.D.N.Y.2007); *see also Moneygram Payment Sys., Inc. v. Consorcio Oriental, S.A.,* 05 Civ. 10773(RMB), 2007 WL 1489806, at \*3 (S.D.N.Y. May 21, 2007). A defendant "is 'doing business' and is therefore 'present' in New York and subject to personal jurisdiction with respect to any cause of action, related or unrelated to the New York contacts, if it does

business in New York not occasionally or casually, but with a fair measure of permanence and continuity."*Wiwa,* 226 F.3d at 95 (internal quotation marks and bracketing omitted)."In order to establish that this standard is met, a plaintiff must show that a defendant engaged in continuous, permanent, and substantial activity in New York."*Id.; see also Metro. Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 567–68 (2d Cir.1996) ( "Because general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's continuous and systematic general business contacts.").

**\*12  [31]**  The Supreme Court's recent decision in *Daimler AG v. Bauman* has brought uncertainty to application of New York's "doing business" rule. As a result, it is unclear whether existing New York general jurisdiction jurisprudence remains viable. *See Sonera Holding B.V. v. Cukurova Holding A.S.,* 750 F.3d 221, 225 n. 2 (2d Cir.2014) ("[W]e note some tension between *Daimler's* 'at home' requirement and New York's 'doing business' test."); *Meyer v. Bd. of Regents of Univ. of Oklahoma,* 13 Civ. 3128(CM), 2014 WL 2039654, at \*4 (S.D.N.Y. May 14, 2014) ("Indeed, the 'at home in' formulation of *Daimler* calls into the question the notion that 'doing business in' New York—the traditional formulation of the CPLR 301 test—is constitutionally compliant."); *Robinson v. Nat'l R.R. Passenger Corp.,* ——F.Supp.3d ——, ——, 14 Civ. 922(BMC), 2014 WL 1599462, at \*1 (E.D.N.Y. Apr. 23, 2014) ("[P]resumably, whatever basis she had for asserting personal jurisdiction ... it is not entirely clear that there is such a basis in light of *Daimler.*"). In any event, this Court need not determine at this time whether Defendants are subject to general jurisdiction under New York law. [4] "Whatever the purported scope of N.Y. C.P.L.R. 301...*Daimler* confirmed that subjecting [Defendants] to general jurisdiction in New York would be incompatible with due process."*Sonera Holding B.V.,* 750 F.3d at 224–25. For general jurisdiction over an individual to comport with due process, Defendants must be domiciled in New York, served in New York, or have otherwise consented to the court's jurisdiction. Only on truly "exceptional" occasions may general jurisdiction extend over individuals who are "at home" in a state that is not otherwise their domicile. *Meyer,* 2014 WL 2039654, at \*4 (citing *Daimler AG v. Bauman,* —— U.S. ——, 134 S.Ct. 746, 761, 187 L.Ed.2d 624 (2014)).

Plaintiffs proffer numerous purported indicia of general jurisdiction, including: Betancourt's ownership of New York residential property (Dkt. No. 29 at ¶ 25), Defendants' New

York office space (*id.* at ¶ 27), the use of New York banks in Defendants' business operations (*id.* at ¶¶ 50, 74), Defendants' retention of New York-based legal counsel (*id.* at ¶ 36), Defendants' previous use of New York courts (*id.* at ¶ 34), Defendants' retention of the services of a New York-headquartered public relations firm (*id.* at ¶ 197), and Defendants' frequent travel to New York (*id.* at ¶¶ 207–208). While these factors are relevant, they still fall short of establishing a *prima facie* case of jurisdiction.

### a. Domicile

It is well established in this Circuit that "for an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile."*In re Roman Catholic Diocese of Albany, New York, Inc.,* 745 F.3d 30, 38 (2d Cir.2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown,* —— U.S. ——, 131 S.Ct. 2846, 2852, 180 L.Ed.2d 796 (2011)); *see also Daimler AG,* 134 S.Ct. at 760; *Sonera Holding B.V.,* 750 F.3d at 225. Most recently, the Supreme Court made clear in *Daimler* that, "as a rule, it is not constitutionally permissible to sue an individual or corporation in a state where that individual is not " 'at home' ... [and that] [a]n individual is 'at home' in the state of his domicile.""*Meyer,* 2014 WL 2039654, at \*2. Based on the Plaintiffs' Complaint, New York domicile is not established for either Betancourt or Trebbau.

**\*13  [32]**  Plaintiffs admit in their supporting memorandum that "it is unclear whether Betancourt or Trebbau—or both—are domiciliaries of New York for jurisdictional purposes."(Dkt. No. 44 at p. 29.) Further, Defendants have not voluntarily offered information identifying of which state they believe themselves to be domiciliaries. (*See* Dkt. No. 33 at p. 24.) In order to establish that Defendants' domicile is New York, Plaintiffs should allege key indicia, such as that each Defendant "holds a New York State driver's license,""maintain[s] personal and business checking and credit card accounts at New York banks,""file[s] New York State tax returns," and lists on tax returns New York as his "home address." *Moneygram Payment Sys., Inc.,*2007 WL 1489806, at \*3.

In reviewing the allegations in the Complaint relating to Betancourt's and Trebbau's potential domicile, there is insufficient information for this Court to conclude that either or both are domiciliaries of New York. Plaintiffs do not allege where Betancourt or Trebbau file taxes, in which state they

hold a driver's license, or in which states the banks holding their personal banking accounts are located. Additionally, there is no allegation that Trebbau owns any residential property in New York, nor are there allegations indicating that Betancourt's residential property is his "home." *See Antone v. Gen. Motors Corp., Buick Motor Div.,* 64 N.Y.2d 20, 28, 484 N.Y.S.2d 514, 473 N.E.2d 742 (1984) (" '[R]esidence' and 'domicile' are not interchangeable[;] ... while a person can have but one domicile he can have more than one residence.") To clarify whether Betancourt's New York property is his "home," Plaintiffs do not offer any information regarding the portion of the year in which he lives at that property or any indication as to how many other residences outside of New York Betancourt may also own. [5] If anything, Plaintiffs' allegation that Betancourt and Trebbau are on record as flying to "New York nearly 200 times during a 3–year period" (Dkt. No. 44 at p. 23) may suggest that there is some other location at which they are more aptly "at home" (or else they presumably would not need to travel to New York for business with such frequency). Based on the Complaint, it is impossible to establish the domicile of either Betancourt or Trebbau, in New York or elsewhere.

### b. Exception to Domicile Requirement

Without establishing the domiciles of Betancourt or Trebbau, it is challenging, but not impossible, to assert general jurisdiction. While domicile is necessary as a general rule, "the phrase 'as a rule' obviously admits of exceptions, and in *Daimler* the Supreme Court was careful to note that domicile (for individuals) ... would not always be the only fora in which general jurisdiction could appropriately be asserted."*Meyer,* 2014 WL 2039654, at *2.

However, Plaintiffs conflate this very limited exception with the "doing business" requirements of CPLR § 301. Plaintiffs draw attention to allegations of Defendants' use of New York office space for Derwick Associates (Dkt. No. 29 at ¶ 27), Defendants' and Derwick Associates' retention of New York legal counsel (*id.* at ¶ 36), Defendants' and Derwick Associates' previous use of New York courts (*id.* at ¶ 34), and Defendants' and Derwick Associates' retention of the services of a New York-headquartered PR firm (*id.* at ¶ 197). Even assuming, arguendo, that all the alleged activities of Derwick Associates are attributable to the Defendants to the extent that Plaintiffs contend, general jurisdiction comporting with due process still may not exist. The mere fact that an individual

or a corporation operates in many places does not imply that they are

> **\*14** deemed at home in all of them. Otherwise, 'at home' would be synonymous with 'doing business' tests framed before specific jurisdiction evolved in the United States. Nothing in *International Shoe* and its progeny suggests that 'a particular quantum of local activity' should give a State authority over a 'far larger quantum of ... activity' having no connection to any in-state activity.

*Daimler AG,* 134 S.Ct. at 762 n. 20 (internal citation omitted); *see also In re Roman Catholic Diocese of Albany, New York, Inc.,* 745 F.3d at 41; *Sonera Holding B.V.,* 750 F.3d at 225. Even when considered together, the supposed contacts Defendants have with the state of New York do not establish general jurisdiction where it is otherwise absent. A corporation's or an individual's "engage[ment] in a substantial, continuous, and systematic course of business is alone insufficient to render it at home in a forum."*Sonera Holding B.V.,* 750 F.3d at 226 (quoting *Daimler AG,* 134 S.Ct. at 761). That is because a state which properly claims general jurisdiction over an individual is typically singular; "[t]hose affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable."*Daimler AG,* 134 S.Ct. at 760; *see also In re Roman Catholic Diocese of Albany, New York, Inc.,* 745 F.3d at 38; *Sonera Holding B.V.,* 750 F.3d at 225. While "exceptional" cases may exist where an individual is subjected to a state's general jurisdiction irrespective of where they are domiciled, this case is not one of those rare instances.

### 3. Specific Jurisdiction

Alternatively, § 302(a), New York's long-arm statute, confers "specific jurisdiction over a non-domiciliary defendant arising out of particular acts."*Accurate Grading Quality Assur., Inc. v. Thorpe,* 12 Civ. 1343(ALC), 2013 WL 1234836, at *2 (S.D.N.Y. Mar. 26, 2013) (internal quotation marks omitted). The relevant provisions of the long-arm statute for this case include the grants of jurisdiction over a person who "transacts any business within the state,"CPLR § 302(a)(1), or who "commits a tortious act within the state, except as to a cause of action for defamation,"CPLR § 302(a)(2). Plaintiffs contend that both provisions confer jurisdiction over Betancourt and Trebbau for purposes of this action.

### a. CPLR § 302(a)(1)

[33]  [34]  [35]  "[I]n determining whether personal jurisdiction may be exercised under section 302(a)(1), a court must decide (1) whether the defendant transacts any business in New York and, if so, (2) whether this cause of action aris[es] from such a business transaction."*Eternal Asia Supply Chain Mgmt.,*2013 WL 1775440, at \*4 (quoting *Licci,* 673 F.3d at 60). A defendant transacts business if he has "purposely availed himself of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws."*D.H. Blair & Co. v. Gottdiener,* 462 F.3d 95, 104 (2d Cir.2006); *see also Licci,* 673 F.3d at 61. "A suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York."*Licci,* 673 F.3d at 66; *see also Eternal Asia Supply Chain Mgmt.,*2013 WL 1775440, at \*4; *HSH Nordbank AG N.Y. Branch v. Street,* 11 Civ. 9405(DLC), 2012 WL 2921875, at \*4 (S.D.N.Y. July 18, 2012). Plaintiffs have not shown that Defendants meet this standard.

 **\*15**  [36]  The only transacted business that Plaintiffs cite is Defendants' hiring of and consulting with New York legal counsel. While the retention of New York lawyers tasked with the advancement of Defendants' interests qualifies as transacting business pursuant to § 302(a)(1), *see Chevron Corp. v. Donziger,* 974 F.Supp.2d 362, 623 (S.D.N.Y.2014) ("[A]n out of state entity's retention and use of the services of a New York lawyer constitutes transaction of business."); *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1109 (2d Cir.1997); *Barclays Am./Bus. Credit, Inc. v. Boulware,* 151 A.D.2d 330, 542 N.Y.S.2d 587, 587–88 (1989), the current cause of action does not arise out of such business. The hired legal counsel in question was retained in association with the defamation lawsuits against Banco Venezolano, to which Plaintiffs were not parties. Further, there is no allegation that the New York counsel ever actually discussed Plaintiffs (*see* Dkt. No. 29 at ¶ 37 ("New York-based counsel certainly *would have* included mention of Ambassador Reich") (emphasis added)), let alone participated in or provided advice regarding the two alleged phone calls giving rise to the current claims.

 [37]  The "arising out of" requirement for personal jurisdiction under § 302(a)(1) is not the same as merely being indirectly "related to" the transacted business. Plaintiffs acknowledge that "an articulable nexus" or a "substantial relationship" between the asserted claim and the transacted business is required, *see Licci,* 673 F.3d at 66 (2d Cir.2012); *PDK Labs, Inc.,* 103 F.3d at 1109; *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 31 (2d Cir.1996), but they contend that the New York counsel's mere involvement in Betancourt's and Trebbau's "multi-pronged strategy" is sufficient to satisfy this nexus. (Dkt. No. 44 at p. 27.) Such a connection is "too attenuated" from the transaction to give rise to specific jurisdiction. *Licci v. Lebanese Canadian Bank,* 20 N.Y.3d 327, 340, 960 N.Y.S.2d 695, 984 N.E.2d 893 (2012). For a claim to arise out of the services of hired counsel, the lawyers must have some interaction with Plaintiffs. "For example, in *PDK Labs,* the defendant's attorney— acting as his agent—'initiated from New York persistent, vexing communications' with the plaintiff for approximately three months. These communications apparently included threats of a lawsuit alleging patent violations and false advertising and attempts to compel the plaintiff into investing in defendant's product."*Chevron Corp.,* 974 F.Supp.2d at 624 (citing *PDK Labs, Inc.,* 103 F.3d at 1109). In this case, the New York counsel was retained by Defendants, who separately and independently caused harm to Plaintiffs. Plaintiffs cannot plausibly allege that the harm stemmed from the retention of the New York counsel. The hiring of a New York lawyer does not automatically grant personal jurisdiction in New York over every subsequent action of the client.

### b. CPLR § 302(a)(2)

 [38]  Alternatively, Plaintiffs assert that Defendants have "[committed] a tortious act within the state," and are thereby subject to New York's jurisdiction pursuant to CPLR § 302(a)(2). This argument is also unavailing. Section 302(a)(2) includes an exception for "cause[s] of action for defamation."Although Plaintiffs' claims include, in addition to defamation, tortious interference with prospective economic advantage, trade libel, and injurious falsehood, all of these causes of action sound in defamation. *See Symmetra Pty Ltd. v. Human Facets, LLC,* 12 Civ. 8857(SAS), 2013 WL 2896876, at \*6 n. 74 (S.D.N.Y. June 13, 2013) (citing *Cantor Fitzgerald, L.P. v. Peaslee,* 88 F.3d 152, 157 (2d Cir.1996)) ("[C]laims of injurious falsehood and tortious interference with prospective economic advantage were subject to defamation exception of sections 302(a) (2)... because the entire complaint sounded in defamation."); *Jolivet v. Crocker,* 859 F.Supp. 62, 65 (E.D.N.Y.1994) ("In

an attempt to circumvent this statute, [Plaintiff] has labelled his claims for relief as 'libel' and 'tortious interference with a contractual relationship.' However, both of these claims are based on the alleged defamatory letter, and thus § 302(a)(3) cannot serve to supply a basis for personal jurisdiction."); *Findlay v. Duthuit,* 86 A.D.2d 789, 790, 446 N.Y.S.2d 951 (N.Y.App.Div. 1st Dep't 1982) ("In looking for the reality and the essence of the action and not its mere name, we conclude from a fair reading of the complaint that plaintiff's claims do indeed sound in defamation of character."). Although Plaintiffs attempt to distinguish between "the falsity of the statement" and "its defamatory nature" (Dkt. No. 44 at p. 28), they provide no support for such a distinction, nor is it logical to draw one.

