UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

AUREL SMITH,

                              Plaintiff,

            v.
                                                            9:11-cv-0241
                                                            (TWD)

MICHAEL WILDERMUTH, et al.,

                              Defendants.

_____

APPEARANCES:                                    OF COUNSEL:

STROUSE & BOND PLLC                             DAVID E. BOND, ESQ.
Counsel for Plaintiff
2 Church St., Suite 3A
Burlington, VT 05401

HON. ERIC T. SCHNEIDERMAN                        C. HARRIS DAGUE, ESQ.
Attorney General of the State of New York        Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, NY 12224


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge


**MEMORANDUM-DECISION AND ORDER[1]**

## I.      INTRODUCTION

        Plaintiff Aurel Smith is an inmate in the custody of the New York Department of

Corrections and Community Supervision and is currently housed at Cayuga Correctional

Facility.  (Dkt. No. 39.)  The allegations of Plaintiff's third amended complaint, which is the

---

[1]  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a
United States Magistrate Judge.  (Dkt. No. 115.)

operative pleading, relate to Plaintiff's previous confinement at Coxsackie Correctional Facility ("Coxsackie"). (Dkt. No. 119.) Plaintiff seeks compensatory and punitive damages against remaining Defendants Corrections Officer ("CO") Michael Wildermuth ("Wildermuth"), CO Nathan Ensel ("Ensel"), CO Christopher Hale ("Hale"), CO Jody Slater ("Slater"), Corrections Sergeant ("Sgt.") Paul Morris ("Morris"), Sgt. James Noeth ("Noeth"[2]); CO James Chewens ("Chewens"), CO Julio Saez ("Saez"), Sgt. Charles Bailey ("Bailey"), and Superintendent Daniel F. Martuscello ("Martuscello"). *Id.* at ¶¶ 247-53.[3] Plaintiff's allegations are organized into five causes of action:

> Count One: Eighth Amendment excessive force claim against Wildermuth, Ensel, Slater, Hale, Morris, and Noeth;
>
> Count Two: Conspiracy claim against Wildermuth, Ensel, Slater, Hale, Morris, and Noeth;
>
> Count Three: First Amendment free exercise claim against Wildermuth;
>
> Count Four: Eighth Amendment failure to intervene claim against Bailey, Chewens, and Saez; and
>
> Count Five: Eighth Amendment conditions of confinement claim against Martuscello.

*Id.* at ¶¶ 237-246.

Defendants have now moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure to dismiss Plaintiff's First Amendment free exercise claim against Wildermuth and Eighth Amendment conditions of confinement claim against

---

[2] Defendant's surname is spelled "Noeth." (Dkt. Nos. 119, 126, and 127.) The Clerk is directed to amend the caption.

[3] Paragraph references are used where a document contains consecutively numbered paragraphs.

Martuscello.  (Dkt. No. 127.)  Plaintiff has opposed the motion.  (Dkt. No. 128.)  Defendants

have filed a reply.  (Dkt. No. 129.)  For the reasons discussed below, Defendants' motion for

partial summary judgment is granted in part and denied in part.  The motion is granted with

respect to Plaintiff's First Amendment free exercise claim against Wildermuth and denied with

respect to Plaintiff's Eighth Amendment conditions of confinement claim against Martuscello.

Further, on the record now before the Court, the Court finds Plaintiff has plausibly

alleged a First Amendment retaliation claim against Wildermuth.  As such, the following claims

will proceed to trial: (1) Eighth Amendment excessive force claim against Wildermuth, Ensel,

Slater, Hale, Morris, and Noeth; (2) conspiracy claim against Wildermuth, Ensel, Hale, Slater,

Morris, and Noeth; (3) First Amendment retaliation claim against Wildermuth; (4) Eighth

Amendment failure to intervene claim against Bailey, Chewens, and Saez; and (5) Eighth

Amendment conditions of confinement claim against Martuscello.