### 4. Jurisdictional Discovery

**\*16** **[39]** **[40]** Since Plaintiffs have not made a *prima facie* showing of personal jurisdiction over Betancourt and Trebbau, they request permission for jurisdictional discovery. At the jurisdictional stage, "district courts enjoy broad discretion in deciding whether to order discovery." *Eternal Asia Supply Chain Mgmt. (USA) Corp.,* 2013 WL 1775440, at \*10 (quoting *In re Terrorist Attacks on September 11, 2001,* 349 F.Supp.2d 765, 811 (S.D.N.Y.2005)). In deciding when to grant such discovery, reliance on "conclusory" allegations is generally not enough, *Jazini v. Nissan Motor Co., Ltd.,* 148 F.3d 181, 185 (2d Cir.1998), as it may lead to an unwarranted "fishing expedition" for jurisdiction, *NovelAire Technologies, L.L.C. v. Munters AB,* 13 Civ. 472(CM), 2013 WL 6182938, at \*13 (S.D.N.Y. Nov. 21, 2013). Similarly, Plaintiffs' preliminary showings should reveal more than mere "speculations or hopes" that jurisdiction exists. *Rosenberg v. PK Graphics,* 03 Civ. 6655(NRB), 2004 WL 1057621, at \*1 (S.D.N.Y. May 10, 2004).

**[41]** In this case, jurisdictional discovery is appropriate. Plaintiffs plausibly contend that limited discovery will reveal much of the currently lacking information, including whether Trebbau owns New York residential property as well as information regarding the portion of the year in which Betancourt and Trebbau reside in New York. It seems likely that such discovery is necessary for Plaintiffs to establish where Defendants are domiciled. "Accordingly, the Court cannot hold as a matter of law that [Plaintiffs have] failed to make a sufficient start toward establishing" jurisdiction. *Biro v. Nast,* 2012 WL 3262770, at \*8 (S.D.N.Y. Aug. 10 2012).

### G. D'Agostino

Unlike the other two Defendants in this case, D'Agostino was served in the state of New York and is therefore subject to this Court's jurisdiction. *See Kadic,* 70 F.3d at 247. However, D'Agostino contends that Plaintiffs have insufficiently pleaded both the RICO claim and the state law causes of action in relation to his involvement. As Plaintiffs have failed to properly plead the RICO claim generally, only D'Agostino's arguments regarding the state law claims remain. Those claims are addressed below.

### 1. The Defamatory Statements

**[42]** **[43]** Plaintiffs' state law claims, which include defamation, trade libel/injurious falsehood/defamation, tortious interference with prospective economic advantage, and civil conspiracy, are all based upon the allegedly defamatory statements made in the two phone calls to Cedeño and Banco Venezolano. As a general matter, Plaintiffs have properly pleaded the requirements of defamation; except for the question of D'Agostino's involvement, the claims are actionable. "To state a claim for defamation under New York Law, the plaintiff must allege (1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.' "*Thai v. Cayre Grp., Ltd.,* 726 F.Supp.2d 323, 329 (S.D.N.Y.2010); *see also Peters v. Baldwin Union Free Sch. Dist.,* 320 F.3d 164, 169 (2d Cir.2003); *Caruso v. City of New York,* 973 F.Supp.2d 430, 459 (S.D.N.Y.2013); *Dillon v. City of New York,* 261 A.D.2d 34, 38, 704 N.Y.S.2d 1 (1999). Plaintiffs allege that third parties Cedeño and Banco Venezolano were intentionally told false statements regarding Plaintiffs' business dealings with Derwick Associates, without prior authorization, resulting in both actual monetary damage ("the loss of something having economic or pecuniary value") and an injury that "impugns the basic integrity or creditworthiness of a business." *Celle v. Filipino Reporter Enterprises Inc.,* 209 F.3d 163, 179–180 (2d Cir.2000); *see* Dkt. No. 29 at ¶¶ 147–150, 157–162.

### 2. Pleading through Conspiracy

**\*17** It is uncontested that D'Agostino did not personally place either of the phone calls or directly utter any of the

alleged defamatory statements. (*See* Dkt. No. 29 at ¶¶ 147, 159; Dkt. No. 43 at p. 4.) However, Plaintiffs still "may plead the existence of a conspiracy in order to connect the actions of [an] individual defendant[ ][to] an actionable, underlying tort." *Briarpatch Ltd., L.P. v. Pate,* 81 F.Supp.2d 509, 516 (S.D.N.Y.2000); *see also Alexander & Alexander of New York, Inc. v. Fritzen,* 68 N.Y.2d 968, 969, 510 N.Y.S.2d 546, 503 N.E.2d 102 (1986). Therefore, Plaintiffs may charge D'Agostino "with the tortious activity alleged in the Amended Complaint, insofar as he is alleged to be part of a civil conspiracy to commit those acts."(Dkt. No. 43 at p. 4.) Plaintiffs' success in pleading claims III through VII is dependent on whether Plaintiffs have sufficiently pleaded a civil conspiracy among the three defendants.

[44] At the outset, Plaintiffs' seventh claim is civil conspiracy. But New York does not recognize civil conspiracy as an independent cause of action. *See Powell v. Kopman,* 511 F.Supp. 700, 704 (S.D.N.Y.1981) ("in New York there is no substantive tort of civil conspiracy"); *see also Legion Lighting Co., Inc. v. Switzer Grp., Inc.,* 171 A.D.2d 472, 567 N.Y.S.2d 52 (1991); *Plymouth Drug Wholesalers, Inc. v. Kirschner,* 239 A.D.2d 479, 658 N.Y.S.2d 64 (1997); *Lau v. Berman,* 6 Misc.3d 934, 792 N.Y.S.2d 292, 294 (Civ.Ct.2004) ("New York law does not recognize a cause of action for civil conspiracy"). Rather, "the damage for which recovery may be had in a civil action is not the conspiracy itself but the injury to the plaintiff produced by specific overt acts." *Rutkin v. Reinfeld,* 229 F.2d 248, 252 (2d Cir.1956). In other words, "the charge of conspiracy in a civil action is merely the string whereby the plaintiff seeks to tie together those who, acting in concert, may be held responsible in damages for any overt act or acts." *Id.; see also Brownstone Inv. Grp., LLC. v. Levey,* 468 F.Supp.2d 654, 661 (S.D.N.Y.2007); *Powell,* 511 F.Supp. at 704; *Alexander & Alexander of New York, Inc.,* 68 N.Y.2d at 969, 510 N.Y.S.2d 546, 503 N.E.2d 102. Therefore, the claim for civil conspiracy will be dismissed, but Plaintiffs may plead the existence of a civil conspiracy to attach responsibility to D'Agostino for the other state law causes of action.

[45] To establish a civil conspiracy, Plaintiffs "must demonstrate the underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and, (4) resulting damage or injury." *Treppel v. Biovail Corp.,* 03 Civ. 3002(PKL), 2005 WL 2086339 (S.D.N.Y. Aug. 30, 2005); *see also Meisel v. Grunberg,* 651

F.Supp.2d 98, 119 (S.D.N.Y.2009); *Am. Bldg. Maint. Co. of New York v. Acme Prop. Servs., Inc.,* 515 F.Supp.2d 298, 318 (N.D.N.Y.2007). In this case, the civil conspiracy allegation turns on whether Plaintiffs have pleaded with particularity that D'Agostino actually agreed to a conspiracy to defame.

### a. Conclusory Allegations

\*18 D'Agostino first contends that Plaintiffs' allegations are too conclusory to plausibly allege that he was involved in a conspiracy with the other defendants. He compares this case to *Schwartz v. Soc'y of New York Hosp.,* in which the First Department explained:

> [M]ore than a conclusory allegation of conspiracy or common purpose is required to state a cause of action against [a] nonactor. In this case, the bare allegation that these two defendants were acting in concert with defendant Savarese without any allegation of independent culpable behavior on their part was clearly insufficient to link them to the allegedly defamatory remarks. Nor is the unsupported statement that he was acting on their behalf sufficient to allege an agency relationship encompassing the authority to make the remarks. [6]

199 A.D.2d 129, 130, 605 N.Y.S.2d 72, 73 (N.Y.App.Div. 1st Dep't 1993) (internal citations omitted). D'Agostino argues that even if he is assumed to be an official of Derwick Associates, that fact alone does not imply that he agreed to conspire to defame Plaintiffs. *See Schwartz,* 605 N.Y.S.2d at 73 (conspiracy was not established among co-officials of a hospital); *Donini Int'l, S.p.A. v. Satec (U.S.A.) LLC,* 03 Civ. 9471(CSH), 2004 WL 1574645 (S.D.N.Y. July 13, 2004) (conspiracy charge among companies partially held by the same owners and located at same address was dismissed as conclusory); *Brownstone Inv. Grp., LLC.,* 468 F.Supp.2d at 661 (conspiracy charge among co-principals of a business dismissed as conclusory). Plaintiffs cannot rely exclusively upon such a business relationship to sufficiently plead a conspiracy.

**[46]** However, even if D'Agostino's alleged business relationship is set aside, Plaintiffs have pleaded conspiracy with enough specificity. To do this, they must assert "specific allegations, including the times, facts, and circumstances of the alleged conspiracy." *Am. Bldg. Maint. Co. of New York,* 515 F.Supp.2d at 318; *see also Brownstone Inv. Grp., LLC.,* 468 F.Supp.2d at 661. Frequently, conspiracy allegations are deemed conclusory when the totality of the allegations starts and ends with a generic statement that the defendants conspired against the plaintiff. *See Treppel,* 2005 WL 2086339, at *12 ("[h]is conclusory allegations ... do not even identify Treppel's alleged co-conspirators"); *Donini Int'l, S.p.A.,*2004 WL 1574645, at *4 ("the Complaint does not [even] provide a factual basis from which it can be inferred that [Defendant] did anything"); *Brownstone Inv. Grp., LLC.,* 468 F.Supp.2d at 661 (nothing in complaint that the alleged co-conspirators were aware of the underlying tort, let alone agreement to advance it); *Am. Bldg. Maint. Co. of New York,* 515 F.Supp.2d at 318 (no allegations that any overt act ever occurred); *Goldstein v. Siegel,* 19 A.D.2d 489, 492, 244 N.Y.S.2d 378, 381 (1963) ("no facts are alleged to identify each of the defendants [in] the alleged conspiracy").

**\*19** The allegations in this case are not as cursory. The Complaint alleges when the agreement constituting the conspiracy was initiated (late 2012), the identities of the co-conspirators (Betancourt, Trebbau, and D'Agostino), the content of the alleged agreement (to contact Cedefio and Banco Venezolano to convey false information), and the motivation underlying the conspiracy (to disseminate false information "throughout the U.S.-based marketplace"). (Dkt. No. 29 at ¶¶ 157–161, 321–323.) It also includes a fairly detailed account of how the alleged conspiracy was executed, including dates, some locations, and the specific acts taken by each conspirator. (*See id.*) Based on Plaintiffs' allegations, it is plausible to infer that D'Agostino agreed to the defamatory acts which Betancourt and Trebbau executed.

### b. Group Pleading

D'Agostino also raises the concern that Plaintiffs engage in impermissible group pleading. "The essential purpose of Rule 8(a)'s pleading requirements is to 'give the defendant[s] fair notice of what the claim is and the grounds upon which it rests.'" *Watkins v. Smith,* 12 Civ. 4635(DLC), 2013 WL 655085, at *9 (S.D.N.Y. Feb. 22, 2013) (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). D'Agostino contends

that Plaintiffs' Complaint frequently uses the collective term "Defendants" when referring to events in which only Betancourt and Trebbau engaged, which prevents each Defendant from knowing the particular allegations made against him.

While Plaintiffs should generally plead allegations in relation to each defendant, the instances of "group pleading" identified by D'Agostino do not raise notice concerns. The underlying premise of Plaintiffs' allegations is that D'Agostino is a de facto principal or agent of Derwick Associates who is heavily involved in its operations, regardless of whether he has an official title. As such, Plaintiffs' use of the collective term "defendants" when discussing the state lawsuit is not a mistake or attempt to obfuscate, but an accurate indication of their claim that D'Agostino was directly involved in the matter even though he was not a named party. "[S]ince there are only three defendants named, which [Plaintiffs allege] were acting either together or interchangeably," Plaintiffs' "imprecise use of the term 'defendants' " does not merit dismissal. *Umoh v. Marks,* 2010 WL 2651939, at *3 n. 2 (N.D.N.Y. June 25, 2010).

The cases cited by D'Agostino in support of his argument reveal the kinds of scenarios where group pleading leads to a lack of notice and therefore warrants dismissal. In each of those cases, the plaintiff alleges fraud, thus invoking Rule 9(b)'s heightened pleading standard requiring even greater specificity. In contrast, in this case, fraud is not raised outside of the improperly pleaded RICO claim. Additionally, Plaintiffs' allegations are comparatively specific. For example, in *Targum v. Citrin Cooperman & Co., LLP,* 12 Civ. 6909(SAS), 2013 WL 6087400, at *6 (S.D.N.Y. Nov. 19, 2013), group pleading was an issue because the complaint referred to the multiple defendants in an inconsistent manner. *See id.*("[Plaintiff] confusingly treats Weber and Citrin as a unit—referring at various times to 'Citrin and Weber,' 'Citrin and/or Weber,' and 'Citrin/ Weber' "). Here, the Complaint frequently distinguishes among the acts committed by the various defendants. In reference to the phone calls at the center of the state law claims, the Complaint clearly states that only Betancourt made the first call to Cedeño; that Trebbau's father-in-law, acting as his agent, made the second call to Cedeño; and that Betancourt and Trebbau, through Betancourt's cousin, contacted Banco Venezolano. (Dkt. No. 29 at ¶¶ 147, 159–162.) D'Agostino's ability to draw attention to the fact that the Complaint never alleges that he personally uttered any of the defamatory remarks demonstrates that there is

sufficient notice as to what allegations are levied against which defendants, when it is necessary to distinguish among them.