## II.     BACKGROUND

At all times relevant to this action, Martuscello served as either the Superintendent or

Deputy Superintendent of Security at Coxsackie.  (Dkt. No. 126 at ¶ 6.)  Plaintiff was housed at

Coxsackie from January 2009 to July 2010.  (Dkt. No. 119 at ¶ 24.)  Plaintiff alleges that

throughout that period there was a "maintained environment of staff abuse . . . and misconduct,

especially guard brutality and the falsification of incident reports fraudulently covering up and

thus justifying such misconduct, as well as both administrative acquiescence and administrative

failure to curb and deter such conduct."  *Id*. at ¶ 25.  Specifically, Plaintiff alleges Martuscello

permitted and maintained the "widespread and systemic conditions of abuse and misconduct"

that "ultimately led to Plaintiff becoming a victim to such patterns of abuse on April 20, 2010."

*Id*. at ¶ 75.

At approximately 3:30 p.m. on April 20, 2010, Plaintiff was in his cell located in the B-2 housing block of Coxsackie. (Dkt. No. 127-4 at 18-20.[4]) Plaintiff was engaged in Salaah, or Islamic prayer, with his back to the cell gate. (Dkt. No. 119 at ¶ 95.) According to Plaintiff, Wildermuth conducted an unannounced, unscheduled, and unexpected walk-through of the B-2 housing block. *Id.* While Plaintiff was praying, Wildermuth ordered Plaintiff to remove a coat hanging on the bedpost of his cell. *Id.* at ¶¶ 97-98. Plaintiff complied by reaching over and moving the coat while still engaged in Salaah. *Id.* at ¶ 98. Plaintiff continued praying. *Id.*

Wildermuth shouted, "hey you," at Plaintiff. (Dkt. No. 127-4 at 8.) Because Plaintiff was praying he did not verbally respond to Wildermuth. *Id.* at 9. Instead, Plaintiff raised his right hand to shoulder level to indicate Wildermuth should wait a moment. *Id.* Wildermuth became irate, began yelling at Plaintiff, banged on Plaintiff's cell gate with his baton, and reached his baton into the cell and knocked some of Plaintiff's personal items from his locker onto the floor. *Id.* at ¶ 101; Dkt. No. 127-4 at 9. Plaintiff continued praying. (Dkt. No. 127-4 at 9.) As a result, Wildermuth informed Plaintiff that he was "burned" for the day, which is form of informal punishment involving the unofficial taking of inmate privileges resulting in "informal keep lock." (Dkt. Nos. 127-4 at 10, 128-4 at 9, and 119 at ¶ 103.)

After Plaintiff finished his Salaah, he sought to speak to Wildermuth "in order to explain the matter and thus to mitigate both the situation and Wildermuth's anger, as well as to (more fundamentally) avoid future repetition of that event." (No. 119 at ¶ 105.) Wildermuth, irate, told Plaintiff that he did not care whether Plaintiff was praying and that Plaintiff had better acknowledge him. *Id.* at ¶ 106.

---

[4] Page references to documents identified by docket number are to the page number assigned by the Court's CM/ECF electronic docketing system.

Because Wildermuth "burned" Plaintiff for the day, Plaintiff claims he was not released for evening recreation. *Id*. at ¶ 108. At approximately 7:00 p.m., Wildermuth returned to Plaintiff's cell. *Id*. at ¶¶ 109-11. Wildermuth "began to rehash a confrontation with Plaintiff, asking Plaintiff whether he had learned his lesson." *Id*. at ¶ 109. Plaintiff claims the confrontation "became heated and hostile" and ended with Wildermuth storming away. *Id*. at ¶ 110.

At approximately 8:00 p.m., Morris and Ensel came to Plaintiff's cell and asked Plaintiff if he was ready to move to the F-2 housing unit. *Id*. at ¶ 112. Plaintiff told them he was not packed because he was unaware that he was scheduled for a move. *Id*. at ¶ 113. Plaintiff asked Morris and Ensel if he was "being set-up" in retaliation for his dispute with Wildermuth. *Id*. at ¶ 114. Plaintiff was instructed to do as he was told and to pack his belongings. *Id*. at ¶¶ 117-118. Although he feared for his safety, Plaintiff packed his belongings. *Id*. at ¶ 118.