### c. Intracorporate Conspiracy Doctrine

**\*20** **[47]** While Plaintiffs sufficiently allege the requisite elements of a civil conspiracy, D'Agostino argues that the charge is nonetheless barred under the intracorporate conspiracy doctrine. [7] "Under the intracorporate conspiracy doctrine, the officers, agents, and employees of a single corporate entity, each acting within the scope of [his] employment, are legally incapable of conspiring together." *Little v. City of New York,* 487 F.Supp.2d 426, 441–42 (S.D.N.Y.2007) (internal quotation marks omitted); *see also Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978); *K.D. ex rel. Duncan v. White Plains Sch. Dist.,* 921 F.Supp.2d 197, 210 (S.D.N.Y.2013); *Dunlop v. City of New York,* 06 Civ. 0433(RJS), 2008 WL 1970002, at \*10 (S.D.N.Y. May 6, 2008); *Ericson v. Syracuse Univ.,* 35 F.Supp.2d 326, 329 (S.D.N.Y.1999). The exception to this doctrine "applies where a plaintiff adequately alleges that each defendant possessed an independent, personal conspiratorial purpose, wholly separate and apart from the entity." *Broich v. Inc. Vill. of Southampton,* 650 F.Supp.2d 234, 247 (E.D.N.Y.2009) (internal quotation marks omitted); *see also Little,* 487 F.Supp.2d at 442; *Quinn v. Nassau Cnty. Police Dep't,* 53 F.Supp.2d 347, 360 (E.D.N.Y.1999). Therefore, when the alleged conspirators are members of the same corporation, Plaintiffs can avoid the application of the intracorporate conspiracy doctrine only by alleging that " 'the individual defendants were motivated by an [ ] independent personal stake in achieving the corporation's objective' rather than 'merely carrying out the corporation's managerial policy.' " *Dunlop,* 2008 WL 1970002, at \*10 (quoting *Girard v. 94th St. & Fifth Ave. Corp.,* 530 F.2d 66, 71 (2d Cir.1976)).

Plaintiffs contend that the intracorporate conspiracy doctrine is applicable only in the narrow contexts of federal antitrust law, 42 U.S.C. § 1985, and 42 U.S.C. § 1983, and does not extend to New York state common law conspiracy claims. While it is true that the Second Circuit has applied the doctrine thus far only in antitrust and § 1985 cases, it has never explicitly limited its application to those narrow confines, *see United States v. Weintraub,* 27 Fed.Appx. 54, 57 (2d Cir.2001); *see also Herrmann,* 576 F.2d at 459; *Girard,* 530 F.2d at 74, and district courts in this Circuit

have expanded the doctrine to cover § 1983 conspiracy claims, *see Dunlop,* 2008 WL 1970002, at \*10; *K.D. ex rel. Duncan,* 921 F.Supp.2d at 210; *Little,* 487 F.Supp.2d at 442. More importantly, Plaintiffs' position is contradicted by the case law: district courts in this Circuit have already applied the intracorporate conspiracy doctrine to state law conspiracy claims on numerous occasions. *See N. Shipping Funds I, L.L.C. v. Icon Capital Corp.,* 12 Civ. 3584(JCF), 2013 WL 1500333, at \*6 (S.D.N.Y. Apr. 12, 2013); *Atl. Int'l Movers, LLC v. Ocean World Lines, Inc.,* 914 F.Supp.2d 267, 280 (E.D.N.Y.2012); *LaPorte v. Greenwich House,* 09 Civ. 6645(NRB), 2010 WL 1779342, at \*8 n. 15 (S.D.N.Y. Apr. 26, 2010); *Santos v. Praxair Surface Technologies, Inc.,* 2005 WL 756528 (D.Conn. Mar. 31, 2005). Furthermore, there is no reason not to apply the doctrine to New York state conspiracy claims as it is rooted in the New York state common law. *See Bereswill v. Yablon,* 6 N.Y.2d 301, 305, 189 N.Y.S.2d 661, 160 N.E.2d 531 (1959) (citing *Nelson Radio & Supply Co. v. Motorola, Inc.,* 200 F.2d 911 (5th Cir.1952)) ("While it is entirely possible for an individual and a corporation to conspire, it is basic that the persons and entities must be separate."). [8] Finally, it would be logically inconsistent to hold that agents of a corporation, acting in their official capacity, together constitute only a single actor for the sake of some conspiracies but not for others. There is no distinction among the types of conspiracies covered by the aforementioned federal statutes as compared to New York state common law that would explain disparate application of the intracorporate conspiracy doctrine. This is evidenced by Plaintiffs' inability to raise any legal arguments opposing the application of the doctrine to state law civil conspiracy claims beyond stating that such application "should be viewed with caution." (Dkt. No. 50. at p. 6.) As Judge Mukasey held when he applied the intracorporate conspiracy doctrine to § 1983 conspiracy claims, "in the absence of controlling contrary authority, this court will continue to apply the intracorporate conspiracy doctrine ... because the doctrine's logic is sound." *Anemone v. Metro. Transp. Auth.,* 419 F.Supp.2d 602, 604 (S.D.N.Y.2006).

**\*21** In the present case, Plaintiffs repeatedly attempt to establish that D'Agostino is the likely founder and co-owner of Derwick Associates. (*See* Dkt. No. 29 at ¶¶ 47, 69–70, 78, 84, 89, 98, 112, 132, 165–166, 171–172.) In their memorandum, they state that "Plaintiffs' defamation allegations cannot be viewed in a vacuum separate and apart from their allegations concerning D'Agostino's ... involvement with Derwick."(Dkt. No. 43 at p. 8.) By basing their allegations on such a theory, they have subjected their

claims to the scope of the intracorporate conspiracy doctrine. If Plaintiffs' allegations are accepted as true at this stage in the proceedings, D'Agostino, Betancourt, and Trebbau are all officers or agents of Derwick Associates.

Plaintiffs alternatively argue that even if the doctrine applies to state law conspiracies, it is inapplicable in the present case because a single corporate entity is not involved, Derwick Associates is not a named defendant, and Defendants' actions qualify under the personal interest exception. First, although the name Derwick Associates is used in reference to the combination of Derwick Associates USA LLC and Derwick Associates Corporation, the Complaint alleges that "at all relevant times, Defendants Betancourt, Trebbau, and D'Agostino worked together as each other's agents and partners, and were the owners and/or officers, directors, or operators of Derwick Associates USA LLC *and* Derwick Associates Corporation."(Dkt. No. 29 at ¶¶ 57–48, 53–54) (emphasis added). As such, the Complaint states with sufficient specificity that the alleged conspirators were all members of at least one single corporate entity. Even if the Complaint lacked this allegation, the intracorporate conspiracy doctrine has previously been expanded to include the "activity of a parent and its wholly owned subsidiary" as one relevant entity. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Although the exact relationship between Derwick Associates USA and Derwick Associates Corporation is not entirely clear at this stage, the allegations suggest that "they have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one," and thus should be judged as one entity for the purposes of this doctrine.*Id.*

Second, it is not a requirement of the intracorporate conspiracy doctrine that the corporate entity in question be a named defendant in the alleged conspiracy. *See, e.g., Lopez v. Bushey,* 2013 WL 1294477 (N.D.N.Y. Mar. 4, 2013); *Randle v. Alexander,* 960 F.Supp.2d 457, 475 (S.D.N.Y.2013).

**[48]**  Finally, Plaintiffs contend that if the doctrine is otherwise applicable, it still does not apply to this case as the alleged conspirators are pursuing personal interests separate and apart from their shared involvement in the corporate entity. Many of the allegations in the Complaint appear to contradict this assertion. For example, the defamatory statements on which all the state law claims arise regard Derwick Associates ("Ambassador Reich is working for

Derwick") (Dkt. No. 29 at ¶ 157), and those statements were allegedly uttered with the intent to cover up the continued operations of Derwick Associates' bribery scheme. Nevertheless, there is also reason to believe based on the Complaint that D'Agostino may have been acting outside of his official capacity. In particular, Plaintiffs draw attention to the fact that D'Agostino "profited wildly" from the ongoing illegal bribery scheme. (*Id.* at ¶ 3.) This implies a "personal stake in achieving the corporation's objective" that goes beyond "merely carrying out the corporation's managerial policy."*Girard,* 530 F.2d at 71; *see also Little,* 487 F.Supp.2d at 442; *Dunlop,* 2008 WL 1970002, at *10. While an employee ensuring the profitability of his company is not exceptional, if Plaintiffs are capable of showing that D'Agostino's alleged conspiratorial activities provided him disproportionately great profit as compared to Derwick Associate's derived benefit (or at the expense of Derwick), such a beyond may constitute a personal stake. *See Walters v. McMahen,* 795 F.Supp.2d 350, 359 n. 16 (D.Md.2011), *aff'd,*684 F.3d 435 (4th Cir.2012). Additionally, the alleged conspiracy relates to D'Agostino's attempt to harm Plaintiffs in order to, in part, protect himself from the surfacing of the bribery activity. Self-protection is separate and apart from the concerns of the company. *See Hill v. City of New York,* 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005) ("conspiring with others to cover-up" illegal activity deemed a personal interest). For these reasons, Plaintiffs have sufficiently alleged at this stage that D'Agostino's involvement in the alleged conspiracy was plausibly based on personal interests rather than his supposed role in Derwick Associates. Accordingly, Plaintiffs' allegations are not barred by the intracorporate conspiracy doctrine at the dismissal stage.

## IV. Conclusion

 **\*22**  For the foregoing reasons, Defendants' motion to dismiss (Docket No. 31) is GRANTED in part and DENIED in part. Claims I and II (RICO) and VII (civil conspiracy) are dismissed.

Defendant D'Agostino's motion for leave to file a sur-reply (Docket No. 57) is granted.

The parties shall confer on the appropriate scope and schedule for jurisdictional discovery and submit a joint letter to the Court with a proposed schedule on or before September 12, 2014.

The Clerk of Court is directed to close the motions at Docket Nos. 31 and 57.

SO ORDERED.

**Parallel Citations**

RICO Bus.Disp.Guide 12,520

Footnotes

1    All facts are as alleged in the Complaint, which the Court accepts as true for purposes of this motion.

2    As discussed *infra,* it is irrelevant whether the multiple violations of the Travel Act are counted as a single or as multiple predicate acts. The same is true of the violations of the wire fraud statute.

3    D'Agostino was personally served in the State of New York. (*See* Dkt. No. 42–11 at 2.) "Fed.R.Civ.P. 4(e)(2) specifically authorizes personal service of a summons and complaint upon an individual physically present within a judicial district of the United States, and such personal service comports with the requirements of due process for the assertion of personal jurisdiction."*Kadic v. Karadzic,* 70 F.3d 232, 247 (2d Cir.1995) (citing *Burnham v. Superior Court of California,* 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990)). D'Agostino does not contest the exercise of personal jurisdiction over him.

4    Since *Daimler,* the Second Circuit has avoided reinterpreting CPLR § 301, a state statute. *See Sonera Holding B.V.,* 750 F.3d at 225 n. 2; *Meyer v. Bd. of Regents of Univ. of Oklahoma,* 13 Civ. 3128(CM), 2014 WL 2039654, at *2 (S.D.N.Y. May 14, 2014); *Robinson,* ——F.Supp.3d at ——, 2014 WL 1599462, at *1.

5    Plaintiffs allege upon information and belief that Betancourt owns additional real property in Florida. Details regarding this property are absent and no allegation is made that the New York property and the Florida property represent the full extent of Betancourt's property portfolio. (*See* Dkt. No. 29 at ¶ 25.)

6    Although *Schwartz* involved a request for leave to amend, its holding has been applied in the context of a motion to dismiss. *See Meisel,* 651 F.Supp.2d at 119; *Am. Bldg. Maint. Co. of New York,* 515 F.Supp.2d at 318; *Treppel,* 2005 WL 2086339, at *5.

7    D'Agostino motion to file a sur-reply is granted. (Dkt. No. 57.)

8    Notably, in *Bereswill* the New York Court of Appeals cited *Nelson Radio & Supply Co.,* 200 F.2d 911, to support its adoption of the intracorporate conspiracy doctrine. This is the same case cited by the Second Circuit in *Girard* when it first extended the same doctrine to § 1985 conspiracy claims. *See Girard,* 530 F.2d at 70.

2011 WL 3876528
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michael SAMMS, Plaintiff,

v.

Brian FISCHER, Lucien J. Leclaire, Jr., S.B.
Duncan, Norman Bezio, James Ferro, H.
Reinhold, Michael Hogan, Mr. Drown, Dale Artus,
S.E. Racette, Joseph P. Porcelli, Defendants.

No. 9:10–CV–0349 (GTS/
GHL). | March 25, 2011.

**Attorneys and Law Firms**

Michael Samms, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of
New York, Charles J. Quackenbush, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### *REPORT–RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to me
for Report and Recommendation by the Honorable Glenn
T. Suddaby, United States District Judge, pursuant to 28
U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Michael
Samms alleges that Defendants violated his constitutional
rights by placing him in administrative segregation at Clinton
Correctional Facility and retaining him in that placement for
more than two years. Currently pending before the Court is
Defendants' motion for judgment on the pleadings pursuant
to Federal Rule of Civil Procedure 12(c). (Dkt. No. 44.)For
the reasons that follow, I recommend that Defendants' motion
be granted in part and denied in part.

### I. BACKGROUND

The following facts are taken from Plaintiff's complaint (Dkt.
No. 1) and documents attached to the complaint [1] (Dkt. Nos.
1–1 and 1–2):

Plaintiff began serving his current sentence in the New York
Department of Correctional Services ("DOCS") system on

July 26, 2007. (Dkt. No. 1 at 10 [2] ¶ 17.) He was housed in
the general population at Downstate Correctional Facility. *Id.*
at 11 ¶ 19.

On January 11, 2008, Plaintiff was transferred to Clinton
Correctional Facility. *Id.* ¶ 21.Plaintiff was escorted directly
to the Special Housing Unit ("SHU"), an area of the
prison in which inmates are confined to a cell for twenty-
three hours a day and deprived of many of the privileges
that inmates in the general population enjoy. *Id.* ¶¶ 24–
28.When Plaintiff asked the area supervisor and officers
why he was being placed in the SHU, they told him they
were "just following orders" from Defendant Dale Artus,
Superintendent of Clinton Correction Facility. *Id.* at 12 ¶ 30.