At approximately 8:40 p.m., Wildermuth, Morris, and Ensel returned to Plaintiff's cell. *Id*. at ¶¶ 119-20. Plaintiff alleges that before opening the cell door, Wildermuth stated to Plaintiff, "We'll see how tough you are now." *Id*. at ¶ 121. Plaintiff then loaded six property draft-bags and his mattress onto a push cart. *Id*. at ¶¶ 122-24.

According to Plaintiff, as he carried his last draft-bag down the staircase to his new cell, Wildermuth punched Plaintiff. *Id*. at ¶¶ 145-46. Hale, Slater, Ensel, Morris, and Noeth joined in the attack. *Id*. at 148. Plaintiff alleges Bailey, Saez, and Chewens were present during the attack and failed to intervene. *Id*. at ¶¶ 146-78.

On April 21, 2010, Plaintiff received two inmate misbehavior reports from Wildermuth and Ensel, which made "a series of false allegations" to cover up their use of force on April 20, 2010. *Id*. at ¶ 195. Plaintiff claims Wildermuth and Ensel fraudulently reported that Plaintiff

attacked Ensel and Wildermuth. *Id.* At the disciplinary hearing, Plaintiff was found guilty of several institutional rule violations. *Id.* at ¶ 229. Plaintiff was sentenced to twenty-four months in the segregated housing unit ("SHU"), with a corresponding loss of privileges and good-time credits. *Id.* at ¶ 230. Plaintiff appealed and his sentence was reduced to twelve months in the SHU, with a corresponding loss of privileges and good-time credits. *Id.* at ¶ 231. Plaintiff was transferred to Upstate Correctional Facility in July of 2010. *Id.* at ¶ 234.

Plaintiff contends that the April 20, 2010, incident was the result of "abusive prison conditions . . . fueled and maintained by Defendant Martuscello's deliberate indifference to the existence of such conditions . . . as well as his abdication of duties to monitor and supervise officers' use of force, to act decisively and meaningfully on possible instances of misconduct by officers in the facility/under his supervision, and to remedy malfeasant behavior so as to otherwise constitute an acquiescence to the existence of said abusive conditions without deterrence. " *Id.* at ¶ 245.

## III.    APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005). "To defeat summary judgment, . . . nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Id*. (citation and internal quotation marks omitted). Indeed, "[a]t the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted).

"[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted); *see also Smith v. Woods*, 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006). "Statements that are devoid of any specifics, but replete with

conclusions, are insufficient to defeat a properly supported motion for summary judgment."

*Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). Even where a complaint or

affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they

are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with

inconsistencies and improbabilities that no reasonable juror would undertake the suspension of

disbelief necessary to credit the allegations made in the complaint.'" *Woods*, 2006 WL 1133247,

at *3 & n.11.

In determining whether a genuine issue of material fact exists, the court must resolve all

ambiguities and draw all reasonable inferences against the moving party. *Major League*

*Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

## IV.    ANALYSIS

### A.    First Amendment Free Exercise Claim

Prisoners retain some measure of the constitutional right to the free exercise of religion

guaranteed by the First Amendment. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). If a

prisoner asserts a First Amendment violation based on a free exercise claim, a court must

evaluate (1) whether the practice asserted is religious in the person's scheme of beliefs, and

whether the belief is sincerely held; (2) whether the challenged practice of the prison officials

infringes upon the religious belief; and (3) whether the challenged practice of the prison officials

furthers some legitimate penological objective. *Farid v. Smith*, 850 F.2d 917, 925-26 (2d Cir.

1988).

To succeed on a claim under the free exercise clause, the plaintiff must show at the

threshold that the challenged conduct "substantially burdens his sincerely held religious beliefs."

*Pugh v. Goord*, 571 F. Supp. 2d 477, 497 (S.D.N.Y. 2008) (quoting *Salahuddin*, 467 F.3d at 274-

75) (citing *Ford*, 352 F.3d at 591). Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. *See Williams v. Does*, 639 F. App'x 55, 56 (2d Cir. 2016) ("We have not yet decided whether a prisoner asserting a free-exercise claim must, as a threshold requirement, show that the disputed conduct substantially burdened his sincerely held religious beliefs."); *Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, courts in this District continue to apply the substantial burden test. *See, e.g.*, *Berisha v. Farrell*, No. 9:13-CV-1191 (LEK/ATB), 2016 WL 1295178, at *3 (N.D.N.Y. Mar. 8, 2016) (applying substantial burden test); *Skates v. Shusda*, 9:14-CV-1092 (TJM/DEP), 2016 WL 3882530, at *4 & n.6 (N.D.N.Y. May 31, 2016) (same); *Houston v. Collerman*, No. 9:16-CV-1009 (BKS/ATB), 2016 WL 6267968, at *7 (Oct. 26, 2016) (same). This Court will do the same.