Pursuant to a written order by Defendant Deputy
Superintendent of Security S.E. Racette, Plaintiff was placed
in a special cell, different from the other cells in the SHU,
designed for inmates who had been found guilty of throwing
feces and bodily fluids. (Dkt. No. 1 at 12 ¶¶ 31–32, 34; Dkt.
No. 1–1 at 1–4.)The metal mesh wire and thick fiber glass
shield across the front of the cell gate prevented much air
from coming into the cell, causing it to be hot, stuffy, and dry.
(Dkt. No. 1 at 12 ¶ 33.) Plaintiff remained in the special cell
until February 10, 2008, "although he never threw anything
on a staff figure [ ]or inmate, nor did Plaintiff ever have
a misbehavior report or incident on his entire disciplinary
history record that would constitute/warrant him being placed
behind this special cell ..."*Id.* at 13 ¶ 35.

On January 12, 2008, Defendant S.B. Duncan, DOCS
Senior Investigator, recommended that Plaintiff be placed
in administrative segregation. *Id.* ¶ 36.In the DOCS system,
inmates are placed in administrative segregation when it is
determined that their "presence in general population would
pose a threat to the safety and security of the facility."N.Y.
Comp.Codes. R. & Regs. tit. 7, § 301.4(b). Pursuant to
regulation, administrative segregation inmates housed in the
SHU are "subject to the same rules and regulations as
those disciplinary inmates who have completed 30 days
of satisfactory adjustment."*Id.* at (c). Plaintiff asserts that
inmates in administrative segregation cannot participate in
religious worship or religious education classes, are limited
to exercising one hour per day in a 9x14 cage, and cannot
possess personal underwear or socks. (Dkt. No. 1 at 26 ¶¶ 96–
97 .) Many of the inmates in administrative segregation are
seriously mentally ill, scream and bang on the cell walls, and
smear feces on the walls and floors. *Id.* ¶ 97.

**\*2** Defendant Duncan stated that his reasons for recommending administrative segregation for Plaintiff were: (1) Plaintiff's conviction for first degree robbery, first degree assault, and criminal possession of a weapon, for which he was serving a sentence of thirty-four to forty years; (2) Plaintiff's guilty plea to a charge of first degree Promoting Prison Contraband; (3) Plaintiff's accumulation of forty-four infractions, including eleven assaults on staff, while confined at Rikers Island prior to entering DOCS; (4) Plaintiff's ability to slip from handcuffs; (5) Plaintiff's disciplinary record during an earlier DOCS sentence at Downstate Correctional Facility in 2001, when he accumulated three Tier 3 reports and six Tier 2 reports on charges ranging from violent conduct and fighting to unauthorized organization; (6) Plaintiff's accumulation of thirty infractions at Rikers Island in 2007, including three assaults on staff; (7) the discovery of a cell phone and charger in Plaintiff's property at Rikers Island; (8) the 'considerable mention' of Plaintiff by name in a 2007 New York Daily News article, which described Plaintiff as "[t]opping the rogues gallery" in a list of sixty-five "violence-prone criminals who need extra attention"; and (9) two 2007 Tier 2 reports. (Dkt. No. 1–1 at 5.) Defendant Duncan concluded that Plaintiff:

> has proven himself to be a severe management problem. His ability to procure a cell phone while housed at Rikers Island [ ] indicates he has the connections to circumvent security and continue with his criminal behavior. This inmate is also seen as having a certain influence over other incarcerated individuals he affiliates himself with.

*Id.*

On January 22, 2008, Defendant Drown conducted an administrative segregation hearing. (Dkt. No. 1 at 13 ¶ 37.) At the beginning of the hearing, Defendant Drown told Plaintiff not to bother calling any witnesses or making too many objections because it would just "drag out the hearing" and "it wouldn't matter anyway because he had a strict order to find Plaintiff guilty." *Id.* ¶ 39. Defendant Drown told Plaintiff "not to worry, because judging by Plaintiff's ... disciplinary history ... Plaintiff would only be held in Administrative Segregation Confinement for approx[imately] six ... months, then released to the Close Supervision Unit ..., as he had seen happen to another inmate ... [who] had a very similar case and record as the Plaintiff's." *Id.* ¶ 40.

The hearing lasted forty-five minutes. (Dkt. No. 1 at 14 ¶ 41.) Plaintiff did not call any witnesses or make too many objections. *Id.* During the hearing, Defendant Drown considered the Daily News article to which Defendant Duncan had referred. *Id .* ¶ 43. The article stated:

> They're among the baddest of the bad, a scary crew of armed thugs who walked the city streets with violence on their minds and guns at the ready. And now they're being shadowed by the NYPD. A little more than a year after it was created, the city's gun offenders registry-the first in the nation-is tracking 65 felons, with hundreds expected to follow. Of the registrants, 21 are out of jail. And the offenders must begin reporting to the NYPD next month. The registry-proposed by Mayor Bloomberg in January 2006, signed into law last summer and launched in March-isn't meant to mimic the public warning system of sex offender registries. It's an internal NYPD roster of violence-prone criminals who need extra attention. Criminals land on the list when they're convicted of a weapons charge. After they're released from prison, they must meet with cops every six months for four years. Topping the rogues gallery is Michael Samms, 26–a career criminal who blew apart a man's leg just for fun, the Daily News has learned. Samms and a pal launched the August 2005 attack while riding around downtown Brooklyn in a silver Chrysler 300. After spotting a couple who had just left a club, Samms jumped out of the car, pointed a 9–mm. Luger semiautomatic pistol at Eddie Battle Jr. and screamed, "Run your pockets!" Battle hesitated. Samms rifled through the man's pants, pulled out a wallet and got into the car. Then—just for spite —Samms stepped out and shot Battle in the thigh, slicing his femoral artery

and shattering the bone. Samms was
sentenced to 25 years in prison in July.

**\*3**  (Dkt. No. 1–1 at 8.)

At the conclusion of the hearing, Defendant Drown
determined that Plaintiff should be placed in administrative
segregation. (Dkt. No. 1 at 14 ¶ 43.) He stated that he relied
upon Plaintiff's "significant record at the New York City
D.O.C.S., and [a] newspaper article describ[ing] the Plaintiff
as 'needing extra attention among a population composed
exclusively of felons....' " *Id.*

Plaintiff asserts that Defendant Drown acted arbitrarily and
capriciously, noting in particular that "the article never stated:
'among a population composed exclusively of felons.' " *Id.*
¶¶ 43–44.

Plaintiff appealed Defendant Drown's disposition to
Defendant Norman Bezio, the DOCS Director of
Special Housing and Inmate Disciplinary Program. *Id.* ¶
45.Defendant Bezio affirmed Defendant Drown's decision on
March 13, 2008.*Id.* ¶ 46.

On March 23, 2008, Plaintiff sent a letter to Defendant Bezio
asking him to reconsider his decision. (Dkt. No. 1 at 15 ¶ 47.)
Plaintiff sent a carbon copy to Defendant Brian Fischer, the
Commissioner of DOCS. *Id.* On March 31, 2008, Defendant
Lucien J. LeClaire, the DOCS Deputy Commissioner of
Correctional Facilities, responded to Plaintiff's letter. *Id.* ¶
48.The letter, which was carbon copied to Defendant Artus,
stated:

> Commissioner Fischer has asked
> me to respond to your letter to
> him concerning your confinement
> status in Administrative Segregation
> at Clinton Correctional Facility.
> Please be advised that Departmental
> regulations require that a hearing be
> conducted to assess the reason why
> the segregation of a specific inmate
> may be necessary. A hearing was
> conducted and due to the serious
> nature of the information contained
> in the Administrative Segregation
> recommendation, your placement
> in Administrative Segregation was
> warranted. It is noted that the decision
> of the hearing officer was affirmed

> on March 13, 2008. The hearing was
> conducted appropriately in accordance
> with Departmental procedures. Your
> Administrative Segregation[ ] status
> continues to be reviewed periodically
> to determine the need for such
> assignment. At this time, your present
> placement appears appropriate.

(Dkt. No. 1–1 at 10.)

On April 4, 2008, Plaintiff wrote to Prisoner's Legal Services
of New York regarding his placement in administrative
segregation. (Dkt. No. 1 at 15 ¶ 49.) On April 18, 2008,
Prisoner's Legal Services wrote to Defendant Bezio.*Id.* ¶
50.The letter stated:

> Overall the recommendation for Mr. Samms' placement
> in Ad Seg seems like an overreaction, as it arose not by
> his behavior in state custody, but rather on the basis of a
> newspaper article. The newspaper article ... discusses a gun
> offender registry created by the NYPD for the purpose of
> tracking offenders upon release from prison. CHO Drown
> notes that the article describes Mr. Samms as a "violence
> prone criminal needing extra attention."Reliance upon this
> registry seems highly irregular and inappropriate here.
> Moreover, it is clearly misplaced as it completely fails to
> consider the significant difference between needed "extra
> attention" while out on the street and warranting extremely
> restricting confinement while in prison. Gun violence and
> crime prevention and detection strategies on the street is
> one thing, appropriate custody placement within DOCS is
> quite another. Indeed the only "extra attention" required
> by the registry is to meet with police officers every six
> months. This pales in comparison to highly restrictive
> SHU confinement and all it entails, including the lack of
> programming. As well, the reliance on Mr. Samms' conduct
> while in jail prior to entering state custody does not provide
> justification for his Ad Seg placement either. Surely a
> maximum [security] state prison such as Clinton is much
> more secure than a city jail. Indeed, this is evidenced by
> the Ad Seg recommendation itself, which lists a total of
> 44 disciplinary infractions incurred during Mr. Samms'
> time on Rikers, as opposed to a total of 9 infractions
> (six of which were Tier II s) while in DOCS custody.
> In addition, the city jail infractions appeared to have
> occurred within a two month period, yet the 9 infractions
> in state custody occurred over a two and a half year period.
> Indeed, at the time this Ad Seg recommendation was made
> Mr. Samms had only received two Tier II tickets in the

nearly six months he had been in state custody. Clearly the diminished infraction rate in state custody reflects, at least in part, the enhanced security that NYSDOCS possesses, together with a qualitative difference in Mr. Samms' behavior and conformity with DOCS' rules and standards. In short, Mr. Samms has not proven himself to be in need of Ad Seg placement in state custody.

**\*4** (Dkt. No. 1–1 at 11–12.)

On May 13, 2008, Plaintiff wrote to Defendant Fischer regarding his placement in administrative segregation. (Dkt. No. 1 at 15 ¶ 51; Dkt. No. 1–1 at 13–16.)Defendant LeClaire responded to Plaintiff's letter. (Dkt. No. 1 at 15 ¶ 52.)He stated that:

> Commissioner Fischer has asked me to respond to your letter to him concerning your confinement status in Administrative Segregation at Clinton Correctional Facility. It should be noted that the procedures to be followed with regard to inmates assigned to Administrative Segregation are established in Directive # 4933, Chapter VI, Title 7, NYCRR. All issues noted in your letter will also be considered as part of your next sixty-day review in Central Office. I am forwarding a copy of your letter to Superintendent Artus at Clinton Correctional Facility for his information and any action deemed appropriate.

(Dkt. No. 1–1 at 17.)

On October 6, 2008, Plaintiff filed a grievance regarding unsanitary SHU conditions. (Dkt. No. 1–2 at 31–32.)He stated that "there is still human feces smeared all over the rec cages that I am being placed in. The feces are smeared on all of the rec cages-not one particular cage. It has been this way for quite a while now (a few months) ..." (Dkt. No. 1–2 at 31.)

On October 7, 2008, Plaintiff filed a grievance regarding excessive noise in the SHU. (Dkt. No. 1–2 at 33–34.)He stated that the "loud and disturbing noise comes from all of the serious mentally ill inmates that they (DOCS) have me around ...." *Id.* at 33.He described the noise as "constant screaming, yelling, banging on the walls and cell gates that

goes on all day thru-out (sic) a 24 hour period." *Id.* He also alleged that he had to "smell and breath[e] in the atrocious odor of feces being thrown ... people not taking showers for weeks." *Id.* at 34.

During 2008 and 2009, a three-member facility committee consisting of Defendant Racette, Defendant Corrections Counselor Joseph P. Porcelli, and an unnamed person (the "facility committee") reviewed Plaintiff's administrative segregation placement every sixty days. (Dkt. No. 1 at 16 ¶ 55.)On November 17, 2008, the facility committee noted that Plaintiff was originally placed in administrative segregation because he:

> has been described in a newspaper article as a violence prone criminal needing "extra attention" among a population composed exclusively of felons. While awaiting trial and subsequent sentencing on Rikers Island, he accumulated 30 infractions including 3 assault[s] on staff. He was also found to possess a Nokia phone and charger on 5/17/07. [3]

(Dkt. No. 1–1 at 32.)The facility committee noted that Plaintiff "continues to comply with all policies and procedures at Clinton Correctional Facility. Samms has not been a management problem since being assigned to Clinton."*Id.* The facility committee concluded, however, that Plaintiff "continues to pose a threat to the safety and security of the facility if placed in General [P]opulation."*Id.*

**\*5** The facility committee forwarded its recommendation to a Central Office committee consisting of Defendant Staff Inspector General James Ferro, Defendant Staff Counsel H. Reinhold, and Defendant Chairman of Facility Operations Michael Hogan. (Dkt. No. 1 at 16 ¶¶ 57–58.)On November 21, 2008, the Central Office committee found that:

> While an inmate with the New York City Department of Correction (DOC) at Riker's Island, [Plaintiff] presented a persistent and serious safety threat. Inmate Samms collected at least 16 disciplinary infractions, including at least two for assaults on DOC staff, from October 2005 through March 2007. During an

earlier period of incarceration at Riker's Island, April 1999 through January 2001, he amassed at least 32 disciplinary infractions, including at least nine for assaulting DOC staff. On May 15, 2007, Riker's Island found inmate Samms to be in possession of a Nokia cell phone and cell phone charger. On December 15, 2006, inmate Samms pled guilty to Promoting Prison Contraband in the 2nd as a result of his possession of a weapon in Riker's Island on September 18, 2006. On February 21, 2006, inmate Samms pled guilty to Assault in the 3rd and Obstruction of Government Administration in the 2nd as a result of his assault on DOC staff at Riker's Island on November 20, 2005. On June 29, 2000, inmate Samms pled guilty to Assault in the 3rd for his assault on DOC staff at Riker's Island on August 28, 1999. On September 27, 1999, inmate Samms pled guilty to Attempted Assault in the 3rd as a result of a physical altercation with DOC staff at Riker's Island that occurred on June 27, 1999. On January 4, 2001, inmate Samms pled guilty to Promoting Prison Contraband in the 1st as a result of the inmate's possession of a weapon (a sharp metal object hidden in his right sock) at Riker's Island on April 20, 1999. During inmate Samms' first period of incarceration with the New York State Department of Correctional Services (DOCS) that commenced on April 11, 2001, he accumulated three Tier III reports and six Tier II reports, for which inmate Samms was found guilty of charges including, but not limited to, Violent Conduct, Fighting and Unauthorized Organization. During inmate Samms' current period of incarceration with DOCS that began on July 26, 2007, he has received two Tier II reports and one Tier III report, for which he was found guilty of charges including, but not limited to smuggling, the exchange of a telephone pin number, and failure to follow a direct order. Inmate Samms' earliest release date is November 15, 2039, resulting from crimes that include Robbery in the 1st, Criminal Possession of a Weapon in the 2nd and Assault in the 1st. The incident that gave rise to these crimes included the gratuitous shooting by inmate Samms of a robbery victim, subsequent to the robbery, resulting in serious injury to said victim's leg. Finally, it should be noted that inmate Samms is a member of a violent unauthorized criminal enterprise. In light of the foregoing, it is clear that inmate Samms is a dangerous individual whose criminal acts did not abate upon his incarceration. He has, on multiple occasions, directed violence against security staff. Consequently, this Committee believes that inmate Samms' presence in a general population setting at any correctional facility would pose an undue risk to safety and security. The Committee therefore recommends the inmate's continued Administrative Segregation at this time.