A religious belief is "sincerely held" when the plaintiff subjectively, sincerely holds a particular belief that is religious in nature. *Ford*, 352 F.3d at 590. A prisoner's sincerely held religious belief is "substantially burdened" where "the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 476-77 (2d Cir. 1996). Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (quoting *Ford*, 352 F.3d at 595) (punctuation omitted).

Here, Plaintiff alleges that he "suffered infringement and violation of his religious free exercise rights by Defendant Wildermuth when and where Defendant Wildermuth deliberately sought to impede, distract, and disrupt Plaintiff's worship in a malicious, antagonistic, and retaliatory way for Plaintiff's not acknowledging Defendant Wildermuth in a matter that Defendant Wildermuth deemed satisfactory and gratifying." (Dkt. No. 119 at ¶ 241.)

In their motion, Defendants do not question the genuineness of Plaintiff's religious beliefs. (*See* Dkt. No. 127-5 at ¶ 3.) They do, however, contend that Plaintiff's rights were not substantially burdened because Wildermuth only attempted to interrupt a single Salaah prayer on April 20, 2010, and in any event, Plaintiff conceded his prayer was not even interrupted. (Dkt. No. 127-6 at 10.) In his opposition, Plaintiff argues that his free exercise claim is not based on Wildermuth's interruption of a single prayer on April 10, 2010, but on the savage beating that followed from Plaintiff's refusal to interrupt his prayer, as per the dictates of his Muslim faith. (Dkt. No. 128 at 3.) In their reply, Defendants argue Plaintiff attempts to re-cast his First Amendment free exercise claim into a First Amendment retaliation claim, which was never previously plead and fundamentally alters his claim against Wildermuth. (Dkt. No. 129 at 3-4.)

Here, the record evidence reveals that Plaintiff's First Amendment free exercise claim turns upon the single instance of interruption of prayer on April 20, 2010. (Dkt. Nos. 119 at ¶¶ 95-103 and 127-4 at 9-10.) However, courts in the Second Circuit have routinely held that missing one religious prayer or service does not constitute a substantial burden necessary to sustain a First Amendment infringement claim. *See Hankins v. N.Y. State Dep't of Corr. Servs.*, No. 9:07-CV-0408 (FJS/GHL), 2008 WL 2019655, at *5 (N.D.N.Y. Mar. 10, 2008) ("an allegation that prison officials caused a prisoner to miss one religious service fails to state an actionable claim under the First Amendment") (collecting cases); *Gill v. DeFrank*, No. 98 Civ.

10

7851(NRB), 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000) (missing one religious service did not substantially burned inmate's free exercise rights), *aff'd* 8 F. App'x 35, 37 (2d Cir. 2001); *Johnson v. Newton*, No. 02-CV-1277 (TJM/DRH), 2007 WL 778421, at *5 (N.D.N.Y. Mar. 13, 2007) ("missing one religious service does not constitute a substantial burden on an inmate's right to the free exercise of his religion") (quotation omitted); *Wagnoon v. Gatson*, No. 00 CIV 3722 AGS, 2001 WL 709276, at * (S.D.N.Y. June 25, 2001) ("the fact that plaintiff missed all or part of one midday prayer did not substantially burden his free exercise rights"); *Cancel v. Mazzuca*, 205 F. Supp. 2d 128, 142 (S.D.N.Y. 2002) (depriving an inmate of attendance at a single religious service does not state a § 1983 claim under the First Amendment).

In any event, Plaintiff claims that he ignored Wildermuth's "impropriety and continued with his religious prayer." (Dkt. No. 119 at ¶ 102.) Indeed, Plaintiff testified that his Salaah prayer was not actually interrupted, that he maintained his prayer during the attempted verbal interruptions, and that he ultimately finished his prayer. (Dkt. No. 127-4 at 9.)