**\*6** (Dkt. No. 1–1 at 32–33.)

The Central Office committee forwarded its recommendation to Defendant LeClaire. (Dkt. No. 1 at 16 ¶ 59.) On December 3, 2008, he found, "[b]ased on all the information," that Plaintiff should remain in administrative segregation because his "release from Administrative Segregation at this time would pose too great a risk to the safety and security of the facility."(Dkt. No. 1–1 at 32.)

In December 2008, Plaintiff wrote to the Legal Aid Society regarding his administrative segregation placement. (Dkt. No. 1 at 18 ¶ 68.) On January 13, 2009, the Legal Aid Society wrote to Defendant Bezio, requesting that Plaintiff be released from administrative segregation due to his good behavior. *Id.* ¶ 69; Dkt. No. 1–1 at 34.

On January 21, 2009, the facility committee found that Plaintiff "complies with all policies and procedures at Clinton. Samms has not been a management problem in the year that he has been assigned to Clinton. Samms has questioned if the Department believes he needs closer monitoring than other inmates, if a placement in APPU or similar unit could be considered."(Dkt. No. 1–1 at 36.)The facility committee concluded that "[a]lthough Samms continues to pose a threat if placed in General Population, placement in restricted population might be appropriate and would allow staff to closely monitor him."*Id.*

On January 23, 2009, the Central Office committee found that Plaintiff "is currently serving a sentence of 34 1/3 to 40 years for the crimes of Robbery 1%] Assault 1st, and Criminal Possession of a Weapon 2nd. These crimes involved the gratuitous shooting by inmate Samms of a robbery victim, resulting in grievous injury to the victim. Inmate Samms' earliest release date is November 15, 2039."(Dkt. No. 1–1 at 36.)The Central Office committee did not state whether or not it recommended continuing Plaintiff's administrative segregation placement.

On January 23, 2009, Defendant LeClaire concluded, upon "review of all available information," that Plaintiff's "retention in Administrative Segregation is necessary at this time."*Id.*

On February 3, 2009, Plaintiff wrote to non-defendant Deputy Superintendent LaValley, non-defendant Captain of Security Uhler, Defendant Racette, and Defendant Artus regarding his administrative segregation placement. (Dkt. No. 1 at 19 ¶ 71; Dkt. No. 1–1 at 37; Dkt. No. 1–2 at 1; Dkt. No. 1–2 at 3–8.)Only Mr. LaValley responded. (Dkt. No. 1 at 19 ¶ 7 1.) He stated that he did not "have the authority to release you from Administrative Segregation. You may make a statement regarding the need for continued administrative segregation, which will be considered during the next scheduled review."(Dkt. No. 1–2 at 2.)

On February 4, 2009, Plaintiff wrote to non-defendant Assistant Commissioner Donald Selsky. (Dkt. No. 1 at 19 ¶ 72; Dkt. No. 1–2 at 9–14.)Mr. Selsky responded on March 9, 2009. (Dkt. No. 1 at 19 ¶ 72.)His response stated that Plaintiff's

> ***7*** status is under regular review by a three-member Central Office committee in accordance with the provisions of Directive # 4933. I am

> not involved in such determinations. You should continue to present your objections to your assignment by writing to the superintendent. That information will be considered at the next regularly scheduled review. Your positive adjustment is noted. I encourage you to continue such efforts as you strive toward release from Administrative Segregation status.

(Dkt. No. 1–2 at 15.)Mr. Selsky cc'd this letter to Defendant Artus.*Id.* Plaintiff wrote to Mr. Selsky again on April 1, 2009. (Dkt. No. 1 at 19 ¶ 72; Dkt. No. 1–2 at 16–18.)Mr. Selsky responded on April 21, 2009. (Dkt. No. 1 at 19 ¶ 72.)He stated that Plaintiff's

> positive overall adjustment while assigned to the Special Housing Unit under Administrative Segregation status is noted. I encourage you to continue such efforts as you strive toward release from that assignment. I have forwarded your letter to the Central Office Administrative Segregation Review Committee for their consideration at your next periodic review of your status. I am confident that all relevant information will be considered at the time of that review.

(Dkt. No. 1–2 at 19.)Mr. Selsky cc'd this letter to Defendant Artus, the Central Office Administrative Segregation Review Committee, and the Central File. *Id.*

On February 24, 2009, the Legal Aid Society wrote to Defendant LeClaire. (Dkt. No. 1 at 18 ¶ 69.) This letter was identical to the January 13, 2009, letter to Defendant Bezio. (Dkt. No. 1–1 at 35.)

In March 2009, the facility committee recommended that Plaintiff be placed in a "closely monitored population" rather than administrative segregation. (Dkt. No. 1 at 19 ¶ 73.) The facility committee's report stated that Plaintiff "continues to comply with all policies and procedures at Clinton. Samms has not been a management problem ... Samms continues to question the Department['s] need to continue to hold him [in] Admin. Seg. Samms has questioned if he can be placed into another Unit that would monitor him closely." (Dkt.

No. 1–2 at 20.)The facility committee stated that "[a]lthough Samms continues to pose a threat if returned to General Population, placement in a closely monitored population may be appropriate."*Id.*

On March 23, 2009, as it had in January 2009, the Central Office committee found that Plaintiff "is currently serving a sentence of 34 1/3 to 40 years for the crimes of Robbery 1st[,] Assault 1st, and Criminal Possession of a Weapon 2nd. These crimes involved the gratuitous shooting by inmate Samms of a robbery victim, resulting in grievous injury to the victim. Inmate Samms' earliest release date is November 15, 2039."(Dkt. No. 1–1 at 36.)The Central Office committee did not state whether or not it recommended continuing Plaintiff's administrative segregation placement. *See id.*

**\*8** On April 1, 2009, Defendant LeClaire concluded, "[u]pon review of all available information, including all data as submitted by the facility and Central Office committees," that Plaintiff's "continued retention is needed at this time."(Dkt. No. 1–2 at 20 .)

On April 13, 2009, Plaintiff filed a grievance regarding his continued confinement in administrative segregation. (Dkt. No. 1 at 20 ¶ 74; Dkt. No. 1–2 at 21–27.)CORC unanimously denied Plaintiff's grievance on June 17, 2009, because:

> CORC has not been presented with sufficient evidence to substantiate any malfeasance by staff. CORC upholds the discretion of the facility administration to place inmates in administrative segregation in order to maintain the safety and good order of the facility. CORC asserts that the appropriate performance of the review committee and enforcement of the rules and regulations should not be construed as punishment by the grievant.

(Dkt. No. 1–2 at 28.)

Plaintiff alleges that after he filed his grievance, the Central Office Defendants ordered the facility committee to stop recommending that Plaintiff be placed in a closely monitored population rather than in administrative segregation. (Dkt. No. 1 at 20 ¶ 76.) Thereafter, although again noting that Plaintiff "has not been a management problem," the facility committee recommended that Plaintiff remain in

administrative segregation. *Id.* ¶ 77; Dkt. No. 1–2 at 29.When Plaintiff asked the facility committee why they contradicted themselves this way, they replied that "they have to follow orders from the higher-ups" and that "if it were up to them ... they would place the Plaintiff in their General Population...."Dkt. No. 1 at 17 ¶ 63.

In May 2009, the Central Office committee noted that it had

> considered Inmate Samms' April 2009 letters to Assistant Commissioner Selsky, Ms. Bellamy and Commissioner Fischer. Inmate Samms wants Administrative Segregation to be moved from the SHU or for him to be released to APPU or GSU. He feels he is being unfairly disciplined when he has not engaged in misconduct, but has had good behavior. He wants more privileges. He feels the review process is unfair and prejudiced against him. He alleges the process uses false evidence and does not have enough evidence to hold him. He writes he is no longer a threat and Administrative Segregation takes a toll on him and his family. Samms is correct about his recent history of good behavior. He has no unusual incidents on file. Since coming to state custody in 2007, he had misconduct in September and November 2007 that led to two Tier II hearings and was engaged in smuggling in January 2008 that led to a Tier III hearing. He has not had a Tier hearing since the January 2008 smuggling charge. Samms is encouraged to continue his good behavior as he hopes to leave Administrative Segregation. However, the committee recommends he remain in Administrative Segregation at this time because of his long history of violence, especially his crimes and misconduct at Rikers Island, and because of his affiliation with an unauthorized criminal organization. Samms started his known criminal career in 1997 at 18 with a conviction for Attempted Criminal Sale of a

Controlled Substance that led to a Youthful Offender adjudication and probation. He was convicted of Assault, First Degree, after he and two others brutally beat up a victim and cut his face and hand with a box cutter in February 1999. The victim required about 40 stitches. In August 2005, Samms shot and robbed a young man, which led to his current incarceration. He is serving 34 1/3 to 40 years for the crimes of Robbery, First Degree, Assault, First Degree, and Criminal Possession of a Weapon, Second Degree. His earliest release date is 2039. Samms has had a long history of problems in prison. In April 1999, he was found with a shank at Rikers Island. Between August 2001 and September 2003, he had six Tier II hearings and three Tier III hearings. In 2006, he was found with a cell phone at Rikers Island. Samms had over 40 infractions while at Rikers Island, including over 10 assaults on staff. He was determined to be a severe management problem while housed at Riker's Island. Inmate Samms' history of repeated violence, and especially assaults on Rikers Island staff, and his ability to obtain a cell phone at Rikers Island causes the committee great concern. Samms' presence in general population poses an undue risk to the safe, secure and orderly operation of any correctional facility and, therefore, this committee recommends his continued Administrative Segregation at this time. Note that pursuant to regulation, Administrative Segregation inmates must be housed in SHU. Privileges for inmates housed in SHU are set by applicable directives and regulations. This review committee is without authority to alter the regulation.

**\*9** (Dkt. No. 1–2 at 29–30.)

On June 1, 2009, Defendant LeClaire concluded, "[b]ased on the information presented," that Plaintiff's "release from Administrative Segregation is not warranted at this time." *Id.* at 29.

As of the date he filed the complaint in this action (March 25, 2010), Plaintiff had been confined to administrative segregation for twenty-two months. (Dkt. No. 1 at 21 ¶ 79.)

Plaintiff alleges that Defendants violated his rights to equal protection and due process and his rights under the Eighth Amendment. *Id.* at 22 ¶ 82, 26 ¶ 95.Plaintiff accuses Defendants of conspiring against him. *Id.* at 28 ¶ 101.Plaintiff requests declaratory relief, an injunction ordering Defendants to release Plaintiff from administrative segregation and barring Defendants from "placing Plaintiff in any form of administrative confinement based on the allegation[s] that have been fraudulently used to confine Plaintiff," compensatory damages, punitive damages, and costs. *Id.* at 28–31.

## II. LEGAL STANDARD GOVERNING MOTIONS FOR JUDGMENT ON THE PLEADINGS

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006). In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133,

136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally."*Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."*Iqbal,* 129 S.Ct. at 1949.

**\*10** Where a *pro se* complaint fails to state a cause of action, the court *generally*"should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."*Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). Of course, an opportunity to amend is not required where the plaintiff has already amended the complaint. *See Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once). In addition, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it."*Cuoco,* 222 F.3d at 112 (citation omitted).

## III. ANALYSIS

### A. Procedural Due Process Claim

Plaintiff alleges that Defendants violated his right to procedural due process. (Dkt. No. 1 at 22 ¶ 82.) Defendants move for judgment on the pleadings dismissing this claim. (Dkt. No. 44–1 at 6–12.)Defendants argue that they provided Plaintiff with due process before placing him in administrative segregation and by providing periodic reviews of the placement.*Id.* For the reasons discussed below, I find that Plaintiff has stated a procedural due process claim as to his initial placement in administrative segregation but not as to the sufficiency of Defendants' periodic reviews.

In order to state a procedural due process claim, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents

of prison life."*Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); Tellier, 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Here, Defendants concede for the purposes of this motion that Plaintiff has alleged facts plausibly suggesting that he was deprived of a liberty interest. (Dkt. No. 44–1 at 5.) The issue, then, is whether Defendants provided Plaintiff with due process (1) before making the initial decision to place Plaintiff in administrative segregation; and (2) before deciding to retain Plaintiff in administrative segregation.

Before being placed in administrative segregation, due process requires that "[a]n inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation."*Hewitt v. Helms,* 459 U.S. 460, 476, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). [4] This "opportunity to present his views" need not be as formal as the proceedings held in connection with disciplinary charges, which must comply with the requirements of *Wolff v. McDonnell,* 418 U.S. 539, 563–72, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). [5] *Soto v. Walker,* 44 F.3d 169, 172 n. 3 (2d Cir.1995). Rather, "[o]fficials must conduct 'an informal, nonadversary evidentiary review' of the information in support of the prisoner's administrative confinement, and the 'proceeding must occur within a reasonable time following an inmate's transfer.' " *Soto,* 44 F.3d at 172 (quoting *Hewitt,* 459 U.S. at 476 n. 8).