Based on the above, the Court finds Plaintiff cannot make the threshold demonstration of "substantial burden" necessary to succeed on his free exercise clause claim against Wildermuth. Therefore, the Court grants summary judgment to Wildermuth on Plaintiff's First Amendment free exercise claim.

However, for the reasons discussed below, the Court finds Plaintiff has plausibly alleged that Wildermuth orchestrated the April 20, 2010, attack and falsified a misbehavior report in retaliation for Plaintiff's refusal to interrupt his midday Salaah on April 20, 2010.

**B.     First Amendment Retaliation Claim**

Claims of retaliation find their roots in the First Amendment.  *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004).  Central to such claims is the notion that in a prison setting prison officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights.  *Id.* at 381-83.  Thus, when prison officials take adverse action against an inmate, motivated by the inmate's exercise of constitutional rights, including the free exercise provision of the First Amendment, a cognizable claim of liability under § 1983 lies. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws.").  As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and prone to abuse, and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care."  *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord*, *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

To state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations showing that (1) he engaged in protected activity; (2) the defendants took adverse action against him; and (3) there was a causal connection between the protected activity and the adverse action.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007).  In the prison context, "adverse action" is objectively defined as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights."  *Pidlypchak*, 389 F.3d at 381.  "Only retaliatory conduct that would deter a similarly situated

individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis*, 320 F.3d at 353 (internal quotation marks and citation omitted).

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Those factors include (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon*, 58 F.3d at 872-73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

By his third cause of action, Plaintiff alleges that he "suffered infringement and violation of his religious free exercise rights . . . when and where Defendant Wildermuth deliberately sought to impede, distract, and disrupt Plaintiff's worship in a malicious, antagonistic, and retaliatory way for Plaintiff not acknowledging Defendant Wildermuth in a manner that Defendant Wildermuth deemed satisfactory and gratifying." (Dkt. No. 119 at ¶ 241.)

In his opposition to Defendants' motion, Plaintiff argues that his "free exercise claim is not based on the attempted interruption of a single prayer, but on the savage beating that followed from [his] refusal to interrupt his prayer, per the dictates of his faith." (Dkt. No. 128 at 3.) Plaintiff argues that his claim against Wildermuth "must be read in the context of the complaint as a whole[,] [and that] [a]gainst this background, [Plaintiff] can fairly be understood to be taking issue with Defendants' overall retaliatory response to his exercise of religion." *Id.* at 5. Thus, Plaintiff argues that notwithstanding Defendants' assertions to the contrary, the "true

issue here is not the interruption of one prayer but rather the consequences that followed from [Plaintiff's] submission to the commands of Islam." *Id*. Accordingly, Plaintiff contends that Wildermuth's "interruption of the prayer itself . . . was merely the spark that led to the horrific consequences [*i.e.*, the subsequent beating and the year of solitary confinement that followed] that are the actual gravamen of the complaint." *Id*. at 8. In their reply, Defendants argue Plaintiff is attempting to re-cast his free exercise claim "into a completely new cause of action not otherwise plead in the Third Amended Complaint." (Dkt. No. 129 at 3.)

The record evidence demonstrates that on April 20, 2010, at approximately 3:30 p.m., Plaintiff was engaged in Salaah. (Dkt. No. 128-4 at 3.) Plaintiff testified Wildermuth became annoyed and irate when Plaintiff failed to verbally acknowledge Wildermuth. *Id*. at 4-5. Plaintiff testified Wildermuth "stormed away from the cell" and told Plaintiff he was "burned for the day." *Id*. at 5. Thereafter, Plaintiff explained to Wildermuth that he had been praying. *Id*. at 7. Plaintiff testified that Wildermuth responded, "I don't care. When I say something, you respond." *Id*. Plaintiff informed Wildermuth that he could not respond while he is engaged in prayer. *Id*. Plaintiff testified that there was "some back-and-forth, some argumentation." *Id*. at 8. Ultimately, Wildermuth walked away after telling Plaintiff that he was "keep locked." *Id*.