**\*11** Defendants cite *Soto* for the proposition that the informal evidentiary review required to satisfy due process must occur "within a reasonable time following an inmate's transfer."(Dkt. No. 44–1 at 6.) However, Defendants' brief does *not* note that the Second Circuit held in *Soto* that "[t]he failure to provide informal review procedures within even as short a time as seven days in connection with a transfer into administrative confinement states a due process claim."*Soto,* 44 F.3d at 172. Here, there was a ten-day delay between the recommendation that Plaintiff be placed in administrative segregation and the hearing conducted by Defendant Drown. Accordingly, Plaintiff has stated a claim that his initial placement in administrative segregation violated his right to procedural due process. Therefore, I recommend that the Court deny Defendants' motion to dismiss the procedural due process claim regarding Plaintiff's initial placement in administrative segregation. [6]

After an inmate has been placed in administrative segregation, due process requires only that "administrative

segregation may not be used as a pretext for indefinite confinement of an be inmate. Prison officials must engage in some sort of periodic review" of the placement. *Hewitt,* 459 U.S. at 477 n. 9. This review may rely on "purely subjective evaluations and on predictions of future behavior." *Id.* at 474. Periodic reviews should be "substantive and legitimate, not merely a 'sham.' " *Giano v. Kelly,* 869 F.Supp. 143, 150 (W.D.N.Y.1994). A review is "substantive and legitimate" where the prisoner has an opportunity to relay information or make a statement to the individuals conducting the review and there is some indication that the information is actually considered. *See Edmonson v. Coughlin,* 21 F.Supp.2d 242, 253–54 (W.D.N.Y.1998) (prisoner's ability to submit information, combined with his ultimate release from administrative segregation, showed that reviews, while "flawed," were "meaningful.").

Here, Defendants conducted periodic reviews of Plaintiff's administrative segregation status. Plaintiff availed himself of the opportunity to express his views to the facility and Central Office committees. The complaint and the attachments thereto show that the committees considered the information Plaintiff submitted. Therefore, Plaintiff has failed to state a procedural due process claim regarding his retention in administrative segregation. Accordingly, I recommend that the Court dismiss the procedural due process claim regarding Plaintiff's retention in administrative segregation.

Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). Plaintiff here has not had an opportunity to amend his complaint. Accordingly, I recommend that the procedural due process claim regarding Plaintiff's retention in administrative segregation be dismissed with leave to amend.

## B. Substantive Due Process Claim

**\*12** Construed liberally, the complaint may assert that Defendants violated Plaintiff's right to substantive due process. (Dkt. No. 1 at 22 ¶ 82.) Defendants acknowledge that the complaint may include a substantive due process claim (Dkt. No. 44–1 at 5 n. 2), but do not explicitly address the elements of such a claim. I recommend that the Court dismiss any substantive due process claim.

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (internal quotation marks and citations omitted). Very few conditions of prison life are "shocking" enough to violate a prisoner's right to substantive due process. In *Sandin v. Conner,* the Supreme Court provided only two examples: the transfer to a mental hospital and the involuntary administration of psychotropic drugs. *Sandin v. Conner,* 515 U.S. 472, 479 n. 4, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Here, neither Plaintiff's administrative segregation status nor the conditions of confinement that he alleges are conscience-shocking or oppressive in the constitutional sense. Therefore, I recommend that the Court dismiss Plaintiff's substantive due process claim with leave to amend.

## C. Equal Protection Claim

Plaintiff alleges that Defendants violated his right to equal protection. (Dkt. No. 1 at 22 ¶ 82.) Defendants acknowledge that the complaint includes an equal protection claim (Dkt. No. 44–1 at 5 n. 2), but do not explicitly address the elements of such a claim. I recommend that the Court dismiss Plaintiff's equal protection claim with leave to amend.

The Equal Protection Clause provides that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Bizzarro v. Miranda,* 394 F.3d 82, 86 (2d Cir.2005) (quoting *LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir.1980)). Governmental action may also violate the Equal Protection Clause where the defendants intentionally treat the plaintiff "differently from others with no rational basis for the difference in treatment." *Id.* (citing *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)). Thus, a plaintiff asserting an equal protection claim must allege facts plausibly suggesting that (1) he was treated differently from similarly situated

individuals; and (2) the defendants treated him differently due to his membership in a suspect class, inhibited his exercise of a fundamental right, acted out of malice, or acted irrationally and arbitrarily.

**\*13** Here, because Plaintiff does not assert that he is a member of a suspect class or that Defendants inhibited his exercise of a fundamental right [7], Plaintiff's equal protection claim is properly classified as a "class-of-one" claim. It is extremely difficult for class-of-one plaintiffs to allege facts plausibly suggesting that they were treated differently from similarly situated individuals. "[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves."*Clubside, Inc. v. Valentin,* 468 F.3d 144, 159 (2d Cir.2006.)

The only allegation in Plaintiff's complaint that even remotely suggests the existence of any similarly situated individual is the allegation that Defendant Drown told Plaintiff that "Plaintiff would only be held in Administrative Segregation Confinement for approx[imately] six ... months, then released to the Close Supervision Unit ... as he ha[d] seen happen to another inmate ... [who] had a very similar case and record as the Plaintiff's."(Dkt. No. 1 at 13 ¶ 40.)This vague allegation is insufficient to state a claim under the rigorous class-of-one standard. Therefore, I recommend that the Court dismiss Plaintiff's equal protection claim with leave to amend.

**D. Eighth Amendment Claim**

Plaintiff alleges that Defendants violated his Eighth Amendment rights. (Dkt. No. 1 at 26 ¶ 95.) Defendants argue that this claim should be dismissed because "beyond his displeasure with the regular attributes of the SHU, [P]laintiff does not claim that he suffered any deprivations which posed any unreasonable risk to his health or which have otherwise violated contemporary standards of decency."(Dkt. No. 44–1 at 14.)Defendants do not discuss Plaintiff's allegations regarding the persistent problem of inmates throwing feces and of feces being smeared on the recreation cages. (Dkt. No. 1–2 at 31–32, 34.)

The Eighth Amendment to the United States Constitution imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical

care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

There are two components of an Eighth Amendment claim: an objective component and a subjective component. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities."*Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim."*Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). To satisfy the subjective component of an Eighth Amendment conditions-of-confinement claim, the plaintiff must show that the defendant acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 302–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A prison official demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."*Farmer,* 511 U.S. at 837.

**\*14** Defendants argue that Plaintiff has failed to state a claim as to the objective component of his Eighth Amendment claim. In support of that argument, Defendants cite only *Rudolph v. Goord,* No. 9:01–CV–1549, 2005 WL 1630022 (N.D.N.Y. Jul.11, 2005). In *Rudolph,* Magistrate Judge Peebles and Senior District Court Judge Scullin found that an inmate who alleged that "the conditions he faced within the SHU included severe mice and bat infestation, with resulting feces in his clothing, bed, and cell; inadequate clothing for outdoor recreation; and garbage and human feces in the gallery area outside his cell" had stated an Eighth Amendment claim. *Rudolph,* 2005

WL 163002, at \*5. Defendants' brief simply cites *Rudolph* without comparing or contrasting the facts of that case with the allegations in Plaintiff's complaint.

A general allegation that a prisoner was subjected to "unclean" conditions, without more particularized allegations of fact, is insufficient to state a conditions of confinement claim. *See Williams v. Carbello,* 666 F.Supp.2d 373, 379 (S.D.N.Y.2009). I find, however, that Plaintiff's allegations that there were "human feces smeared all over the rec

cages" over a period of several months and that he had to "smell and breath[e] in the atrocious odor of feces being thrown" are sufficient to plausibly suggest that Plaintiff was subjected to unconstitutional conditions of confinement. *See Gaston v. Coughlin,* 249 F.3d 156, 166 (2d Cir.2001) (finding that triable issue of fact existed where prisoner alleged that he was, *inter alia,* exposed to human feces in his cell). Although Plaintiff's allegations are not as severe as those described in *Gaston* or *Rudolph,* they are sufficient to plausibly suggest that the conditions to which he was exposed were sufficiently "serious" to satisfy the objective prong of his Eighth Amendment claim.

Defendants do not argue that Plaintiff has failed to state a claim regarding the subjective prong of his Eighth Amendment claim. Nor do they argue that Plaintiff has failed to sufficiently allege that Defendants were personally involved in the alleged constitutional violation. Nor do they argue that they are entitled to qualified immunity. Therefore, I recommend that the Court deny Defendants' motion to dismiss Plaintiff's Eighth Amendment conditions of confinement claim.

### E. Conspiracy

Plaintiff alleges that Defendants conspired against him, thus violating 42 U.S.C. § 1983. (Dkt. No. 1 at 1 ¶ 1, 28 ¶ 101.) Defendants argue that this claim should be dismissed because (1) Plaintiff has not alleged any facts plausibly suggesting that Defendants committed any overt act in furtherance of the alleged conspiracy; (2) Plaintiff has not alleged any facts plausibly suggesting a meeting of the minds for an unlawful purpose; and (3) it is barred by the intracorporate conspiracy doctrine. (Dkt. No 44–1 at 12–13.) I will address only Defendants' third argument, as it is dispositive.

**\*15** The intracorporate conspiracy doctrine states that employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York,* No. 97–cv–1337, 1999 U.S. Dist. LEXIS 3164, at \*5–6, 1999 WL 151702, at \*2 (W.D.N.Y. Mar.17, 1999)."This doctrine applies to public entities and their employees."*Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009) (citations omitted). Although the Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, *see Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978); *Girard v. 94th and Fifth Ave. Corp.,* 530 F.2d 66, 72 (2d Cir.1976), it has not extended its application of the doctrine to conspiracy claims under § 1983. Several district courts in the Second Circuit have, however, applied

the doctrine to § 1983 cases. [8] The district court cases cited in the footnote applied the intracorporate conspiracy doctrine to § 1983 without discussing whether it was appropriate to do so.

In *Anemone v. Metropolitan Transportation Authority,* 419 F.Supp.2d 602, 604 (S.D.N.Y.2006), the Southern District squarely held that the intracorporate conspiracy doctrine should be applied to § 1983 cases. Like that Court, in the absence of any authority to the contrary, I

> will continue to apply the intracorporate conspiracy doctrine to Section 1983 claims because the doctrine's logic is sound. A civil rights conspiracy requires an agreement between two or more actors to inflict an unconstitutional injury. This 'two or more actors' requirement cannot be satisfied where all of the alleged conspirators are employees of a single entity and acting within the scope of their employment [9] as agents of that entity.

*Id.* (citation omitted). Here, Defendants are all DOCS employees and there is no allegation that they were not acting within the scope of their employment. Therefore, Plaintiff's conspiracy claimed is barred by the intracorporate conspiracy doctrine and I recommend that it be dismissed with leave to amend.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for judgment on the pleadings (Dkt. No. 44) be ***GRANTED IN PART AND DENIED IN PART.***It is recommended that the Court dismiss (1) the procedural due process claim regarding the retention of Plaintiff in administrative segregation; (2) the substantive due process claim; (3) the equal protection claim; and (4) the conspiracy claim, all with leave to amend. It is recommended that the Court deny the motion as to (1) the procedural due process claim regarding Plaintiff's original placement in administrative segregation; and (2) Plaintiff's Eighth Amendment conditions of confinement claim.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.****Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

Footnotes

1    When determining whether a complaint fails to state a claim, a court may review exhibits attached to the complaint and any documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989)).

2    Page number references are to the page numbers assigned by the Court's electronic filing system.

3    This section of the facility committee's January 21, 2009, March 19, 2009, and May 13, 2009 reports was identical. (Dkt. No. 1–1 at 36; Dkt. No. 1–2 at 20, 29.)

4    *Hewitt's* analysis of the proper method for determining whether an inmate has been deprived of a liberty interest was overruled by *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). However, *Hewitt* "remain[s] instructive for [its] discussion of the appropriate level of procedural safeguards."*Wilkinson v. Austin,* 545 U.S. 209, 229, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005).

5    These requirements include (1) advanced written notice of the charges; (2) a hearing affording a reasonable opportunity to call witnesses and present documentary evidence; (3) a fair and impartial hearing officer; and (4) a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken. *Wolff,* 418 U.S. at 563–67; *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004). In some circumstances, such as where the inmate is illiterate or where the complexity of an issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, an inmate may also be entitled to assistance from another inmate or from prison staff in preparing his defense. *Wolff,* 418 U.S. at 570.

6    Despite noting in the "Statement of the Case" section of their brief that "some defendants are alleged to have been personally involved while others are gathered in upon a theory of conspiracy or by virtue of their supervisory capacities," Defendants have not argued that any Defendant should be dismissed for lack of personal involvement. (Dkt. No. 44–1 at 3.) Nor do Defendants argue that any Defendant is entitled to qualified immunity.

7    Prisoners do not have a fundamental right to be free from administrative segregation. *Brown v. Nix,* 33 F.3d 951, 954 (8th Cir.1994).; *Matthews v. Wiley,* —— F.Supp.2d. ——, No. 09–CV–00978, 2010 WL 3703357, at \* 11 (D.Colo. Sept.13, 2010).

8    *See Sebast v. Mahan,* No. 09–cv–98 (GLS/RFT), 2009 U.S. Dist. LEXIS 64712, at \*7–8, 2009 WL 2256949, at \*3 (N.D.N.Y. July 28, 2009); *Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009); *Lukowski v. County of Seneca,* No. 08–CV–6098, 2009 U.S. Dist. LEXIS 14282, at \*42–44, 2009 WL 467075, at \*3 (W.D.N.Y. Feb.24, 2009); *Perrin v. Canandaigua City School Dist.,* No. 08–CV–6153L, 2008 U.S. Dist. LEXIS 95280, at \*4–5, 2008 WL 5054241, at \*2 (W.D.N.Y. Nov.21, 2008); *Rodriguez v. City of New York,* 644 F.Supp.2d 168, 200–01 (E.D.N.Y. Feb.11, 2008); *Crews v. County of Nassau,* No. 06–CV–2610, 2007 U.S. Dist. LEXIS 94599, at \*41–42, 2007 WL 4591325, at \*12 (E.D.N.Y. Dec. 27, 2007); *Little v. City of New York,* 487 F.Supp.2d 426, 441–42 (S.D.N.Y.2007); *Clark v. City of Oswego,* No. 5:03–CV–202 (NAM/DEP), 2006 U.S. Dist. LEXIS 95769, at \*22–25, 2007 WL 925724, at \*7 (N.D.N.Y. March 26, 2007); *Malone v. City of New York,* No. CV–05–2882, 2006 U.S. Dist. LEXIS 61866, at \*32, 2006 WL 2524197, at \*11 (E.D.N.Y. Aug. 30, 2006); *Caidor v. M & T Bank,* No. 5:05–CV–297 (FJS/GJD), 2006 U.S. Dist. LEXIS 22980, at \*42–45, 2006 WL 839547, at \*11–12 (N.D.N.Y. Mar.27, 2006).