At approximately 7:00 p.m., non-party Corrections Officer Adelian confirmed that Plaintiff was "keep locked . . . per Officer Wildermuth." *Id*. at 11. Thus, Plaintiff was not permitted to attend evening recreation. *Id*. at 12.

While Plaintiff's company attended evening recreation, sometime between 7:00 and 7:30 p.m., Wildermuth "did a round" and "rehashed . . . the confrontation again." *Id*. Plaintiff testified that Wildermuth asked "whether [he] had learned [his] lesson." *Id*. Plaintiff could not recall his response, but testified that their conversation became "heated." *Id*. at 12-13. Plaintiff

testified that he expressed his concern that Wildermuth would "get a bunch of officers to jump" him. *Id*. at 14. Wildermuth "stormed off" and replied "we'll see." *Id*.

Thereafter, at approximately 8:00 p.m., Morris and Ensel approached Plaintiff's cell and Morris asked Plaintiff if he "was ready to go." *Id*. at 15. Plaintiff testified that he "was kind of struck, . . . I was taken back because I wasn't told to go anywhere." *Id*. Plaintiff has alleged the following sequence of events:

> At approximately 8:00 pm Defendant Morris and Defendant Ensel came to Plaintiff's cell, asking whether he was ready to move to the F-2 housing unit.
>
> Plaintiff was unaware of any cell-move and informed Defendants Morris and Ensel that he was not due to his not being notified in order to prepare for a move.
>
> Plaintiff asked Defendants Morris and Ensel whether he was being set up in order for said defendants along with Defendant Wildermuth and other officers to retaliate against Plaintiff by attacking him for his dispute with Wildermuth earlier in the evening.
>
> Defendants Morris and Ensel were apparently dismissive of Plaintiff's concerns and were seemingly annoyed at said question.
>
> Plaintiff repeated his inquiry in concern for his personal safety from guard brutality.
>
> Defendants Morris and Ensel after some conversation with Plaintiff told him to pack his cell property/personal belongings and do what he was told to do.
>
> Plaintiff, although concerned for his safety, complied in order not to provoke the situation further.
>
> At approximately 8:40 pm, Plaintiff was released from his cell in order to move from his housing unit (B-2) for transfer to the F-2 keeplock housing unit.

> Defendant Wildermuth released Plaintiff from his cell via an on-unit "lock-box" control panel, with Defendants Morris and Ensel in form of Plaintiff's cell.
>
> Before releasing Plaintiff from his cell, however, Defendant Wildermuth stated to Plaintiff, "We'll see how tough you are now."

(Dkt. No. 119 at ¶¶ 113-21.)

Plaintiff claims that at approximately 8:45 p.m., during the move from the B-2 to the F-2 housing unit, he was beaten by Wildermuth, Ensel, Slater, Hale, Morris, and Noeth. (Dkt. Nos. 119 at ¶¶ 146-73, 186 and 128-4 at 7-8.) Plaintiff alleges that Slater threatened Plaintiff that he "better not tell what happened, or else [he, Plaintiff] will get [his, Plaintiff's] ass kicked again. (Dkt. No. 119 at 178 (brackets in original).) While at the infirmary, Chewens and non-party C.O. Panbianchi "threatened Plaintiff . . . that a repeat of what occurred in the cell block would occur if Plaintiff were to give them one reason." (Dkt. No. 119 at ¶ 180.)

According to Plaintiff, on April 21, 2010, Plaintiff received two misbehavior reports from Wildermuth and Ensel "making a series of false allegations against Plaintiff, fraudulently asserting that it was Plaintiff who provokingly and inexplicably attacked Defendant Ensel and then attacked Defendant Wildermuth[.]" (Dkt. No. 119 at ¶ 195.) Plaintiff was found guilty of the false charges and was sentenced to twelve months of SHU confinement. *Id.* at ¶ 230.