9    Even where the intracorporate conspiracy doctrine applies, there is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity."*Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (citation and quotation marks omitted), *vacated and remanded on other grounds, Orafan v. Rashid,* No. 06–2951, 249 Fed. Appx. 217 (2d Cir. Sept.28, 2007). I have previously found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleges that officers assaulted him in retaliation for participating in a federal lawsuit.*Medina v. Hunt,* No. 9:05–CV–1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force. *Hill v. City of New York,* No. 03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at \*6 (E.D.N.Y. Dec. 30, 2005). Here, Plaintiff does not allege that any of the Defendants engaged in excessive force or that they were pursuing personal interests wholly separate and apart from their DOCS employment. Therefore, the exception is inapplicable.

---

**End of Document**               © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 842008
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

David SIMMONS, Plaintiff,
v.
Theresa LANTZ, et al., Defendants.

No. 3:04–CV–2180 (RNC). | March 12, 2007.

**Attorneys and Law Firms**

David Simmons, Brooklyn, CT, pro se.

Robert F. Vacchelli, Attorney General's Office, Hartford, CT, for Defendants.

***RULING AND ORDER***

ROBERT N. CHATIGNY, United States District Judge.

**\*1** Plaintiff, a Connecticut inmate proceeding *pro se* and in *forma pauperis,* brings this action pursuant to 42 U.S.C. § 1983 against employees of the Department of Correction alleging violations of his federal rights. Defendants have filed a motion to dismiss and plaintiff has filed a motion for leave to file a third amended complaint. For the reasons that follow, the motion for leave to amend is granted and the motion to dismiss is granted in part and denied in part.

**I.** *Motion for Leave to Amend [Doc. # 28]*
The plaintiff seeks leave to file a third amended complaint to identify defendant "Nurse Scott" as Nurse L. Sklarz. Leave to amend a complaint is "freely given when justice so requires."Fed.R.Civ.P. 15(a). Under this rule, leave is freely given in the absence of undue delay or undue prejudice to the opposing party. *See Foman v. Davis,* 371 U.S. 178, 182 (1962).

The proposed amendment does not add or modify any factual allegations in the complaint. Instead, it seeks to clarify the identity of one of the defendants, "Nurse Scott." The proposed amendment will not delay the litigation or prejudice the defendants, and there is no evidence that it is made in bad faith. The motion is therefore granted.

**II.** *Motion to Dismiss [Doc. # 20]*

The following allegations in the second amended complaint are assumed to be true for present purposes. [1] In November 2004, and again in February 2005, Dr. Pilli and Nurse Sklarz placed the plaintiff in an observation room because he refused to take a shot of Insulin. This was done despite plaintiff's repeated statements that he suffered strong adverse effects from Insulin. In each instance, he was held in the observation room against his will for seven to ten days, and deprived of food for three days.

On April 10, 2005, Lieutenant Atkins placed the plaintiff in segregation after he complained about Nurse Sklarz. Later that day, Correctional Officer Chevalier confiscated some items of plaintiff's personal property. Commissioner Lantz and Warden Strange ignored plaintiff's requests for the return of his property, and Officer Chevalier subsequently gave the plaintiff a false disciplinary report. Plaintiff was then transferred to another facility, ostensibly on the basis of Chevalier's disciplinary report, which Lantz and Strange knew to be false.

On being transferred, plaintiff was placed in a cell with another inmate. Between May 16 and June 8, 2005, he complained to Captain Frey on three occasions that he felt unsafe with his cellmate. On June 8, plaintiff's cellmate assaulted him, causing injuries to plaintiff's face, left thumb, left ankle and torso.

Based on these allegations, plaintiff claims that the defendants are liable to him for: (1) deprivation of property under the Fourteenth Amendment; (2) unlawful seizure under the Fourth Amendment; (3) violation of his right to refuse medical treatment under the Fourteenth Amendment; (4) retaliation under the First and Fourteenth Amendment; and (5) failure to protect under the Eighth Amendment. [2]

**\*2** The defendants move to dismiss on the following grounds: (1) the Eleventh Amendment bars claims for money damages against the defendants in their official capacities; (2) the plaintiff has failed to state a claim upon which relief may be granted; (3) the plaintiff has failed to allege personal involvement on the part of defendants of Antico, Lantz and Strange; and (4) the defendants are shielded from liability by qualified immunity.

**A.** *Eleventh Amendment*
The Eleventh Amendment prohibits suits for money damages against states or state actors in their official capacities. *See*

*Kentucky v. Graham,* 473 U.S. 159, 169 (1985).Section 1983 does not override a state's Eleventh Amendment immunity, *see Quern v. Jordan,* 440 U.S. 332, 345 (1979), and Connecticut has not otherwise waived its immunity to this suit. Accordingly, the motion to dismiss is granted as to the claims for money damages against the defendants in their official capacities.

### B. *Legal Sufficiency*

#### 1. *Deprivation of Property*

The motion to dismiss is granted as to the property claim. "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available."*Hudson v. Palmer,* 468 U.S. 517, 533 (1984). Connecticut provides an adequate remedy for the kind of deprivation the plaintiff describes, *see*Conn. Gen.Stat. § 4–141 *et seq.* (2007), and plaintiff does not claim that this remedy is unavailable to him.

#### 2. *Unlawful Seizure and Unwanted Medical Treatment*

The motion to dismiss the claims relating to plaintiff's placement in observation after he refused to take Insulin are denied. The Fourth Amendment protects an individual from involuntary transfer to and confinement in a medical facility unless he is dangerous to himself or others. *See Green v. City of New York,* 465 F.3d 65, 83 (2d Cir.2006); *Glass v. Mayas,* 984 F.2d 55, 58 (2d Cir.1993). And a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment, which survives incarceration. *See Washington v. Harper,* 494 U.S. 210, 221–22 (1990); *Pabon v. Wright,* 459 F.3d 241, 249 (2d Cir.2006). Defendants contend that dismissal is proper because plaintiff's refusal to take Insulin endangered himself, and his claim is based on nothing more than disagreement with his health care providers concerning the proper treatment for his condition. At this stage of the case, however, it is not clear beyond doubt that plaintiff can prove no set of facts consistent with his allegations that would entitle him to relief.

#### 3. *Retaliation*

The motion to dismiss the retaliation claims is denied. To state a claim for retaliation, plaintiff must make non-conclusory allegations showing that he was subjected to adverse action because he engaged in protected speech or conduct. *See Gill*

*v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Complaints are protected conduct, *cf. Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996), as is the exercise of the right to refuse medical treatment, *cf. Pabon,* 459 F.3d at 246.Retaliatory conduct is adverse if it "would deter a similarly situated individual of ordinary firmness" from the exercise of his constitutional rights. *Pidlypchak,* 389 F.3d at 381(internal quotations omitted). Plaintiff's retaliatory transfer to and confinement in a medical facility while being deprived of meals sufficiently states an adverse action. *See Morales v. Mackalm,* 278 F.3d 126, 131–32 (2d Cir.2002)(finding transfer to psychiatric facility sufficient on motion to dismiss to constitute adverse action under a retaliation analysis), *abrogated on other grounds by Porter v. Nussle,* 534 U.S. 516 (2002). And the filing of a false disciplinary report resulting in institutional transfer may constitute adverse action. *See Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003).

#### 4. *Failure to Protect*

**\*3** The motion to dismiss the failure to protect claim is denied. To establish a constitutional violation, plaintiff must show that he was "incarcerated under conditions posing a substantial risk of serious harm," and that prison officials showed "deliberate indifference" to his safety. *See Farmer v. Brennan,* 511 U.S. 825, 834 (1994). A prison official possesses culpable intent to support a claim of deliberate indifference if he "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm."*Hayes v. New York City Dep't Of Corrections,* 84 F.3d 614, 620 (2d Cir.1996). Plaintiff alleges that he informed Captain Frey on three occasions before June 8, 2005, that he felt threatened by his cellmate, but Captain Frey refused to move him to another cell. This is sufficient to withstand the motion to dismiss.

### C. *Personal Involvement*

#### 1. *Defendant Antico*

The motion to dismiss the action against defendant Antico is granted. Plaintiff has failed to allege any acts or omissions on the part of this defendant and thus has failed to adequately allege his personal involvement in any of the alleged wrongs. *See Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006).

#### 2. *Defendants Lantz and Strange*

The motion to dismiss the action as to defendants Lantz and Strange is granted in part. Plaintiff alleges that he asked these

defendants to arrange for return of his personal property, which he claimed had been stolen by defendant Chevalier. According to the plaintiff, they ignored his requests, then transferred him to another facility based on a disciplinary report issued by Chevalier, which they knew to be false. As discussed earlier, these allegations are sufficient to state a claim for retaliation. However, plaintiff's allegations do not support a claim against these defendants with regard to any of the other alleged wrongs. With regard to those matters, there is no allegation that either of these defendants was grossly negligent or deliberately indifferent, nor any allegation of an "affirmative causal link between [their] inaction and [his] injury" as required to support a theory of supervisory liability. *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002).

### D. *Qualified Immunity*

The motion to dismiss based on qualified immunity is denied. "[A] qualified immunity defense can be presented in a Rule 12(b)(6) motion, but ... the defense faces a formidable hurdle when advanced on such a motion and is usually not successful." *Field Day, LLC v. County of Suffolk,* 463 F.3d 167, 191–92 (2d Cir.2006)(internal quotations omitted). This case is no exception. Defendants have not shown that, accepting plaintiff's allegations as true, their conduct must be deemed objectively reasonable.

### III. *Conclusion*

Accordingly, the motion for leave to amended [doc. # 28] is hereby granted, and the motion to dismiss [doc. # 20] is granted in part and denied in part.

Footnotes

1   Because plaintiff's motion for leave to amend has been granted, the second amended complaint's allegations regarding Nurse Scott are construed as referring to Nurse Sklarz.

2   Generously construed to state all claims that they suggest, plaintiff's allegations also appear to be sufficient to state a claim for deprivation of food under the Eighth Amendment. *See Phelps v. Kapnolas,* 308 F.3d 180, 185–86 (2d Cir.2002).

---

                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext® © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Sims v. Bowen, Not Reported in F.Supp. (1998)

1998 WL 146409

1998 WL 146409
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Craig James SIMS, Plaintiff,

v.

R. Bowen, Correctional Officer at Great
Meadow Correctional Facility, Defendant.

No. 96–CV–656 RSP/DRH.  |  March 23, 1998.

**Attorneys and Law Firms**

Craig James Smith, Clinton Correctional Facility,
Dannemora, for Plaintiff Pro Se.

Hon. Dennis C. Vacco, Attorney General for the State of New
York, Attorney for Defendant, Albany, Jeffrey P. Mans, Esq.,
Assistant Attorney General, of Counsel.

**MEMORANDUM-DECISION AND ORDER**

POOLER, D.J.

**\*1** Defendant R. Bowen, a correctional officer at Great
Meadow Correctional Facility ("Great Meadow"), objects to
Magistrate Judge David R. Homer's recommendation that
I deny Bowen's motion for summary judgment dismissing
plaintiff Craig James Sims' claim that Bowen violated his
Eighth Amendment right to be free from cruel and unusual
punishment.

**BACKGROUND**

Sims alleges that on November 16, 1995, Bowen told him that
he would have to move from protective custody unit D–1 to
protective custody unit D–2, which also housed A. Brown.
Pl.'s Dep., Dkt. No. 32 Ex. A., at 5, 11. Sims told Bowen
that Brown was a known enemy and supplied a letter dated
October 20, 1995, from Great Meadow's Superintendent,
James Stinson, to Assistant Attorney General David B.
Roberts. Id. at 5; Dkt. No. 35 Item 1. In Stinson's letter—
which was apparently written concerning an earlier request
by Sims for protective custody—he said:

> Sims has been denied protection
> because he has one known enemy
> that he has named at this facility

—INMATE BROWN # 84–B–2381.
All other names that he has given
are either not at the facility or non-
existent. The one enemy that he does
name is presently in our protection
unit. Therefore, he cannot be moved to
that location if, in fact, that inmate is
indeed his enemy.

Dkt. No. 35 Item 1 at 1. Sims alleges that he also showed
Bowen a copy of a protective custody recommendation. Pl.'s
Dep. at 7. Bowen looked at Sims' documentation and briefly
left the area. Id. at 13–14. However, Bowen told Sims that he
would still have to move him to the other protective custody
unit because there had been "an incident up there with another
two inmates." Id. at 5–6.

At some point after Bowen placed Sims in a locked cell in
the D–2 unit, Brown—who was on his way the shower—
approached the cell and said, "You all, I want to talk to you."
Id. at 17–18. Sims went up to the bars, and Brown punched
him in the face. Id. at 20, 21. The blow did not break Sims'
skin or knock him to the floor. Id. at 21. Brown then continued
toward the shower, and Sims overheard Brown tell another
inmate to throw feces at Sims. Id. at 22. The other inmate
followed Brown's instructions, causing the feces to go into
Sims' mouth. Id. at 27.

According to Sims, at shower time, the only correctional
officer on duty in the D–2 unit stays in a bubble-like structure
near the shower area, and an inmate actually lets protective
custody inmates out to take their showers. Id. at 17. Because
Sims was way in the back of the unit, he could not promptly
notify the officer of the attacks. Id. at 23. However, he did
tell a correctional officer who passed by his cell in the middle
of the night about the feces throwing incident. Id. at 23.
That officer simply told the other inmates to leave Sims
alone and stop throwing things at him. Id. Sims then decided
that the only way to get off the unit and away from his
enemies was by cutting his arm with a razor, which he did.
Id. at 24. Corrections officials then took Sims to the hospital
where medical staff disinfected his wounds and—because
the inmate who threw the feces had "some kind of sickness,
hepatitis or something"—gave him a blood test. Id. at 25.
Neither that blood test or subsequent blood tests revealed any
problem. Id. at 27–28. The next morning Sims was moved out
of the unit. Id. at 27.

**\*2** Plaintiff filed his complaint on April 25, 1996. He
requested damages and an order directing defendants to place

Sims v. Bowen, Not Reported in F.Supp. (1998)

1998 WL 146409

him in protective custody for the rest of his stay in state prison. Compl. § 3. Stinson was subsequently transferred to Clinton Correctional Facility. On July 30, 1997, Bowen moved for summary judgment. Dkt. No. 29. Sims opposed defendant's motion. *See* Dkt. Nos. 33–36.