In light of the above, the Court disagrees with Defendants' contention that on summary judgment Plaintiff is attempting to restate his First Amendment free exercise claim as a retaliation claim. (*See* Dkt. No. 129 at 3.) Nor has Plaintiff engaged in a type of "bait and switch pleading[,]" which "would constitute a post-discovery pleading amendment" depriving Defendants "of essential due process respecting the new cause of action." *Id.* at 4. Defendants deposed Plaintiff and questioned him at length regarding the alleged interruption of the afternoon

16

prayer on April 20, 2010, the conversations that followed, Plaintiff's cell transfer to the keeplock

block, the use of excessive force during that move, the false misbehavior reports issued the next

day, and the twelve month SHU sentence imposed.  (Dkt. No. 128-4.)  For these reasons, the

Court finds that Plaintiff has plausibly alleged a First Amendment retaliation claim against

Wildermuth, which will proceed to trial.[5]

### C.     Eighth Amendment Conditions of Confinement Claim

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the

form of "unnecessary and wanton infliction of pain" at the hands of prison officials.  *Wilson v.*

*Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  The constitutional

prohibition against cruel and unusual punishment includes the right to be free from conditions of

confinement that impose an excessive risk to an inmate's health or safety.  *Farmer v. Brennan*,

511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).  To establish an

Eighth Amendment conditions of confinement claim, a plaintiff must establish that (1) he was

incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison

officials acted with deliberate indifference to his health or safety.  *See Farmer*, 511 U.S. at 834.

The required culpable state of mind of the prison official is one of deliberate indifference.

*Farmer*, 511 U.S. at 834; *Trammell v. Keane*, 338 F.3d 155, 162 (2d Cir. 2003).  "Deliberate

indifference" requires more than negligence, but less than conduct undertaken for the very

purpose of causing harm.  *Farmer*, 511 U.S. at 835.  The prison official must know that the

---

[5]  In any event, under Federal Rule of Civil Procedure 15, the court should freely give leave
when justice so requires.  Fed. R. Civ. P. 15(a).  In the absence of prejudice, the court may
permit the pleadings to be amended at any time, even after judgment.  Fed. R. Civ. P. 15(b).
Even if a liberal reading of Plaintiff's third amended complaint failed to plausibly allege a first
Amendment retaliation claim against Wildermuth, based on the current record, the Court would
be so inclined to grant Plaintiff leave to file a fourth amended complaint.

inmate faces "a substantial risk of serious harm and [must disregard] that risk by failing to take reasonable measures to abate it." *Bolton v. Goord*, 992 F. Supp. 604, 626 (S.D.N.Y. 1998) (quoting *Farmer*, 511 U.S. at 847).

Plaintiff has asserted a supervisory liability claim against Martuscello, claiming that prior to the time Plaintiff was allegedly assaulted on April 10, 2010, Martuscello had exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring at Coxsackie. (*See* Dkt. No. 128 at 8.) Defendants seek summary judgment on the supervisory liability claim on the grounds that there is no evidence that Martuscello was personally involved in the alleged assault, and that Plaintiff merely "relies upon a litany of inadmissible, irrelevant, and conclusory allegations, none of which establish any link between Superintendent Martuscello and the April 20, 2010, incident[.]" (Dkt. No. 127-6 at 13.) Defendants have submitted no affidavit or declaration in support of their motion for partial summary judgment.

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934). Therefore, "a plaintiff must . . . allege a tangible

connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon*, 58 F.3d at 873.[6]

Here, Plaintiff alleges that he "suffered cruel and unusual punishment resulting from the widespread and pervasive abusive prison conditions plaguing Coxsackie that were fueled and maintained by Defendant's Martuscello's deliberate indifference to the existence of . . . guard brutality [and] guard misconduct[.]" (Dkt. No. 119 at ¶ 245.) In the third amended complaint, Plaintiff sets forth "some examples of the conditions of prisoner abuse and staff misconduct" in an attempted to "give an idea or glimpse of the situation at Coxsackie." *Id*. at ¶¶-34-78. The Court agrees with Defendants that such allegations are largely conclusory and irrelevant hearsay accounts of alleged events. (Dkt. No. 127-6 at 14-16.) Accordingly, those allegations are inadmissible, and in any event, fail to establish personal involvement against Martuscello.