On February 11, 1998, Magistrate Judge Homer issued a report-recommendation and order in which he recommended that I deny defendant's motion. Dkt. No. 41. The magistrate judge found that plaintiff created issues of fact under the applicable standard for judging an alleged Eighth Amendment violation. More specifically, the magistrate judge found that (1) Sims offered competent evidence that defendant knew that the D–2 unit contained a purported known enemy of Sims; (2) Stinson's letter stating that Sims could not be placed in protective custody if his known enemy was also in protective custody evidenced the substantial risk of harm from placing him in Brown's unit; and (3) Bowen's description of a prior incident involving two protective custody inmates demonstrates that he knew that inmates could still harm each other even though they are usually locked in their cells. Report–Recommendation at 6. Although Bowen argued that Sims cannot establish deliberate indifference because Bowen left Sims for a period of time after Sims informed him that his known enemy was housed in the D–2 unit, the magistrate judge found that Bowen offered no competent evidence that he ever considered Sims' concerns. *Id.* Finally, the magistrate judge rejected Bowen's argument that Sims could not sustain this action because he suffered no compensable injury. *Id.* at 7. The magistrate judge found that if Sims established an Eighth Amendment violation, he could recover nominal damages even in the absence of actual injury. *Id.* at 8.

Bowen filed his objections on February 19, 1996. Dkt. No. 42. Bowen argues that (1) the first assault on Sims occurred only because Sims voluntarily went to the front of his cell; (2) Sims suffered no injury as a result of either of the assaults; (3) Sims was locked in his cell at the time of both assaults and this situation does not present a substantial risk of serious harm; (4) Bowen was not responsible for security on D–2 block when Sims was injured, and his sole involvement was moving Sims from D–1 Block to D–2 Block; and (5) the magistrate erred when he read Sims' testimony as alleging that Bowen had told him of a physical altercation between two inmates on D–2 Unit. *Id.*

## DISCUSSION

### I. Standard for Review
Because Bowen filed objections, I review the report-recommendation *de novo.* 28 U.S.C. § 636(b)(1)(C).

### II. Summary Judgment Standard
Summary judgment shall enter if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The materiality of facts must be determined with reference to the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial responsibility of demonstrating that there is no genuine issue of material fact to be decided. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As to any issue on which the moving party does not have the burden of proof, the moving party may satisfy its burden by "pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

**\*3** Once the moving party satisfies this initial burden, "the burden shifts to the nonmovant to proffer evidence demonstrating that a trial is required because a disputed issue of material fact exists." *Weg v. Macchiarola,* 995 F.2d 15, 18 (2d Cir.1993). In satisfying this burden, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." ' Fed. R. Civ. P 56(e). The opponent of summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[M]erely colorable" evidence will not suffice as a basis for opposing summary judgment. *Anderson,* 477 U.S. at 249–50.

In weighing a motion for summary judgment, the court must accept as true the non-moving party's evidence and make "all justifiable inferences" in the non-moving party's favor. *Anderson,* 477 U.S. at 255. The evidentiary standard governing proof at trial determines how the court must assess the evidence in deciding whether the summary judgment standard has been met. *Id.* at 254–55. In an ordinary civil case, such as this one, where plaintiffs must prove their case by a preponderance of the evidence, the determinative standard is

Sims v. Bowen, Not Reported in F.Supp. (1998)

1998 WL 146409

"whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Id.* at 252.

### III. The Substantive Law

To hold Bowen liable for an Eighth Amendment violation, Sims must show that Bowen was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed] .. and that he [drew] that inference." *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994). Sims need not show, however, that he actually incurred serious physical harm. *Gibeau v.. Nellis,* 18 F.3d 107, 110–11 (2d Cir.1994); *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997).

The magistrate judge found that a fact finder could infer that Bowen knew that he was exposing Sims to a substantial risk of serious harm because (1) Sims showed Bowen the Stinson letter and (2) Bowen acknowledged that there had been an incident on the D–2 unit that day. Bowen argues correctly that the finder of fact could not infer without speculating that the incident he described involved physical violence. *See* Pl.'s Dep. at 5. Nevertheless, a fact finder could infer based on Sims' description of the D–2 unit's layout, his testimony that an inmate and not a correctional officer let inmates out for their showers, and his testimony that inmates in the back of the unit could not be seen or heard by the correctional officer on duty during shower time that there could be an opportunity for one inmate to harm another even while the victim was inside a cell. Sims has not offered competent evidence, however, from which the fact finder could infer that Bowen knew Sims was likely to be attacked on D–2 unit. The only evidence in the record relevant to this claim is Sims' statements to both Stinson and Bowen that Brown was his "known enemy." Sims did not claim that he told Stinson or Bowen that Brown had either assaulted or threatened him. The weakness of Sims' contentions contrasts sharply with cases in which the courts have found that there were issues of fact as to whether a defendant knew that he was exposing an inmate to a substantial risk of serious harm. *See Villante v. Department of Corrections of the City of New York,* 786 F.2d 516, 522 (2d Cir.1986) (allegation that plaintiff "was the victim of a pattern of sexual threats and abuse virtually from the time he arrived at the [facility] and that appellees' actions in response to the problem exacerbated it rather than cured it."); *Ayers v. Coughlin,* 780 F.2d 205, 206 (2d Cir.1985) (plaintiff claimed that defendant had specific knowledge of death threats); *cf. Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 29 (2d Cir.1988) (holding on a

Rule 12(b)(6) motion that plaintiff stated a claim by alleging that one defendant did not try to stop an attack on him and others knew of a previous fight between him and his assailant and/or a previous attempt on his life by the assailant and/or that the assailant was generally involved in assaults on and extortion from inmates). Correctional officials must respond to a wide variety of institutional needs including the safety of inmates when they decide on a particular inmate's placement. I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference. Therefore, Sims did not produce competent evidence from which a fact-finder could find in his favor.

### CONCLUSION

**\*4** For the reasons I have discussed, it is

ORDERED that the report-recommendation is not approved; and it is further

ORDERED that defendant's summary judgment motion is granted and the complaint dismissed; and it is further

ORDERED that the Clerk of the Court serve a copy of this order on the parties by ordinary mail.

HOMER, Magistrate J.

### REPORT-RECOMMENDATION AND ORDER [1]

The plaintiff, an inmate in the New York State Department of Correctional Services ("DOCS"), brought this pro se action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that defendant violated his rights under the Eighth and Fourteenth Amendments while he was an inmate at the Great Meadow Correctional Facility ("Great Meadow"). Specifically, he alleges that defendant's actions in moving plaintiff to a cell block where a known enemy of plaintiff's was being held violated the Eighth Amendment's prohibition on cruel and unusual punishment. Plaintiff seeks monetary damages and an order directing that he be placed in protective custody.

Presently pending is defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 29. Also pending are motions by plaintiff for the appointment

Sims v. Bowen, Not Reported in F.Supp. (1998)

1998 WL 146409

of counsel. Docket Nos. 37, 38 & 40. For the reasons which follow, it is recommended that defendant's motion for summary judgment be denied, and it is ordered that plaintiff's motions for appointment of counsel are denied.

## I. Background

On November 16, 1995, while incarcerated at Great Meadow, [2] plaintiff was moved from his cell in a protective custody unit (D–1 Block) to a cell in a separate protective custody unit (D–2 Block) by defendant. Def's. Rule 7.1(f) Statement (Docket No. 30) ¶ 1. Plaintiff objected to the move and told defendant that a known enemy of plaintiff's was housed in the unit to which plaintiff was being moved. Plaintiff presented defendant with a letter making reference to plaintiff's alleged known enemy. *Id.* at ¶ 5. Upon seeing the letter, defendant left plaintiff for a period of time, but returned and transferred him to the other unit. Pl's. Dep. (Docket No. 32, Ex. A) p. 13–14.

While locked in his cell in D–2 Block, plaintiff's known enemy, inmate A. Brown, confronted plaintiff and called him to the front of his cell. Plaintiff and Brown exchanged words and then Brown punched plaintiff in the face through the bars of his cell. Def's. Rule 7.1(f) Statement at ¶ 6. Later that day, another inmate, allegedly at Brown's request, threw feces on plaintiff from outside plaintiff's cell. *Id.* at ¶ 9. Although plaintiff claims to have heard Brown direct the inmate to attack plaintiff, plaintiff did not attempt to notify guards of the threat. Plaintiff received medical attention following the incidents (Docket No. 35, Item 3) and no medical problem associated with either incident has developed.

## II. Summary Judgment Standard

Under Fed.R.Civ.P. 56(c), if there is "no genuine issue as to any material fact ... the moving party is entitled to judgment as a matter of law, ... where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *Federal Deposit Ins. Corp. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994); *see also Heyman v. Commerce and Industry Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975). Once the movant has come forward with sufficient evidence in support of the motion for summary

judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e); *accord Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994).

**\*5** The trial court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *American Cas. Co. of Reading, Pa. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994); *see also Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985), *cert. denied,*484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). "Furthermore, the non-movant 'will have his allegations taken as true, and will receive the benefit of the doubt when his assertions conflict with those of the movant.' " *Samuels v. Mockry,* 77 F.3d 34, 36 (2d Cir.1996) (citations omitted).

When summary judgment is sought against a pro se litigant, a court must afford the non-movant special solicitude. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. Discussion

### A. Defendant's Motion for Summary Judgment

The Eighth Amendment places a burden on prison officials to "take reasonable measures to guarantee the safety of [] inmates ."*Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). That burden includes an obligation to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991). Not every injury suffered by one inmate at the hands of another imposes constitutional liability, however. *Farmer,* 511 U.S. at 834. A prisoner asserting an Eighth Amendment claim must establish two things. First, the deprivation alleged is sufficiently serious. Second, the defendant acted with a sufficiently culpable state of mind. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

Sims v. Bowen, Not Reported in F.Supp. (1998)

1998 WL 146409

In the context of a failure to protect claim, the deprivation is sufficiently serious if the inmate is incarcerated under conditions imposing a substantial risk of serious harm. *Farmer,* 511 U.S. at 834. In prison condition cases, the state of mind requirement is one of deliberate indifference to the inmate's health and safety. *Wilson,* 501 U.S. at 302–03. Deliberate indifference requires that a prison official "be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference" before Eighth Amendment liability may be imposed. *Farmer,* 511 U.S. at 837.

Defendant contends that plaintiff cannot establish that he was placed in a situation where a substantial risk of serious harm existed because he simply was moved from one protective custody unit to another. The record, however, establishes that the protective custody unit to which plaintiff was moved also housed a person purported to be a known enemy of plaintiff. That such a situation may create a substantial risk of harm is evidenced by a letter from James Stinson, Superintendent at Great Meadow, stating that plaintiff could not be placed in its protective custody unit if a known enemy was also housed there. [3] Docket No. 35, Item 1. Moreover, plaintiff alleges that defendant told him he was being moved to make room for an inmate from D–2 Block who had been involved in an "incident" with another inmate on that block. Credited as fact for purposes of this motion, that statement indicates knowledge by defendant that, although locked in their cells, inmates in D–2 Block still may cause harm to each other. A fact-finder could infer from these facts that defendant's transfer of plaintiff to the same unit as Brown deliberately placed plaintiff in a situation which created a substantial risk of serious harm.

**\*6** Defendant contends that to establish deliberate indifference, defendant must not have even considered plaintiff's concerns. Defendant further contends that no deliberate indifference can be shown here because, after plaintiff informed defendant that a known enemy was housed on the D–2 Block, defendant left for a period of time before transferring plaintiff. Defendant's claim should be rejected because he offers no evidence to suggest that he ever considered plaintiff's concerns. The mere fact that defendant departed and returned later is no more proof that defendant considered plaintiff's concerns than that he deliberately ignored them. In any event defendant offers no proof of where defendant went or what he did during that interval.

Recovery of compensatory damages under section 1983 requires a showing of actual injury. *Miner v. City of Glens Falls,* 999 F.2d 655, 660 (2d Cir.1993). However, even absent proof of compensable injury, a section 1983 plaintiff is entitled to nominal damages upon establishing a violation of a substantive constitutional right. *Gibeau v. Mellis,* 18 F.3d 107, 110 (2d Cir.1994). Therefore, since plaintiff can recover damages if he establishes an Eighth Amendment violation, defendant's claim that plaintiff did not suffer an "actual injury" within the meaning of the Eighth Amendment should be rejected.

### B. Appointment of Counsel

Plaintiff's previous request for the appointment of counsel was denied because he had failed to demonstrate his inability to retain counsel from either the private sector or a public interest firm. Docket No. 27. In support of his renewed application, plaintiff has provided this Court with letters that he has apparently received from the public and private sector that substantiate his claimed inability to secure counsel on his own. Docket Nos. 37, 38 & 40. Thus, this Court may properly consider plaintiff's renewed request for appointment of counsel.

Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by a court in ruling upon such a motion. As a threshold matter, a court should ascertain whether the indigent's claims seem likely to be of substance. If so, the court should then consider:

> The indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986)). That is not to say that all, or indeed any, of these factors are controlling in a particular case. Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,*

Sims v. Bowen, Not Reported in F.Supp. (1998)

1998 WL 146409

899 F.Supp. 972, 974 (N.D.N.Y.1995) (citing *Hodge,* 802 F.2d at 61). With the foregoing standards in mind, the Court will consider plaintiff's renewed application for appointment of counsel.

**\*7** A review of the file in this matter reveals that the issues in dispute herein—whether plaintiff's Eighth Amendment rights were violated—are not overly complex. Further, it appears that to date, plaintiff has been able to litigate this action effectively. While it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of trial, as is the case in many pro se actions brought under section 1983, "this factor alone is not determinative of a motion for appointment of counsel." *Velasquez,* 899 F.Supp. at 974. Finally, this Court is unaware of any special reason why appointment of counsel at this time would be more likely to lead to a just determination of this litigation. The Court, therefore, finds that, based upon the existing record in this case, appointment of counsel is unwarranted.

### IV. Conclusion

WHEREFORE, for the reasons stated above it is

RECOMMENDED that defendant's motion for summary judgment be DENIED; and it is

ORDERED that plaintiff's motions for the appointment of counsel are DENIED; and

IT IS FURTHER ORDERED that the Clerk of the Court serve a copy of this Report–Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Footnotes

1   This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).
2   Plaintiff is now incarcerated at the Clinton Correctional Facility.
3   The same letter questions whether Brown was in fact defendant's enemy, but defendant offers no evidence to show that plaintiff's claim that Brown was his known enemy was unsubstantiated.