---

[6] The Second Circuit has thus far expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

However, in his opposition to Defendants' motion, Plaintiff has produced excerpts of deposition testimony from inmates Eliseo DeLeon, Ramon Arguinzoni, Dino Solorzano, Londarr Ward, Mark Martin, Dequan Robinson, and Damian Hendley, all of whom testified to Coxsackie's reputation of violence within the inmate population. (*See* Dkt. Nos. 128-3 through 128-10.) Notably, two inmates testified that Martuscello himself addresses inmates at orientation, informing inmates that Coxsackie is a "hands-on" facility. (Dkt. Nos. 128-6 at 9 and 128-9 at 16.)

Inmate Arguinzoni testified that he met Martuscello during his orientation in 2010:

> I've never forgot it, because it was the first time -- I mean, I've heard threats from staff to inmates. I've never -- at the time he was a dep. of security -- threaten the guys. He said, "This is a hands-on facility. If you don't listen to our rule, we will put our hands on you." That's what he told the guys in orientation class.

(Dkt. No. 128-6 at 9.) Inmate Martin also testified that during his orientation in 2010, Martuscello stated that Coxsackie was a "hands-on facility and he's backing his officers up, no matter what." (Dkt. No. 128-9 at 16.) Inmate Martin testified that Martuscello "told [him] that in 2012 too[,]" when he was transferred back to Coxsackie. *Id*. According to inmate Martin, "every time you come back to that facility you have to go to orientation and [Martuscello] shows up here and says this is a hands-on facility and not only is it a hands-on facility, he backing his officers up a hundred percent." *Id*. at 16-17. Inmate Martin explained that a "hands-on facility" means that the officers "think they have a right to put their hands on you if you do something wrong or [need] discipline. *Id*. at 10.

Despite Plaintiff's claim that Martuscello "fueled and maintained" the abusive conditions at Coxsackie and the deposition testimony from inmates Arguinzoni and Martin that Martuscello

himself informs the inmates during orientation that Coxsackie is a "hands-on" facility, Martuscello has submitted no affidavit or declaration in reply.

On a summary judgment motion, a court may not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). "The weighing of the evidence and the determination as to which version of the events to accept are matters for the jury." *Id*. at 856; *see also Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) (on a summary judgment motion "the court should not weigh evidence or assess the credibility of witnesses . . . . These determinations are within the sole province of the jury.").

Drawing all inferences in favor of Plaintiff, the Court finds that the unchallenged deposition testimony submitted in opposition to Defendants' motion is sufficient to raise a material issue of fact as to whether Martuscello "exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon*, 58 F. 3d at 873; *see e.g.*, *Brown v. Artus*, 647 F. Supp. 2d 190, 201-20 (N.D.N.Y. 2009) (fact issues precluded summary judgment on prisoner's Eighth Amendment claim against superintendent where a reasonable factfinder could conclude that the superintendent possessed the requisite knowledge of potential staff abuses, and "at the very least, was grossly negligent in carrying out his duties as the facility superintendent by not taking appropriate measures to avoid such staff misconduct").

Therefore, the Court denies summary judgment to Martuscello on Plaintiff's Eighth Amendment supervisory liability claim.

## V.    CONCLUSION

Based on the above findings, the Court grants in part and denies in part Defendants' motion for partial summary judgment.  As such, the following claims will proceed to trial: (1) Eighth Amendment excessive force claim against Wildermuth, Ensel, Slater, Hale, Morris, and Noeth; (2) conspiracy claim against Wildermuth, Ensel, Hale, Slater, Morris, and Noeth; (3) First Amendment retaliation claim against Wildermuth; (4) Eighth Amendment failure to intervene claim against Bailey, Chewens, and Saez; and (5) Eighth Amendment conditions of confinement claim against Martuscello.

**WHEREFORE**, it is hereby

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. No. 127) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that Defendants' motion is **GRANTED** with respect to Plaintiff's First Amendment free exercise claim against Defendant Wildermuth; and it is

**ORDERED** that Defendants' motion is **DENIED** with respect to Plaintiff's Eighth Amendment conditions of confinement claim against Defendant Martuscello; and it is further

**ORDERED** that the Clerk is directed to amend the docket in this action so that the name of "James Noethe" reads "James Noeth."

**SO ORDERED.**

Dated:  April 14, 2017
          Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

22